UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MIDWEST-CBK, LLC**<br>           **Plaintiff**<br><br>       v.<br><br>**UNITED STATES,**<br>           **Defendant** | Court No. 17-00154 |

# COMPLAINT

Plaintiff, Midwest-CBK, LLC ("Midwest") by and through its undersigned attorneys, for its Complaint against Defendant, the United States, does hereby state and allege as follows:

## CAUSE OF ACTION

1. This action is commenced to contest the deemed denial of Midwest's protest against the determination, in liquidation, by United States Customs and Border Protection ("CBP") of the appraised value of certain merchandise which Plaintiff imported into the United States.

## JURISDICTION AND STANDING

2. This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(a). All liquidated duties, taxes and fees were paid prior to the commencement of this action.

3. Plaintiff is the importer of record of the merchandise, timely protested the appraisement of the merchandise in liquidation, has paid all liquidated duties, taxes and fees, and is the real party in interest in this case.

4. Defendant is the Federal Defendant which acts by and through its agencies, including United States Customs and Border Protection ("CBP"), which liquidated Midwest's subject entries and denied the subject protest.

## STATEMENT OF FACTS

5. Midwest is a Limited Liability Company organized and existing under the laws of the State of Delaware, and at times relevant to this Complaint had its headquarters and principal place of business in Cannon Falls, Minnesota.

6. On various dates, as set forth in the Summons and protest papers, Midwest imported into the United States various items of giftware, household furnishing and decorations and other merchandise as set forth in the entry papers.

7. Midwest purchased the merchandise which is the subject of this action from various unrelated foreign vendors, primarily in the People's Republic of China, and caused the merchandise to be exported to Woodbridge, Ontario, Canada, and placed in leased warehouse space rented there by Midwest.

8. At all relevant times, Midwest employed approximately 200 salaried sales personnel in the United States, who had responsibility for soliciting purchase orders from retailer customers for giftware, household furnishings and decorations. These personnel presented the merchandise to customers via electronic catalogues contained in a point-of-sale computer software program.

9. United States retailers placed purchase orders with Midwest CBK, through that company's United States salaried salespersons, for merchandise. Under the terms of the purchase orders, the goods were to be sold and delivered by Midwest to the customers "FOB Buffalo, New York", as that term is defined in the New York Uniform Commercial Code.

10. Purchase orders received by Midwest's sales personnel from United States customers were received by and accepted by Midwest personnel at the company's Cannon Falls, Minnesota office.

11. Under the terms of sale and delivery, Midwest was responsible for clearing the goods through United States Customs and Border Protection, paying all duties, taxes and fees imposed by reason of the goods' importation, and transporting the goods to a location at Buffalo, New York, where the goods were delivered to domestic carriers nominated by Midwest's United States retailer customers.

12. Midwest's customers acquired title to the imported goods and risk of loss with respect thereto at Buffalo, New York and bore all costs and risks of transporting the goods from Buffalo, New York to the destinations selected by the customers.

13. Midwest obtains State sales tax waivers from all of its customers prior to making sales to those customers.

14. Midwest officials in the United States determined the merchandise to be sold by the company, the placement of that merchandise in catalogues and other publications, and the prices at which the merchandise would be sold to United States customers.

15. Upon receiving orders from United States customers for merchandise to be delivered FOB Buffalo, New York, Midwest directed its personnel at the leased warehouse in Canada to select the merchandise, and pack the merchandise in boxes for each individual United States customer.

16. Midwest contracted with a land carrier to transport the goods from its leased warehouse in Woodbridge, Ontario to Buffalo, New York.

17. Midwest acted as the importer of record for the merchandise when it was entered for consumption at the Port of Buffalo, New York, and paid all duties, taxes and fees assessed thereon by reason of importation.

18. After the goods cleared Customs, Midwest delivered them to the various carriers identified by its customers at locations in and around Buffalo, New York.

19. Title and risk of loss to the goods passed from Midwest to its customers, pursuant to the New York Uniform Commercial Code, when Midwest placed the goods with the carrier designated by its customer.

20. After the goods were dispatched FOB Buffalo, New York, the United States customers paid Midwest, by credit card or by check, which payment was deposited in a Midwest bank account in the United States.

21. At all times relevant to this action, Midwest had no personnel in Canada with responsibility or capability to accept an order from a United States customer.

22. By prior arrangement with Customs officials at the Port of Buffalo, New York, Midwest valued the merchandise upon importation according to its deductive value, as set forth in 19 U.S.C. § 1401a(d).

23. Customs appraised the merchandise in liquidation on the basis of a purported transaction value pursuant to 19 U.S.C. § 1401a(b) on the claimed basis of the FOB New York delivered, duty-paid prices charged by Midwest to its customers.

24. In fact, Customs did not determine a "transaction value" for any of the merchandise imported into the United States, but arbitrarily applied an uplift ratio to the declared entered deductive values.

25. After entry of the merchandise which is the subject of this action, but prior to the purported liquidation of the subject entries, Customs' Office of Regulatory Audit conducted an audit of Midwest's appraised values.

26. CBP commenced the regulatory audit in 2014, and performed field work at Midwest's inventory location in Canada February, 2014. CBP did not conduct any audit work at Midwest's Cannon Falls, Minnesota headquarters office, or any other Midwest locations.

27. In the course of the regulatory audit, CBP requested information from Midwest which it deemed necessary for appraisement of the imported merchandise. The last information request from the auditors was answered on June 3, 2014.

28. More than a year later, in July, 2015, Customs' Office of Regulatory Audit issued a draft audit report for comment.

29. Customs did not issue its final audit report until February 24, 2016. Customs thereafter liquidated the entries which are the subject of this action with an increase in duties.

30. Plaintiff timely protested the liquidation of its entries and, following the deemed denial of its protest, initiated this action.

## COUNT I

31. Paragraphs 1 through 30 of this Complaint are restated and re-alleged as though fully set forth herein.

32. Pursuant to 19 U.S.C. § 1401a(b), which is the best evidence of its contents, the principal basis of appraisement, for Customs purposes, for goods imported into the United States is its "transaction value" which is defined as the "price actually paid or payable for the merchandise when sold for exportation to the United States" plus certain additions not here relevant.

33. As a matter of fact and law, Midwest's sale of merchandise to its customers FOB Buffalo, New York was a domestic sale which occurred only after goods have been exported to the United States, cleared through Customs, and brought to the customer's carrier at Buffalo.

34. Midwest's sale of merchandise to its customers FOB Buffalo, New York was not a "sale for exportation to the United States" and the prices charged in such sale cannot be the basis of a determination of transaction value.

35. Midwest transported the goods from Canada to the United States pursuant to an internal transfer or consignment, without a sale. No transfer of title to the goods for consideration occurred until after the goods were imported into the United States and sold to the customers in domestic sales, FOB Buffalo, New York.

36. In the absence of a sale of the goods for exportation to the United States, the goods must be appraised under a different basis as set forth in 19 U.S.C. § 1401a, according to available information.

37. There were no sales of identical or similar merchandise by Midwest from Canada for exportation to the United States, so the goods cannot be appraised pursuant to 19 U.S.C. § 1401a(c).

38. Midwest is not the producer of the goods, and does not have information sufficient to declare or permit the determination of a computed value in accordance with 19 U.S.C. § 1401a(e).

39. The merchandise is therefore subject to appraisement on the basis of deductive value pursuant to 19 U.S.C. Section 1401a(d), as stated in the entry documents, or upon the "fallback" basis of appraisement provided in 19 U.S.C. Section 1401a(f).

## COUNT II

40. Paragraphs 1 through 39 of this Complaint are restated and incorporated by reference as though fully set forth herein.

41. Section 402(f)(2)(G) of the Tariff Act of 1930, as amended, which is the best evidence of its contents, provides that imported merchandise may not be appraised, for purposes of duty assessment, on the basis of "arbitrary or fictitious values".

42. The values used by CBP to appraise the plaintiff's merchandise in liquidation were based upon multiplying the entered deductive values by an arbitrary uplift, calculated with reference to plaintiff's financial statements for the year 2013.

43. The values used by CBP to appraise the plaintiff's merchandise in liquidation were not based on adaptation of the methods of appraisement set out in 19 U.S.C. §1401a(f).

44. The values used by CBP to appraise the plaintiff's merchandise in liquidation were not based on sales of merchandise for exportation to the United States, on sales of identical or

similar merchandise for export to the United States, on computed or deductive values, or any other method of appraisement allowed under 19 U.S.C. §1401a.

**45.** The values used by CPB to appraise the plaintiff's merchandise in liquidation were arbitrary and capricious values, rendering the appraisement unlawful pursuant to 19 U.S.C. §1401a(f)(2)(G).

## COUNT III

46. Paragraphs 1 through 45 of this Complaint are restated and incorporated by reference as though fully set forth herein.

47. Section 504(a) of the Tariff Act of 1930, as amended [19 U.S.C. §1504(a)], which is the best evidence of its contents requires that entries be liquidated within one year after the date of entry, and that, if not so liquidated, the entries are deemed liquidated at the rate and amount of duty set forth in the entry.

48. Under Section 504 (b) of the Tariff Act, CBP may extend the period for liquidating an entry if a request is made therefor by the importer of record, or if CBP requires additional information in order to liquidate the entry.

49. CBP conducted a regulatory audit of Midwest's entries for the period covered by this complaint, including the entries which are the subject of this action.

50. In the course of considering the liquidation of these entries, Customs sought information from Midwest on numerous occasions. Customs last sought and received information from Midwest on June 3, 2014.

51. Subsequent to the gathering of information, CBP prepared a draft audit report which was sent to the Plaintiff for comment in July, 2015. Plaintiff promptly provided comments thereon.

52. CBP did not its final audit report until February 24, 2016, more than a year after it had last sought information concerning the appraised value of the entries.

53. CBP did not liquidate the entries until nearly two years after the last information was requested from Midwest, on the dates shown in the Summons in this case.

54. On information and belief, CBP was conducting no investigation or undertaking any activity which involved gathering additional information regarding the appraised value of Midwest's imports after June 3, 2014.

55. Any extensions of liquidation occurring after June 3, 2014, when Midwest last provided information to Customs regarding the appraisement of the subject merchandise are without legal authority and null and void.

56. Accordingly, the subject entries were deemed liquidated, as entered, on the anniversary date following the extensions of liquidation which occurred on or before June 3, 2014.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor; and direct the Port Director of Customs at Buffalo, New York to reliquidate the entries at the rate and amount of duty set forth in the entries, and to refund to Plaintiff such excess duty as assessed upon liquidation, together with interest as provided by law; and furnishing Plaintiff such additional and further relief as the Court may deem just.

Respectfully submitted,

John M. Peterson
Richard F. O'Neill

Neville Peterson LLP
Counsel for Plaintiff
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212)-635-2730