**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JENNIFFER CHOE-GROVES, JUDGE**
------------------------------------------------------------------- X

| | |
|---|---|
| **MIDWEST-CBK, LLC.,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| *v.* | :  **Consol. Court No. 17-cv-00154** |
| | : |
| **THE UNITED STATES,** | : |
| | : |
| **Defendant.** | : |

------------------------------------------------------------------- X


## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

John M. Peterson
Patrick B. Klein
NEVILLE PETERSON LLP
Counsel for Plaintiff
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated:  July 20, 2021

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ................................................................................................................ i

**TABLE OF AUTHORITIES** ....................................................................................................... ii

**STATEMENT OF FACTS** ......................................................................................................... 2

**STANDARD OF REVIEW** ........................................................................................................ 11

**SUMMARY OF ARGUMENT** ................................................................................................... 12

**ARGUMENT** ............................................................................................................................... 14

**I.    There Can be No "Transaction Value" of the Imported Merchandise** .......................... 14

   **a.    There Has Been No Sale For Export to the United States** ........................................... 15

   **b.    A F.O.B. Buffalo, New York Sale, Under the New York UCC, is a Domestic Sale** ... 18

   **c.    CBP is Not Permitted to Rewrite Commercial Terms of Sale Explicitly Stated in a Valid Contract.** ...................................................................................................................... 23

   **d.    CBP's Claim that an Export Sale Occurs Under the Instant Facts Directly Contradicts Decisions of the Trade Courts and Those Interpreting the UCC.** .................................... 26

**II.    Deductive Value Appraisement is the Proper Methodology Under 19 U.S.C. § 1401a and According to Precedent of the Trade Courts** ................................................................... 32

**III.    Even If *Arguendo* CBP Rejects Deductive Value as the Basis of Appraisement and Maintains that Transaction Value is Proper, the Uplift Calculation CBP Utilized in Liquidating the Instant Entries is Improper** ......................................................................... 33

**IV.    Certain of the Protested Entries Are Deemed Liquidated By Operation of Law Pursuant to 19 U.S.C. § 1504(b).** ........................................................................................... 34

**CONCLUSION** .......................................................................................................................... 38

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)................................................................ 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)......................................................... 11

*Ashland Chemical Co. v. United States*, 7 C.I.T. 362, 367-368 (1984 .................................. 10, 34

*Butler v. Thomson, et. al.,* 92 U.S. 412, 414-15(1876)............................................................ 16, 17

*Cable Elecs., Inc. v. N. Am. Cable Equip., Inc.,* 20 I 0 WL 1541504 at *3 n.25 (N.D. Tex. Apr. 15, 2010) .................................................................................................................................... 20

*Campbell Soup Co. v. United States*, 107 F.3d 1556, 1558 (Fed. Cir. 1997) ............................... 10

*Chase Manhattan Bank v. Nissho Pacific Corp.,* 22 A.D.2d 215, 221 (1st Dep't 1964)............... 21

*Citizens Banking Co. v. Ravenna National Bank,* 234 U.S. 360 (1914)...................................... 16

*CMF Industries Inc. v. Ram Winch and Hoist Ltd.,* 2009 U.S. Dist. LEXIS 59713 (W.D. Wash. 2009) .................................................................................................................................... 21

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,* 593 F.3d 1249, 1255 n.2 (11th Cir. 2010) .................................................................................................................................... 21

*Ford Motor Co. v. United States,* 157 F.3d 849 (Fed. Cir. 1998)................................................. 37

*Greb Industries, Ltd. v. United States,* 64 Cust. Ct. 608, 617 (1970)......................................... 16

*H.K. & Shanghai Banking Corp. v. HFH USA Corp.,* 805 F. Supp. 133, 141-42 (W.D.N.Y. 1992) .................................................................................................................................... 21

*In re Carolina Wine Co.,* 2009 WL 2399944 at *2 (Bankr. E.D.N.C. July 31, 2009) ................. 21

*In re Nevins Ammunition, Inc.,* 79 B.R. 11, 16-17 (Bankr. D. Idaho 1987) ................................ 20

*In re Sunbelt Grain WKS, ILC,* 406 B.R. 918, 933 (D. Kan. 2009)............................................. 21

*J.H. Cottman & Co., v. United States,* 20 C.C.P.A. 344, 356 (1932) .......................................... 16

*J.L. Wood v. United States,* 62 C.C.P.A. 25, 33 (1974).................................................. 14, 16, 17

*Jarvis Clark Inc. v. United States*, 733 F.2d 873 (Fed Cir. 1984) ......................................... 10, 11

*La Perla Fashions, Inc. v. United States*, 22 C.I.T 393, 395 (1998). ........................................... 11

*Ladex Corp. v. Transporte Aereos Nacionales, S.A.,* 476 So. 2d 763,765 (Fla. Dist. Ct. App. 1985) .................................................................................................................................... 20

*MEl lnt'l, Inc. v. Schenkers Int'l Forwarders, Inc.,* 807 F. Supp. 979, 986 n.2 (S.D.N.Y. 1992). 21

*Neal-Cooper Grain Co. v. Tex. Gulf Sulphur Co.,* 508 F.2d 283, 291 (7th Cir. 1974) ............... 20

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ..................... 11

*Orbisphere Corp. v. United States*, 726 F. Supp 1344, 1357-58 (Ct. Int'l Trade 1989) ....... passim

*Peerless Clothing Int'l, Inc. v. United States*, 33 C.I.T. 24, 28-29 (2009)................................... 11

*Pittsburgh Industrial Furnace Co. v. Universal Consolidated Cos.,* 789 F. Supp. 184, 188-89 (W.D. Pa. 1991) .................................................................................................................. 22

*S&H Commcns, Inc. v. Seiscor Techs., Inc.,* 221 A.D.2d 156 (1995). ......................................... 22

*Sara Corp. v. Sanity Intl Am. Inc.,* 2008 WL 2944862 at *7 (S.D.N.Y 2008) ............................ 21

*St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763 (Fed. Cir. 1993) ......................... 37

*Standard Casing Co. v. California Casing Co.,* 233 N.Y. 413, 416 (1922)................................... 21

*Synergy Sport lnt'l, Ltd. v. United States,* 17 C.I.T. 18, 19-21 (1993)................................... 16, 30

*Target Corp. v. United States* 31 C.I.T. 154, 159 (2007); ............................................................ 11

*United States v. Massce & Co., et. al.,* 22 C.C.P.A. 54 (1933) .................................................... 28

*Universal Percussion Inc. v. United States,* 19 CIT 546 (1995). ................................................. 37

*VWP of Am. v. United States*, 25 C.I.T. 1056, 1076-1077 (2001.................................................. 11
*VWP of Am., Inc. v. United States,* 117 Fed. Appx. 113, 115-116 (Fed. Cir. 2004)..................... 32
*VWP of Am., Inc. v. United States,* 175 F.3d 1327, 1339 (Fed. Cir. 1999)...................... 14, 16, 17
*Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art,* 324 Fed. Appx. 117, 119-120 (2d Cir. 2009) 21

**Statutes**

19 U.S.C. § 1484(a)(2)(B). ...................................................................................................... 7
19 U.S.C. § 1504(b) ......................................................................................... 34, 35, 36, 37
19 U.S.C. §1401a ................................................................................................................ passim
28 U.S.C. § 2640(a)(1)........................................................................................................ 11
NY UCC § 2-106 ................................................................................................................ 18
NY UCC § 2-319 ................................................................................................................ 19
NY UCC § 2-401 .................................................................................................... 18, 19, 22
NY UCC § 2-509. ............................................................................................................... 19

**Other Authorities**

Bona Fide Sales & Sales For Exportation to the United States (2005), ...................................... 22
*Customs Headquarters  Ruling 006576 of December 19, 2007*) .................................................. 26
Customs Headquarters issued *Headquarters Ruling H275056* ........................................ 9, 17, 26
*Customs Headquarters Ruling 548273* ................................................................................. 18
*Customs Headquarters Ruling H165361* ............................................................................... 32
*Customs Headquarters Ruling H249150 of January 28, 2014* .................................................. 26

**Treatises**

Sherman and Glashoff, *Customs Valuation: Commentary on the GATT Customs Valuation Code*
   (2d ed.), .......................................................................................................................... 30

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

This memorandum of Points and Authorities is submitted in accordance with Rule 56 of
Rules of the United States Court of International Trade ("USCIT") on behalf of our client,
Midwest-CBK, LLC ("Midwest"). It provides facts and reasons in support of Midwest's *Motion
for Partial Summary Judgment* regarding the appraisement, in liquidation, of certain entries of
decorative and festive goods imported into the United States from Canada.

The specific issue raised in this Partial Summary Judgment Motion is whether Midwest's
domestic sales of goods to its customers, made on "FOB Buffalo, New York" terms "in accordance
with the New York ("NY") Uniform Commercial Code (UCC)", are sales of the goods "for
exportation to the United States" which can be used to determine the "transaction value" of the
imported merchandise pursuant to Section 402(a) of the Tariff Act of 1930, *as amended* [19 U.S.C.
§1401a]. For the reasons set forth below, plaintiff Midwest submits that these are purely domestic
sales which cannot be considered sales "for export to the United States". There being no sale of
the goods "for export to the United States", the goods cannot be appraised on the basis of
"transaction" value, and an alternate basis of appraisement must be adopted, using the methods set
out in 19 U.S.C. §§1401a(c) through (f).

Indeed, as discussed herein, the specific issue before the Court was considered and decided
more than three decades ago in *Orbisphere Corp. v. United States*, 726 F. Supp 1344, 1357-58 (Ct.
Int'l Trade 1989), where this Court determined that domestic sales of merchandise were not
transformed into "sales for exportation to the United States" simply because the goods are
physically outside the United States when the domestic sale and delivery is arranged.

As counsel for the parties explained to the Court during a conference called to discuss
bifurcation of this action, none of the merchandise involved in this case was actually appraised in

1

liquidation on the basis of the "FOB Buffalo, New York" prices. Defendant has expressed a willingness to resolve the issue of whether the "FOB Buffalo, New York" prices are a legally viable way to appraise the goods. Once this issue is resolved, the parties are hopeful that they will be able to resolve remaining issues in judicially-annexed mediation.[1]

## STATEMENT OF FACTS

Plaintiff has annexed a Rule 56.3 Statement of Material Facts Not in Dispute. The operative facts relevant to the instant motion are summarized herein.

Plaintiff Midwest was established in 1953 as "Midwest of Cannon Falls, Inc." as a retailer of Christmas ornaments, nutcrackers, wood carvings and similar decorative articles headquartered in Cannon Falls, Minnesota. It would remain headquartered in Cannon Falls, Minnesota for all periods relevant to this case. Rule 56.3 statement, at ¶ 2.

In 1964, Midwest of Cannon Falls, Inc. established a wholesale division, which sold Christmas ornaments and festive decorations to small retailers throughout the United States. Midwest of Cannon Falls, Inc. purchased goods from producers in the Far East and imported them directly into the United States, storing the goods in a warehouse in Cannon Falls, Minnesota. Rule 56.3 statement, at ¶ 3. The company employed a team of salaried sales representatives, who were assigned to particular geographic territories. These representatives would visit retailers in the United States to solicit orders, first using paper catalogues which displayed the wares and their prices, and later using electronic catalogues stored in tablet computers which the sales representatives carried.

---

[1] For this reason, a finding by the Court that the "FOB Buffalo, New York" prices are a viable basis of appraisement would not result in a judgment for either party. Such prices would need to be compared to the liquidated appraised values of the goods to determine whether, and to what extent, plaintiff is entitled to a refund of excess duties paid.

Terms of sale to customers were "FOB Cannon Falls, Minnesota", which meant that the sale from Midwest of Cannon Falls, Inc. to its customer was consummated when the company delivered the goods to the customer's carrier of choice at Cannon Falls, Minnesota. *Id.* The customer bore the cost of transporting the goods from Cannon Falls to its location.

In 2009, Midwest of Cannon Falls, Inc. was acquired by Blyth, Inc., which merged the company into its CBK Holdings Group, which was located in Union Falls, Tennessee. The company was renamed "Midwest-CBK Inc." The company's headquarters remained in Cannon Falls, Minnesota, but its inventory location was shifted to Union City, Tennessee. Rule 56.3 statement, at ¶ 4. The company's business proceeded as before, except that the imported merchandise was brought to a warehouse in Union City, Tennessee, and sales to the company's customers were made on "FOB Union City, Tennessee" terms. *Id.* The customers were required to pay the cost of transporting the goods from Union City, Tennessee to their respective locations.

In 2011, Midwest-CBK Inc. was acquired by South Carolina-based MVP Group International Inc. The company's corporate headquarters, operations and sales facilities remained in Cannon Falls, Minnesota, and its inventory operations remained in Union City, Tennessee. Midwest-CBK, Inc. continued to import goods directly into the United States and sell them to customers on "FOB Union City, Tennessee" terms. Rule 56.3 statement, at ¶ 5.

During these periods, Midwest-CBK, Inc.'s goods were imported directly into the United States, and appraised on the basis of "transaction value", according to the prices at which foreign vendors sold the goods to Midwest "for export to the United States." There was never any suggestion that Midwest-CBK, Inc.'s sales to its United States customers were anything other than domestic sales.

In late 2012, came the developments which led to the instant case. The assets of Midwest-CBK Inc. were acquired by Giftware Holdings LLC ("Giftware Holdings"), a Delaware Limited Liability Company controlled by Canadian investors, the Ganz family. These assets were later transferred to Midwest-CBK, LLC, the corporate entity which is the plaintiff in this action. Rule 56.3 statement, at ¶ 6.

The Ganz family controls a substantial amount of commercial warehousing space in Canada. A decision was made that the inventory location for Midwest would be transferred to a warehouse located at 610 Hanlan Road, Woodbridge, Ontario, just outside the Toronto City limits. Midwest entered into a market-rate lease with Ganz Realty Ltd. for the warehouse, and the company hired a staff of Midwest employees to staff the warehouse[2]. Rule 56.3 statement, at ¶ 7.  Midwest's headquarters continued to be in Cannon Falls, Minnesota, and its sales force continued to be located in, and operated from, the United States[3]. *Id.*

The only change noticeable to Midwest's customers was that the terms of sale to them were changed to "FOB Buffalo, New York, as provided in the New York Uniform Commercial Code". Rule 56.3 statement, at ¶ 10. The sales to Midwest's customers remained purely domestic sales. Midwest continued to obtain state sales tax waivers from its customers, in which the customers indicated that they were resellers of the goods being purchased. This meant that Midwest-CBK did not need to collect State sales taxes from its customers in these domestic sales. Rule 56.3 statement, at ¶ 30.

---

[2] It is lawful for United States companies to hire employees in Canada, and establish bank accounts to pay them in Canadian dollars.

[3] There were numerous business reasons to relocate Midwest's inventory operations to Canada. The move allowed the Ganz family to locate a tenant for some of its commercial real property. The Midwest employees hired to staff the warehouse could be paid in Canadian dollars, which at the time was advantageous both from a currency exchange rate perspective and the fact that Canadian employees generally have health and pension benefits provided by their Government, rather than the private employer.

Midwest's purchase terms with its suppliers also changed. It no longer purchased goods "for export to the United States", but rather "for export to Canada[4]". Goods were shipped by the foreign vendors to the Port of Vancouver, British Columbia, then shipped by rail and truck cross-country to the warehouse at 610 Hanlan Road in Woodbridge, Ontario. Rule 56.3 statement, at ¶ 11.

It is also important to note that Midwest remained solely a United States company. It did not establish any affiliate or subsidiary in Canada. It was simply a United States company which maintained its inventory in Canada, for sound business reasons.

Midwest also entered into an agreement with United Parcel Service ("UPS") under which Midwest leased warehouse space in UPS' Buffalo, New York, facility. Midwest utilized this warehouse location to temporarily store goods awaiting delivery to domestic carriers, and to receive customer returns. Rule 56.3 statement, at ¶ 27.

From the viewpoint of Midwest's customers, nothing changed, except the delivery point at which they received their goods. The catalogue prices in Midwest-CBK LLC's catalogues were based on "FOB Buffalo, New York" delivery terms, as defined in the NY UCC. These prices were fully-loaded prices, designed to allow Midwest to recoup all of its expenses, including the considerable expenses of operating its Headquarters and sales staff in the United States, the company's profits, and recoupment of expenses such as international transportation and Customs duty expenses – all the foregoing not included in any of the basis of Customs' appraisement set out in 19 U.S.C. §1401a. The sales were by their terms domestic sales, and Midwest continued to collect sales tax waivers from its United States clients.

---

[4] Midwest has a few "national account" customers, large retailers such as Kohl's, to whom it continued to ship merchandise directly from foreign countries of origin to the United States. The retailers generally acted as importers of record. These national account sales are not involved in the instant case.

5

In terms of operations, business continued much as it had previously. Midwest sales representatives solicited orders from retailer customers throughout the United States.[5] Rule 56.3 statement, at ¶ 14. These orders were transmitted, via computer link, from the salespersons to Midwest's headquarters in Minnesota, where they were reviewed and approved by Midwest's management. Rule 56.3 statement, at ¶ 16. Once the orders were approved, they were transmitted to the warehouse in Woodbridge, Ontario for fulfillment. Rule 56.3 statement, at ¶ 17.

When the customer orders were transmitted to the warehouse in Canada, an inventory query was done to determine whether the goods ordered by the customers were available.[6] Rule 56.3 statement, at ¶ 18. Once this was determined, a "pick list" was generated, and warehouse workers would select the goods for the customer's order from the appropriate inventory locations in the warehouse. Rule 56.3 statement, at ¶ 19.

Once a customer's order was picked from inventory, it would be brought to a packing area. Rule 56.3 statement, at ¶ 20. Warehouse workers would then place the order into one or more boxes, which were labeled for delivery to the customer's premises, typically using a waybill form from the customer's appointed carrier. Most of Midwest's customers used UPS as their carrier of choice, but others designated Federal Express or other carriers. Rule 56.3 statement, at ¶ 21.

As customer orders were boxed and labeled, they were placed in a truck located at a loading dock at the Hanlan Road facility. Rule 56.3 statement, at ¶ 22. Once the truck was filled, or at the end of the work day, the truck, contracted by Midwest, would depart from the Woodbridge warehouse to Buffalo, New York. Rule 56.3 statement, at ¶ 23.

---

[5] In addition, customers were able to submit orders over the internet. In such cases, the sales representative for the territory in which the internet purchaser was located received credit for the sale, and these sales were made on the same "FOB Buffalo, New York" terms as all other sales.

[6] Where goods were not available in inventory a deferred delivery date was provided, and if such date was not acceptable to the customer, the customer had the option to cancel the purchase order.

When the goods arrived in Buffalo, New York, they were entered for consumption, with Midwest designated as importer of record. Rule 56.3 statement, at ¶ 26.  Midwest's right to act as importer of record derived from the fact that it was the "owner" of the merchandise, see 19 U.S.C. § 1484(a)(2)(B). Midwest paid all Customs duties, brokerage and forwarding charges, as well as transportation charges. *Id.* Midwest also handled all "Partner Government Agency" requirements, such as filing reports with the United States Fish and Wildlife Service ("FWS"). *Id.*

After clearing Customs, the goods were transported to the UPS facility in Buffalo (Cheektowaga), New York, for delivery to carriers or for temporary storage. Rule 56.3 statement, at ¶ 27. Under the "FOB Buffalo, New York" sales term, as provided in the NY UCC, title to the goods and risk of loss, transferred from Midwest to its customer once the goods were turned over to the customer's designated carrier – in Buffalo, New York, after all Customs clearance formalities had been completed. Rule 56.3 statement, at ¶ 28- ¶ 29.

Midwest's management understood that, under this structure, there was no sale of the goods "for export to the United States". They also understood that, from a United States customs duty perspective, this supply chain structure was less efficient than when the goods had simply been purchased from vendors "for export to the United States".[7]

With no sale of the goods "for exportation to the United States", Midwest recognized that a different basis of Customs appraisement would be necessary. There was no sale of "identical or similar merchandise" for exportation to the United States, so appraisement under 19 U.S.C.

---

[7] For instance, where goods were purchased from Asian vendors "for export to the United States", costs of ocean shipping from the country of origin to the United States would not be included in dutiable value. Where the goods were purchased "for export to Canada", however, no sale "for export to the United States" could be established. And regardless of the basis of appraisement selected, the dutiable value would include (1) the cost of transporting the goods from Asia to Canada, (2) the costs of shipping them across Canada to the warehouse location, (3) warehousing costs, and (4) costs of repacking the goods in Canada. These costs were never subject to duty when the goods were exported directly to the United States. However, as noted above, there were good business reasons for Midwest's decision to store its inventory in Canada, and United States duty concerns were not paramount.

§1401a(c) was not available.[8]  Accordingly, the company determined that "deductive value" under 19 U.S.C. §1401a(d) was the next appropriate basis of appraisement in the statutory hierarchy.[9]

In earlier 2013, Midwest, through counsel, reached out to U.S. Customs and Border Protection ("CBP" or "Customs") at the Port of Buffalo, New York, to explain the organization of the company and its supply chain, and to explain that Midwest would make entry of goods on the basis of calculated "deductive values".  Rule 56.3 statement, at ¶ 34.

Midwest proceeded to make entry on the basis of calculated "deductive values" through 2013, 2014, 2015 and into 2016.  In 2014, Customs "extended" the liquidation of plaintiff's entries pursuant to 19 U.S.C. §1504(b), and requested that the agency's Office of Regulatory Audit conduct an audit of the company's basis of appraisement. Rule 56.3 statement, at ¶ 35.   In a draft Audit Reported dated July, 2015, the Auditors concluded that Midwest's entries should be appraised on the basis of "transaction value", at the "FOB Buffalo, New York" prices charged to Midwest's customers. Rule 56.3 statement, at ¶ 36. Plaintiff submitted its comments on the draft audit report on July 8, 2015, requesting that the auditors seek Internal Advice from Customs Headquarters regarding the proper basis of appraisement of Midwest's merchandise. Rule 56.3 statement, at ¶ 37. Thereafter, Customs requested no other information from Midwest concerning the appraisement of plaintiff's merchandise. Rule 56.3 statement, at ¶ 38.

On February 24, 2016, the Customs auditors issued their final audit report, holding that Midwest's imported merchandise should be appraised on the basis of "transaction value", according to the "FOB Buffalo, New York" prices charged to Midwest's customers. Rule 56.3

---

[8] While Midwest continued to have some direct exports to the United States for "national accounts", these goods were neither identical nor similar to the goods at issue in this case. If those values could have been used to appraise the goods at bar, it would have been advantageous, since those values were not encumbered by international or Trans-Canada transportation costs, warehousing costs or repacking costs.

[9] Midwest did not have production cost information from which a "computed value", 19 U.S.C. §1401a(e), could be calculated.

statement, at ¶ 39. On July 1, 2016, Customs Headquarters issued *Headquarters Ruling H275056,* which reached the same conclusion.[10] Rule 56.3 statement, at ¶ 40.

However – and here's where things get a bit screwy – in liquidating the goods which are the subject of the instant case, the Customs Import Specialists at Buffalo did not follow either the recommendations in the Final Audit Report, nor the holding in *Customs Headquarters Ruling H275056.* Rule 56.3 statement, at ¶ 41. They did not calculate the appraised values for *any* of the merchandise at bar using the "FOB Buffalo, New York" prices. Rather, working from plaintiff's 2013 financial statements, they calculated an arbitrary "uplift" equal to 123.18% of plaintiff's entered "deductive values" – effectively liquidating the goods at 223.18% of the entered values. Rule 56.3 statement, at ¶ 42. This method did not correspond with any of the statutory bases of appraisement contained in 19 U.S.C. § 1401a.

Plaintiff protested these liquidations, and in their protests noted that, even if Customs "uplift" was an appropriate basis for appraising plaintiff's merchandise – which it was not – the "uplift" calculation suffered from numerous computational errors. Rule 56.3 statement, at ¶ 46. CBP accepted that it had made computational errors, and granted some of plaintiff's protests, reliquidating plaintiff's entries at entered deductive values, plus an "uplift" of 75.75%. Rule 56.3 statement, at ¶ 47. Plaintiff protested both the original liquidations and the reliquidations. Upon denial of its protests, plaintiff commenced the actions constituting the current Consolidated action.

Long after the issuance of the Final Audit report and *Customs Headquarters Ruling H275056,* Customs proceeded to liquidate plaintiff's entries without regard to those pronouncements. Although the agency requested and received plaintiff's 2014 and 2015 financial statements, it liquidated plaintiff's 2014 and 2015 entries using the "uplift" factor it had calculated

---

[10] It is noteworthy that the Customs auditors issued their final report without awaiting the Internal Advice response from Customs Headquarters.

from plaintiff's 2013 financial reports, ignoring both the Final Audit Report and the Headquarters Ruling. Rule 56.3 statement, at ¶ 51.

Plaintiff has recognized that the deductive values it used to make entry may not be totally accurate as a basis of appraisement.[11]  However, as explained herein, CBP's basis for determining the values used in liquidation was wholly arbitrary and does not relate to any of the statutory bases for appraising merchandise set out in 19 U.S.C. §1401a.

As explained to the Court in a hearing conducted in connection with the motion to bifurcate this case, plaintiff has proposed settlement of this case on several occasions and has moved for a referral of the case for Court-annexed mediation. Defendant has resisted this. It appears to have an "itch" it wants to "scratch" – namely, to obtain a reading from this Court concerning whether Midwest's "FOB Buffalo, New York" prices to its customers constitute a viable basis for determining a 19 U.S.C. §1401a(b) "transaction value" for its merchandise. It is hoped that obtaining such a reading will guide the parties regarding the direction of future mediation or settlement negotiations.

It is also hoped that resolving this question will help this Court discharge its obligation under *Jarvis Clark Inc. v. United States*, 733 F.2d 873 (Fed Cir. 1984), which requires this Court to reach the correct valuation result, and not merely select between the alternatives offered by the parties[12].

---

[11] Plaintiff confronted significant difficulty in calculating deductive values for the more than 27,000 different products contained in its annual catalogues. One factor was that, during the periods in question, plaintiff operated at a financial loss – deducting its sales expenses from its resale values often resulted in below-cost or negative values. In those cases, plaintiff adjusted its entered value upwards to reflect all of its costs.  In additional, the seasonality of plaintiff's business – heavily weighted toward the Christmas holiday market – presented further challenges. Deductive values are typically calculated on a quarterly basis. However, in some quarters, plaintiff had few sales but its full complement of sales expenses, which would have led to negative values under the classic deductive value calculation method.

[12] The Jarvis Clark rule has been applied in Customs valuation cases, as well as in classification matters. See *Campbell Soup Co. v. United States*, 107 F.3d 1556, 1558 (Fed. Cir. 1997) (noting *Jarvis Clark* in the context of the initial allocation of burden of proof); *Ashland Chemical Co. v. United States*, 7 C.I.T. 362, 367-368 (1984); *Peerless Clothing*

For the reasons set out herein, plaintiff maintains that it is emphatically clear that its "FOB Buffalo, New York" prices to its customers are *domestic* sale prices which cannot constitute a "sale for exportation" to the United States[13].

## **STANDARD OF REVIEW**

Summary judgment is appropriate where the "movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(c). To obtain summary judgment, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim . . . or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden of production, the nonmovant must "produce enough evidence to create a genuine issue of material fact." *Id*. at 1102-03.

"Material" facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine" dispute of material fact if there is sufficient evidence for a reasonable factfinder to find for the plaintiff in light of the appropriate evidentiary burden. *Id*. at 251-54. A party opposing a motion for summary judgment may not rest

---

*Int'l, Inc. v. United States*, 33 C.I.T. 24, 28-29 (2009); *VWP of Am. v. United States*, 25 C.I.T. 1056, 1076-1077 (2001); *Target Corp. v. United States* 31 C.I.T. 154, 159 (2007); *La Perla Fashions, Inc. v. United States*, 22 C.I.T 393, 395 (1998).

[13] We are further constrained to note that defendant has not interposed any counterclaim for recovery of additional duties based on such appraisement. To the extent the parties seek judicial resolution of this issue, it is in furtherance of this Court's obligation under *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) to reach the correct result, regardless of the alternatives offered by the parties.

We expect that, in responding to this Motion, the government will argue for the use of plaintiff's "FOB Buffalo, New York" prices as a basis from appraisement. To the extent that price was not used to actually appraise plaintiff's merchandise in liquidation, the government, in making this argument, will not be allowed to rely on the statutory presumption of correctness attaching to CBP's liquidation decisions, and will instead be deemed to have abandoned same. See 28 U.S.C. § 2640(a)(1).

upon mere allegations or denials, but must point to specific and sufficient evidence of the claimed differences to require that the facts be established at trial. *Id*. at 248-49. In determining sufficiency, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. Even where basic facts are undisputed, if reasonable minds could differ as to the inferences to be drawn from those facts, summary judgment should be denied. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## SUMMARY OF ARGUMENT

Midwest entered merchandise under cover of the protested entries on the basis of deductive value pursuant to 19 U.S.C. § 1401a(d). CBP disagreed with the appraisement methodology. In CF 29s and in liquidation, CBP asserted that the goods are subject to appraisement on the basis of transaction value pursuant to 19 U.S.C. § 1401a(b). In a Customs Audit Report and a subsequent Customs ruling, the agency asserted that plaintiff's goods were capable of being appraised on the basis of "transaction value", according to the "FOB Buffalo, New York" prices, at which Midwest sold goods to its customers in sales pursuant to the NY UCC.

However, instead of applying the "FOB Buffalo, New York" prices, Customs officers valued plaintiff's merchandise in liquidation by applying an uplift of 123.18% above the deductive values declared by Midwest. After Midwest protested, CBP voluntarily reduced the uplift from 123.18% to 75.75%.

Before this Court, defendant apparently wishes to assert that plaintiff's "FOB Buffalo, New York" prices, charged to its customers, are prices in sales "for exportation to the United States" and can be used as the basis of dutiable transaction value. As explained herein, those sales are not sales "for exportation to the United States", but rather *domestic* sales, made within the United States, which cannot, as a matter of law, be used as the basis of "transaction value".

In the instant case, there is no sale of the imported goods "for exportation to the United States". Midwest structured its sales so this would be the case[14]. Midwest's goods move from Canada to the United States pursuant to an internal inventory transfer between two Midwest inventory locations, without any sale. Midwest retains title to the goods and right of loss from the time they leave the Woodbridge facility, and while the goods were entered for consumption into the United States and cleared. Title transfers to its customers in the United States, when the goods are delivered to the customers' designated carriers.

As this Court held in *Orbishphere, supra*, the fact that goods are physically located outside the United States when a domestic sale is agreed does not transform that domestic sale into a sale "for exportation to the United States" which can be used as the basis for calculating a dutiable "transaction value". By way of comparison, assume that a United States purchaser visits a Toyota dealer in Buffalo, New York, and places an order for a Japanese-origin vehicle at a price of $30,000. The vehicle is to be delivered to the customer "FOB Buffalo, New York", at the dealership. At the time the sale is agreed, the vehicle is outside the United States (something the customer may or may not know). The fact that the goods being sold are located outside the United States does not transform the customer's domestic purchase into a "sale for exportation to the United States" which can be used as the basis for calculating a "transaction value" under 19 U.S.C. §1401a(b). If the vehicle is the subject of an earlier "sale for export to the United States", the price in that sale might be used as the basis for "transaction value". If there was no such sale, then the dutiable value for customs purposes must be calculated using one of the alternate bases of appraisement specified in 19 U.S.C. §§1401a(c) through 1401a(f).

---

[14] Midwest's management wished to avoid the formation of a Canadian sales affiliate for Midwest and the establishment of a "related party" transaction value.

For the reasons set forth herein, Midwest maintains that the "FOB Buffalo, New York" sales in which it sells merchandise to customers located in the United States are not "sales for exportation to the United States" and cannot be used as the basis for appraisement of plaintiff's imported merchandise.[15]

## ARGUMENT

### I.  There Can be No "Transaction Value" of the Imported Merchandise

The Principal basis of appraisement for goods imported into the United States is its "transaction value" which is defined at 19 U.S.C. § 1401a(b) as "the price actually paid of payable for the merchandise **when sold for exportation to the United States**," plus certain statutory additions (not applicable here).  There can be no "transaction value" of imported merchandise, unless two conditions are satisfied:

(1) There must be a "sale" of the merchandise, that is, "a transfer of title from one party to another for consideration," *VWP of Am., Inc. v. United States,* 175 F.3d 1327, 1339 (Fed. Cir. 1999); *see J.L. Wood v. United States,* 62 C.C.P.A. 25, 33 (1974); and

(2) The sale must be "for exportation to the United States," that is, an international sale in which the goods enter the customs territory of the United States.

If the merchandise undergoing appraisement was not the subject of a sale "for exportation to the United States, it must be appraised according to one of the other bases of appraisement set out in 19 U.S.C. §1401a, which are applied in hierarchical order[16].

---

[15] Phase I of this proceeding addresses only the question of whether plaintiff's goods may be appraised on the basis of the "FOB Buffalo, New York" prices which plaintiff charges its customers in the United States. Once the Court has resolved this issue, the proper basis for appraising plaintiff's merchandise will be addressed in Phase II of this case.

[16] The statutory bases of appraisement are set out in 19 U.S.C. §1401a(a)(1) as follows:

**Sec. 1401a. Value**

While in this case, there is a "sale", the second requirement is not met. The sales are not "for export to the United States." Midwest owns the merchandise from the time it is shipped by the foreign manufacturer/seller. It continues to own the goods while they are stored in Canada, and when they are transferred from the Canadian warehouse to the distribution center in Buffalo, New York. The bill of lading and other documents accompanying the goods from Canada to the United States confirm that the shipment is a mere consignment, from one Midwest (storage) location to another (delivery) location, and that there is no sale of goods for exportation to the United States.

The "FOB Buffalo, New York" sales from Midwest to its customer are sales by a domestic seller to domestic customers, procured by a United States-based sales staff, and effected by delivery to the customer at a designated delivery point in the United States.

### a.   There Has Been No Sale For Export to the United States

As required by 19 U.S.C. § 1401a(b), we begin our analysis by determining whether transaction value can be used to appraise the merchandise entered into the United States in the subject entries. The first question in this inquiry is whether, under the instant facts, there is a *bona fide* sale at arm's length between a buyer and seller.

---

(a)   Generally

(1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:

   (A) The transaction value provided for under subsection (b) of this section.
   (B) The transaction value of identical merchandise provided for under subsection (c) of this section, if the value referred to in subparagraph (A) cannot be determined, or can be determined but cannot be used by reason of subsection (b)(2) of this section.
   (C) The transaction value of similar merchandise provided for under subsection (c) of this section, if the value referred to in subparagraph (B) cannot be determined.
   (D) The deductive value provided for under subsection (d) of this section, if the value referred to in subparagraph (C) cannot be determined and if the importer does not request alternative valuation under paragraph (2).
   (E) The computed value provided for under subsection (e) of this section, if the value referred to in subparagraph (D) cannot be determined.
   (F) The value provided for under subsection (f) of this section, if the value referred to in subparagraph (E) cannot be determined.

15

The term "sale" has an established definition consistent with its common meaning and that intended by the Tariff Act and the UCC. According to *Greb Industries, Ltd. v. United States,* 64 Cust. Ct. 608, 617 (1970), the term "sale is defined as a contract by which the absolute ownership of property is transferred from one person to another for a price, sum of money, or other consideration." Likewise, in *J.H. Cottman & Co., v. United States*, 20 C.C.P.A. 344, 356 (1932), the Court defined sale as "a contract whereby the absolute, or general, ownership of property is transferred from one person to another for a price, or sum of money, or, loosely, for any consideration." This definition, according to the Court, "is the usual meaning given to ["sale"] by the courts, unless by accompanying language, some other meaning is evidently intended." (citing *Citizens Banking Co. v. Ravenna National Bank,* 234 U.S. 360 (1914); *Butler v. Thomson, et. al.,* 92 U.S. 412, 414-15(1876);  *Five Per Cent Cases,* 110 U.S. 471, 478 (1884). The Supreme Court has held that "[a] sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." *Id.* at 478. In the context of Section 402 of the Tariff Act, there is no reason to believe that "sale" should have any meaning besides its ordinary meaning. 19 U.S.C. § 1401a.

All of the foregoing definitions of "sale" consistently require a transfer of ownership for consideration. The Trade Courts have carefully scrutinized whether a transfer has occurred in a variety of contexts. *See e.g., J.L. Wood v. United States,* 62 CCPA 25, 33 (1974); *Orbisphere Corporation v. United States,* 726 F. Supp. 1344, 1357-58 (Ct. Int'l Trade 1989); *Synergy Sport lnt'l, Ltd. v. United States,* 17 C.I.T. 18, 19-21 (1993); *VWP of America Inc. v. United States,* 175 F.3d 1327, 1339 (Fed. Cir. 1999). Here, because there is no transfer of property until after importation, there is no possible export or international "sale" to the U.S. from which to calculate transaction value. It is indisputable that Midwest holds title to the merchandise when it acquires

16

same "FOB [foreign port of export]" from its foreign vendors. Midwest holds title to the merchandise when the goods are put into inventory in Woodbridge, ON, and it continues to hold title at the time the goods are exported from Canada, and through their importation into the U.S. Indeed, no transfer of ownership from Midwest to its customers occurs until *after importation and Customs clearance* and until Midwest delivers the goods to the customer's designated carrier "FOB Buffalo, New York" or to their customer's otherwise negotiated FOB point in the United States. The transfer of title for consideration -- the definition of a "sale" under *J.L. Wood v. United States,* 62 CCPA 25, 33 (1974), and *VWP of America Inc. v. United States,* 175 F.3d 1327, 1329 (Fed. Cir. 1999) -- occurs in the United States.

Dissatisfied with the commercial reality of Midwest's domestic sales, CBP has elected to rewrite the essential elements of "sale" to its favor. In *Customs Headquarters Ruling H275076* the agency disregards the most important consideration *(i.e.,* whether "title passes from one, and vests in another" for consideration, *Butler, supra,* at 414-15), and prioritizes the following considerations instead:

> (i) "whether, in general, the roles of the parties and circumstances of the transaction indicate that the parties are functioning as buyer and seller";
>
> (ii) "whether the buyer provided or could provide instructions to the seller";
>
> (iii) whether the buyer "was free to sell the transferred item at any price he or she desired";
>
> (iv) whether the buyer "selected or could select its own downstream customers without consulting with the seller"; and
>
> (v) whether the buyer "could order the imported merchandise and have it delivered for its own inventory."

*See Customs Headquarters Ruling H275056 of July 1, 2016.* These questions, of course, go the issue of whether there is a *"bona fide* sale", not whether the sale is one "for exportation to the

United States". A quick review will indicate that there is, of course, a *bona fide* sale from Midwest to its customers. Midwest and its customers act as buyer and seller; the buyer provides instructions to the seller concerning the merchandise to be purchased, and the time and place of delivery; the buyer, once it purchases the goods, has full discretion to place it in inventory, or to resell or dispose of it as the buyer sees fit to customers of its own choosing.

This, however, begs the question of whether the sale is "for exportation to the United States", or one which occurs domestically, after importation. These are purely domestic sales. Customs has consistently ruled that sales occurring domestically are not sales "for exportation to the United States" and cannot serve as the basis for a "transaction value" appraisement. See, e.g., *Customs Headquarters Ruling 548273 of April 17, 2003.*

b. **A F.O.B. Buffalo, New York Sale, Under the New York UCC, is a Domestic Sale**

If there remains any doubt that the prevailing elements of a sale require a transfer of title for consideration, the New York UCC, which governs Midwest's sales to its United States customers, is clear. It offers the following definition: "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." *See* NY UCC § 2-106. Addressing the transfer of title to a buyer, NY UCC § 2-401(1) provides that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." With an emphasis on the conditions of the sales contract, the law further states:

> (3) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
>
> (b) if the contract requires delivery at destination, title passes on tender there.

NY UCC § 2-401(2) (emphasis added). Of course, here, the commercial sales documents specifically require delivery at a particular destination, and thus NY UCC § 2-401(2)(B) governs.

To this end, the pro forma invoice shows that the merchandise is exported from the Woodbridge warehouse on consignment to Midwest CBK, LLC at an address in Buffalo, New York without any transfer of title or risk of loss occurring. The packing slip further specifies that the terms of sale require that the goods be delivered to the customer "F.O.B. Buffalo, New York," while the invoice is even more explicit, specifying "F.O.B. Buffalo, New York as DEFINED BY THE NEW YORK STATE UNIFORM COMMERCIAL CODE."

The term "F.O.B." is governed by NY UCC § 2-319 (emphasis added), which provides in pertinent part:

> (l) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which
>> (a) [Inapplicable]
>>
>> (b) when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in this Article (Section 2-503)

CBP does not dispute that Midwest incurs all expenses associated with the movement of goods from Woodbridge to the "F.O.B. Buffalo, New York" delivery point. There is no question that Midwest bears the risk of loss associated with this movement. Certainly, the NY UCC supports this position. *See* NY UCC § 2-509.

In its Final Audit Report, CBP sought to wish away the strength of the UCC terms stated in the governing commercial documents, going so far as to claim that the UCC itself requires evidence that a contract's governing UCC terms were subject to some level of active negotiation between the contracting parties. *See* Rule 56.3 statement, at ¶ 39; Exhibit S ("There was no evidence where term of sale or title were negotiated or agreed upon, as in accordance with the UCC." *Id.*) The auditors never cite which provision of the UCC supposedly requires specific negotiation, and of course, this is unsurprising because there is no UCC provision to support this claim.

Terms of the agreement between the parties are evident in the transaction documents themselves. Midwest's Terms and Conditions, featured in its catalogue and website offering materials, expressly indicates that "Freight charge is in addition to our Buffalo NY F.O.B. cost. Oversized items might incur additional freight charges." *See* Rule 56.3 statement, at ¶ 29; Exhibit O. The invoice to the customer specifically states the terms of sale and delivery: "FOB BUFFALO, NEW YORK AS DEFINED BY THE NEW YORK UNIFORM COMMERCIAL CODE". Rule 56.3 statement; Exhibit F, Bates No. 000392.

Rather, the UCC is explicit in requiring a seller of goods on "FOB" terms to make the goods available to the buyer at the named place, and bear the risks and costs of putting them into the buyer's possession. *Ladex Corp. v. Transporte Aereos Nacionales, S.A.,* 476 So. 2d 763,765 (Fla. Dist. Ct. App. 1985) (distinguishing between "shipment" and "destination" contracts); *see also e.g., In re Nevins Ammunition, Inc.,* 79 B.R. 11, 16-17 (Bankr. D. Idaho 1987) (same); *Neal-Cooper Grain Co. v. Tex. Gulf Sulphur Co.,* 508 F.2d 283, 291 (7th Cir. 1974) (same); *Cable Elecs., Inc. v. N. Am. Cable Equip., Inc.,* 20 I 0 WL 1541504 at *3 n.25 (N.D. Tex. Apr. 15, 2010) (same).

Delivery to the carrier constitutes delivery to the buyer. *Sara Corp. v. Sanity Intl Am. Inc.,* 2008 WL 2944862 at *7 (S.D.N.Y 2008) and citations therein; *CMF Industries Inc. v. Ram Winch and Hoist Ltd.,* 2009 U.S. Dist. LEXIS 59713 (W.D. Wash. 2009). As described in *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,* 593 F.3d 1249, 1255 n.2 (11th Cir. 2010), "the use of the term F.O.B Savannah in this case means that [seller] had the obligation to tender the product at its plan in Savannah and bore the risk of loss for the product until it was tendered."

Consequently, the term "F.O.B. Buffalo, NY" means that merchandise is delivered when the seller hands it over to the buyer's conveyance at the seller's facility in New York. Delivery of the merchandise F.O.B. to the seller's facility means that the sale takes place there. *See* NY UCC 2-401(2)(a). Under this provision, title passes upon delivery in the absence of a contrary agreement between the parties. *See, e.g., Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art,* 324 Fed. Appx. 117, 119-120 (2d Cir. 2009); *In re Sunbelt Grain WKS, ILC,* 406 B.R. 918, 933 (D. Kan. 2009); *In re Carolina Wine Co.,* 2009 WL 2399944 at *2 (Bankr. E.D.N.C. July 31, 2009); *MEl lnt'l, Inc. v. Schenkers Int'l Forwarders, Inc.,* 807 F. Supp. 979, 986 n.2 (S.D.N.Y. 1992) ("[u]nder U.C.C. § 2-401(2), title to goods passes at the time and place that the seller completes performance with respect to the physical delivery of the goods"); *H.K. & Shanghai Banking Corp. v. HFH USA Corp.,* 805 F. Supp. 133, 141-42 (W.D.N.Y. 1992). As set forth in *Sara Corp. v. Sainty Intl Am., Inc.,* 2008 WL2944862 at *7 (S.D.N.Y. Aug. 1, 2008), "[t]he general rule is that upon a sale 'f.o.b. the point of shipment,' title passes from the seller at the moment of delivery to the carrier, and the subject of the sale is thereafter at the buyer's risk. *Standard Casing Co. v. California Casing Co.,* 233 N.Y. 413, 416 (1922) (citations omitted). Thus, "[o]rdinari1y, delivery to the carrier is delivery to the buyer." *Chase Manhattan Bank v. Nissho Pacific Corp.,* 22 A.D.2d 215, 221 (1ˢᵗ Dep't 1964). "[T]he seller must bear the risk and expense of putting the goods in the possession of an

independent carrier at the seller's location." *Pittsburgh Industrial Furnace Co. v. Universal Consolidated Cos.,* 789 F. Supp. 184, 188-89 (W.D. Pa. 1991) (construing UCC 2-319(l)(a)).

NY UCC § 2-401(2)(a) permits the parties to specify in a contract the point at which title passes. *See e.g., S&H Commcns, Inc. v. Seiscor Techs., Inc.,* 221 A.D.2d 156 (1995). In *S&H,* the contract specified that title passed at the place of delivery, and thus did not depart from the general rule set forth in UCC § 2-401(2). Consequently, title passed when the merchandise was handed over to the carrier, the same as if the contract were silent regarding title passage.

CBP's own Internal Compliance Publication regarding "sale for exportation" contains the following passage:

### 8. What factors indicate whether property or ownership in property was transferred?

In determining whether property or ownership in property has been transferred from a potential seller to a potential buyer, CBP considers whether the potential buyer has assumed the risk of loss for the imported merchandise *(i.e.,* the potential buyer was liable for the imported merchandise if lost or damaged during shipment) and acquired title to the imported merchandise *(i.e.,* the potential buyer legally possesses or owns the imported merchandise). In addition, CBP may examine whether the potential buyer paid for the merchandise *(i.e.,* consideration passed between the potential buyer and seller for the imported merchandise). Transactions involving goods that are shipped on consignment do not constitute *bona fide* sales because the goods are not the subject of a sale. Therefore, the transaction value method of appraisement cannot be used to appraise goods shipped to the United States on consignment. Other examples where imported goods are not considered to be the subject of a sale include gifts, samples and promotional items furnished free of charge; goods imported under a leasing contract; and goods that were loaned. The transaction value method cannot be used to appraise such goods. Therefore, an alternative method of appraisement must be used in such situations.

Bona Fide Sales & Sales For Exportation to the United States (2005), at 3, CBP.GOV, https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/ICP-Bona-Fide-Sales-2005-Final.pdf. Here, under the governing contracts between Midwest and its

customers, the sales occurred in Buffalo, New York because the merchandise was delivered and title and risk of loss transferred there.

The state of the law is clear, conclusive and overwhelming. Where goods are sold "FOB Buffalo, New York," pursuant to the New York UCC, the sale of the goods occurs domestically, in the State of New York. From a customs perspective, where a sale occurs at an "FOB" point in the U.S., and purchase orders are accepted in the U.S., the sale is purely a domestic one which cannot be used as the basis of dutiable "transaction value." *See Orbisphere, supra.*

Simply stated, the sales from Midwest to its United States customers are not "sales for exportation to the United States" since they do not occur until after exportation to the United States has been completed. Midwest and its customers are subject to a purely domestic contract of sale, not an international one. A domestic sale is not a "sale for exportation to the United States" and cannot be used as the basis of appraisement.

### c. CBP is Not Permitted to Rewrite Commercial Terms of Sale Explicitly Stated in a Valid Contract.

The facts are clear that Midwest and its customers lawfully entered into a binding contract for the sale of goods in a purely domestic transaction. Under the sales terms, title transfers to Midwest's customers upon delivery to the customers' designated carriers at the "F.O.B." point in Buffalo, NY. The parties explicitly selected a term which governs domestic sales, rather than one of the INCOTERMS which are commonly used in international commerce, and which specify responsibilities for international movement, customs clearance and duty payment respecting the goods. In this case, there is no mention, anywhere in the contract documents, regarding the importation of the goods, or responsibility for payment of duties and clearance charges.  In this regard, these transactions are no different from the transactions which Midwest entered into with its customers when the delivery point was Cannon Falls, Minnesota, or Union City, Tennessee.

CBP does not dispute that Midwest and its customers were competent to contract with one another, and did so. Thus, with the parties intending to form such a contract, and there being a "meeting of the minds" reflected in a written contract, it is beyond the pale for CBP to suggest that Midwest somehow improperly "influence[d]" the sale, or "manipulate[d]," the place where title transfer occurred. *See* Rule 56.3 statement, at ¶ 39; Exhibit S at Bates No. 000733. The parties, by mutual agreement, as reflected in the contract of sale, set the point of delivery and title transfer at Buffalo, New York, in a domestic transaction.

CBP itself concedes that Midwest and its customers intentionally agreed for title to transfer to the customers in the United States:

> As part of our audit we also examined the terms of delivery and we determined that just as a related party can influence the price or payable, we found that Midwest influenced the sale by use of the term of deliver [sic], Free-on-Board (FOB), Buffalo and manipulated where title transferred in conjunction with the terms of delivery. There was no evidence where term of sale or title were negotiated or agreed upon, as in accordance with the UCC. The evidence suggests that Midwest designed each sale to its benefit. There appears to be no other options presented to the customer as to delivery or where title was transferred.

*Id.* The notion that Midwest "manipulated where title was transferred" is unsupported by any evidence or authority. CBP never specified how the use of a particular delivery term "influence[d] the sale", or what "manipulation" occurred by reason of the transfer of title. Indeed, by electing to sell goods FOB Buffalo, New York, Midwest was assuming all of the risks of international transportation, Customs clearance and duty payment - hardly a manipulation of sales "to its benefit", as it obligated Midwest to incur higher costs than had it sold the goods to customers "ex works" the Woodbridge warehouse, and let the customers act as importer of record.[17]

---

[17] Indeed, the use of an "FOB Buffalo, New York" delivery term in the instant case was to the benefit of Midwest's customers, most of which are small retailers, such as gift shops, florists, and hospital shops which would not have the business sophistication to retain Customs brokers, post customs bonds and act as Importers of Record.

Further, the notion that Midwest somehow "manipulates" terms of sale to its benefit is belied by the notion that the company actively negotiates terms of sale and delivery with its customers. As previously noted, some larger importers in the United States, i.e., department store chains such as Kohl's, negotiate with Midwest to purchase goods for direct export from foreign countries to the United States, where these customers often act as importer of record for the goods, which are specially made for them. On the other hand, Midwest's customers who are the subject of the transactions at bar tend to be smaller retailers, such as gift stores, florists and hospital gift shops who purchase relatively small amounts of merchandise. These customers tend to be less sophisticated, and less inclined to undertake the burdens of acting as importer of record, paying Customs duties, posting an importer bond with Customs, arranging for international transportation of the merchandise, engaging Customs brokers, arranging FWS import permits, and dealing with Partner Government Agency requirements concerning the importation of merchandise. In the transactions at bar the use of the sales term "FOB Buffalo, New York" is in accordance with the NY UCC is for the convenience of the customers, not Midwest.

Since the company's inception, virtually all of the goods which Midwest has sold in the United States are imported. Midwest offers to sell goods to customers "FOB Buffalo" because many of its customers are small businesses, inexperienced in importing, and prefer to purchase the goods on domestic terms. Indeed, even when Midwest's inventory of imported goods was kept in the United States, it offered goods to customers on domestic terms. Nothing has changed. Not only is it lawful for Midwest, or any other importer, to structure its sales transactions in the way which most suits it, but there are legitimate business reasons for Midwest's use of the "FOB Buffalo" sales term.

CBP has no authority to rewrite the commercial sales terms governing thousands of Midwest's purely domestic transactions in a concerted effort to shift the point at which title and risk of loss passes from Midwest to its domestic customers. While CBP has found "sales for exportation" to exist, or not exist, *when the terms of sale are not clearly identified by the parties* (*see e.g., Customs Headquarters Ruling H249150 of January 28, 2014*); *Customs Headquarters Ruling 006576 of December 19, 2007*), there is no basis, whether rooted in law, regulation, court decision, or other authority, whatsoever permitting CBP to rewrite commercial sales terms when they are, as here, clearly delineated by the parties in the governing sales contract.

CBP's quibbles with the location of the "F.O.B. Buffalo" term of sale on the governing commercial documents[18] are immaterial, and have no effect on the governing terms. The UCC-defined "F.O.B." delivery terms were stated explicitly on all commercial sales documents binding the parties. These terms set forth, *inter alia,* the delivery point, location at which title to the goods transferred to the buyer, and the location and time at which risk of loss transfers to the buyer. The rights and duties of the contracting parties are thus set forth in the contract, as interpreted by the UCC, and not one of Midwest's customers have taken issue with the terms employed in the governing commercial documents.

### d. CBP's Claim that an Export Sale Occurs Under the Instant Facts Directly Contradicts Decisions of the Trade Courts and Those Interpreting the UCC.

CBP's claim that a "sale for export" exists under these facts directly contradicts court decisions interpreting the UCC and various decisions of the trade courts concerning whether there is a "sale for export to the U.S." for Customs appraisement purposes.  Indeed, decisions interpreting

---

[18] In *Customs Headquarters Ruling H275056 of July 1, 2016*, Customs agrees that the "terms of delivery [are] shown on the invoices as "F.O.B. Buffalo, New York." ["The document specified the unit price for the items listed and the words 'FOB Buffalo, New York' were printed on the bottom of the packing slip in fine print"; "in fine print on the bottom of the invoices, the words 'FOB Buffalo, New York as DEFINED BY THE NEW YORK UNIFORM COMMERCIAL CODE' are printed."] *See* Rule 56.3 statement, at ¶ 40; Exhibit T.

the UCC as adopted by the State of New York, and as adopted in other states, corroborate Midwest's contentions herein, as well as the conclusions drawn in *Orbisphere* and related cases (discussed *infra*).

It is well-settled that where goods move to the United States on consignment, or in a transfer between two of the seller's facilities, there is no sale of goods "for exportation to the United States", and no transaction value can be determined for the goods. This principle was established over thirty years ago, in the case of *Orbisphere, Inc. v. United States*, 726 F. Supp. 1344, 1357-58 (Ct. Int'l Trade 1989). In *Orbisphere,* United States customers placed orders for the purchase of gas detection devices at one of the plaintiff's four domestic sales office location in New Jersey, Texas, Illinois and California. *Id*. at 1344. Once the orders were received, they were forwarded to plaintiff's office in Geneva, Switzerland, where the devices were manufactured. *Id*. at 1344-45. The goods were then shipped to Orbisphere's office in New Jersey. Prices were set by the Geneva, Switzerland officer, and were not subject to adjustment by the United States sales officer. *Id*. at 1345.

The gas detection devices, when imported, were unpacked and inspected at Orbisphere's New Jersey office, before being shipped to United States customers. *Id.* The Court noted the terms of delivery to be the following:

> …"title and risk of loss passes [sic] from seller to the buyer on delivery of the merchandise to the carrier at the F.O.B. point indicated in the invoice.' Under the heading 'Prices and payment terms', item 5 on this invoice, it is stated 'All prices are F.O.B. Haworth, N.J. Item 1 on this invoice, titled 'Orders', provides "Orders are subject to acceptance only at seller's office in Haworth, N.J."

*Id.* The costs of shipping the goods from the New Jersey office to the customers' United States locations were billed to the customers separately from the price of the goods. *Id.* Trial testimony also established that while the goods were being shipped from Switzerland to the United

States, Orbisphere maintained an open freight insurance policy on the goods, and that any loss of the goods while in transit would be for Orbisphere's account, not the customer's. *Id*. at 1348.

Referring to the decision in *United States v. Massce & Co., et. al.,* 22 C.C.P.A. 54 (1933), the *Orbisphere* Court noted that purchase orders had been placed in the United States before the goods were exported from their foreign country of origin. *Id*. at 1351. The key issue, the *Orbisphere* Court noted was "depends substantially upon where the sales of the product are deemed to have occurred." *Id*. at 1350. Holding that the sales from Orbisphere to its customers were domestic sales, and that there was no international sale which could have formed the basis for a transaction value, the Court noted:

> "Because the present case involves statutes, legal issues, and facts similar to those in Massce, the doctrine of *stare decisis* would seem to require a similar outcome here. In fact such an outcome seems to be required even *a fortiori* here: while the incorporation status of the plaintiffs in *Massce* is not wholly clear from that decision, in the present case both Orbisphere and Orbisphere Labs were American corporations, incorporated in Delaware, at the time of the sales at issue; moreover, while it is also unclear what, if any, terms were included on sales or shipping documents used in the *Massce* transactions, the invoices used by Orbisphere to document the transactions at issue here, supported by testimony at trial, clearly states that the orders were acceptable at New Jersey, and that title and risk of loss of the goods passed to the purchasers at that location."

*Id*. at 1351.

The Court also focused on the place where the orders were accepted, noting that Orbisphere's United States offices accepted orders from United States customers, and that its Swiss office had no communication with the domestic purchasers of the merchandise. In the instant case, all orders are accepted by Midwest's office in Minnesota. Customers had no communication with the warehouse prior to acceptance of their orders, and indeed may be unaware that Midwest kept its inventory in Canada. Indeed, the warehouse had no capacity to accept orders, as all order acceptance was done at plaintiff's Cannon Falls, Minnesota headquarters office.

28

The decision in *Orbisphere* is directly applicable to the instant case. In the instant case, all of the sales orders from U.S. Customers were solicited and/or received by the U.S. sales offices of Midwest, a U.S. corporation. None were ever solicited or received directly by the Woodbridge, ON warehouse. Indeed, the Woodbridge, ON warehouse never had direct communications of any kind with U.S. customers. The terms and conditions printed on the sales invoices for all of the products involved here clearly stated that orders were acceptable only by the Minnesota office, that title and risk of loss on all sales passed to the buyer on delivery of the products to the ultimate carrier at the F.O.B. point stated in the invoice, and that this F.O.B. point was Midwest's third party logistics facility located in Buffalo, NY and operated by UPS. The invoices are mailed to the customers from the F.O.B. point stated in the invoice. All payments for U.S. sales were sent to Midwest's U.S. bank.

Midwest's customers have title to the goods and bear risk of loss from the "FOB" delivery point forward, and are responsible for paying the cost of domestic freight from Buffalo, N.Y., to their location. Such sales are recognized as purely domestic sales under the UCC, and under 19 U.S.C. § 1401a. *See Orbisphere, Inc. v. United States*, 726 F. Supp. 1357-58 (Ct. Int'l Tr. 1989). A domestic sale is not a sale "for exportation" to the U.S., and cannot be the basis of transaction value. *Id.*

Moreover, it is overwhelmingly clear that a sale made on "F.O.B. Buffalo" terms, under the NY UCC is a sale occurring within New York State and is not an international sale or a "sale for exportation."  That the goods may be sold on "FOB" terms within the U.S. before they are imported does not transform a domestic sale into a sale for exportation. *See e.g.*, *Synergy Sport*

*International v. United States*, 17 CIT 18 (1993).[19]  As the leading commentary on the GATT

Customs Valuation Code (which is the basis for the U.S. value statute) indicates:

> The fact that the goods have been resold by the importer to a customer in the country
> of importation before they are imported does not alter the TV [transaction value
> analysis], at least if the original importer is still the importer or consignee and title
> passes through him to the later purchaser or if the customs value can be declared in
> his name.

*See* Sherman and Glashoff, *Customs Valuation: Commentary on the GATT Customs Valuation*

*Code* (2d ed.), at p. 100, ¶ 186.[20]  The original owner (*i.e.,* Midwest), is still the consignee of the

goods, title passes through it to subsequent purchasers, and, at the time of entry, the Customs entry

is filed in Midwest's name, as Midwest holds title to the goods.

We have found no authority for the proposition that CBP may change the terms of a clearly-

defined sales transaction, to convert it from a domestic transaction to a "sale for exportation to the

U.S."  The CIT in *Orbisphere, supra*, rejected this effort.

*Orbisphere* and the instant case are for all purposes inseparable. For example, the

merchandise in *Orbisphere*, as here, is/was in its finished condition when the purchase orders

are/were received by the corporate headquarters.  *See Orbisphere*, at 1345 ("The completed item

was then shipped from Geneva … ").  Moreover, as in *Orbisphere*, the U.S. customer is not

apprised of the items' inventory location—for Midwest, unbeknownst to its customers, the

---

[19] Similarly, if, when Midwest had warehouses in Minnesota and Tennessee, a United States customer had placed a sale before goods were imported and available at the warehouse, this circumstance would not have transformed those customer sales into "sales for exportation to the United States".

[20] The same treatise also suggests that if a company acquires title to merchandise in a foreign country, and consigns it to himself in the country of importation, that could indicate that the price paid to the foreign supplier should be taken as the basis of a transaction value. Id., at p. 100, ¶187. This notion would support appraising Midwest's goods on the basis of "transaction value", based on the prices Midwest pays to its various foreign vendors. The only impediment to applying this rule is that the goods are sent to Canada before being consigned into the United States.

merchandise is warehoused in Canada; for Orbisphere, unbeknownst to its customers, the inventory was maintained in Switzerland.

Whereas in Orbisphere, the proceeds from the sales made by the U.S. offices "were ultimately remitted to the Geneva office; the U.S. offices, therefore, were 'cost centers', not 'profit centers'", *Id.* at 1345, in the instant case all of Midwest's revenues are deposited into an account held by Midwest in the U.S.  Midwest's only profit center is in the U.S.

Furthermore, <u>Orbisphere's Switzerland office was at one point solely responsible for order acceptance</u>.  Indeed, the *Orbisphere* court observed how "the invoices used [by Orbisphere] in and prior to 1983 state that orders are subject to acceptance 'only at sellers office at Geneva, Switzerland', and that all prices are 'F.O.B. Geneva, Switzerland.'" *Id.* Even after Orbisphere altered this invoice language,[21] the court observed how "the New Jersey office would send to the factory in Geneva" a telex "requesting the Geneva office to "please accept" the order described in the telex and the suspense copy."  *Id.* The authority given by Orbisphere to its Switzerland office immediately preceding the transactions at issue in that case suggest much greater foreign involvement in corporate decision making to the extent that there is at least a *possibility* that orders could be accepted in a foreign location. *Id*. at 1351. In this case, however, there is only one Midwest entity, and this entity alone accepts orders from customers at its office in Cannon Falls, MN. Just as orders accepted by the New Jersey office in Orbisphere were deemed to be domestic sales orders, so too orders accepted by Midwest's Minnesota office signify domestic sales transactions. *Id*. at 1352.

In *Orbisphere*, the sales orders for merchandise were solicited in the U.S. by sales staff working at four U.S. sales offices. *Id*. at 1344, 1351.  Midwest at relevant times employed

---

[21] That is, to indicate that "[o]rders are subject to acceptance only at seller's office in Haworth, N.J." *Id.* at 1345.

approximately 116 salaried salespeople working in their territories and reporting to the sales staff in Cannon Falls.

## II. Deductive Value Appraisement is the Proper Methodology Under 19 U.S.C. § 1401a and According to Precedent of the Trade Courts

Where, as here, goods are entered into the U.S. on consignment, transaction value appraisement does not apply. In *VWP of Am., Inc. v. United States,* 117 Fed. Appx. 113, 115-116 (Fed. Cir. 2004), the Federal Circuit explained the sequential application of the appraisement methods of Section 402:

> In the event that the transaction value of the imported merchandise cannot be calculated, the merchandise should next be appraised based on the transaction value of identical or similar merchandise. *See id.* §§ 1401a(a)(l)(B) & (C). This transaction value must be calculated from imported merchandise that is "(A) with respect to the merchandise being appraised, either identical merchandise or similar merchandise, as the case may be; and (B) exported to the United States at or about the time that the merchandise being appraised is exported to the United States." *Id.* § 140la(c)(l).

> The next preferred appraisal value, if identical or similar merchandise is not available, is "deductive value." */d.§* 140la(a)(1)(D). Deductive value is equal to the resale price in the United States, less certain commissions, costs, and duties. *Id.* § 140la(d)(3)(A). If deductive value, too, is unavailable, Customs may turn to "computed value," *id.* § 140la(a)(1)(E), which reflects the sum of production and material costs of the imported merchandise, plus profits and general expenses from sales of merchandise of the "same class or kind as the imported merchandise," *id.* § 140la(e)(l). In the event that none of the valuation methods described in section 1401a(a)(l)(A)-(E) can be used, Customs may resort to section 140la(f), *id.* § methods set forth in ... subsections [(b) through (e)], with such methods being reasonably adjusted to the extent necessary to arrive at a value," *id.* § 140la(f)(l).

(*See also, Customs Headquarters Ruling H165361 of November 1, 2011*: "However, in order to use transaction value as the basis for appraisement, there must be a *bona fide* sale. If there is no sale, as in the case of merchandise imported under consignment, then appraisement must be based on another method set forth in 19 U.S.C. § 140la, the valuation statute, taken in sequential order." (*See also, Customs Headquarters Ruling H165361 of November 1, 2011.*).

Here, Midwest moves the goods from its Woodbridge warehouse into the U.S. on consignment without any transfer of title or risk of loss. It is well-settled that an international consignment of goods is not a "sale," and certainly not a "sale for exportation to the U.S." Accordingly, transaction value cannot serve as the basis of appraising the goods. Where transaction value appraisement under 19 U.S.C. § 1401a(b) is unavailable, "the merchandise should next be appraised based on the transaction value of identical or similar merchandise." *VWP of Am.,* at 115 (citing 19 U.S.C. §§ 1401a(a)(l)(B) & (C)). This method of appraisement is unavailable in this case, as Midwest does not sell identical or similar goods for export to the United States to any customers. In such situations, Section 402 indicates that deductive value appraisement is appropriate. *Id.* at § 1401(a)(I)(D) Alternatively, the goods may be appraised according to the residual appraisement provided in § 1401 a(f).

Because no version of transaction value appraisement is proper under the instant facts, Midwest submits that the merchandise must be appraised according to deductive value, which is the methodology it applied at the time of entry. Precise deductive values are to be calculated in Phase II of this action.

**III.    Even If *Arguendo* CBP Rejects Deductive Value as the Basis of Appraisement and Maintains that Transaction Value is Proper, the Uplift Calculation CBP Utilized in Liquidating the Instant Entries is Improper**

In a CF 29 Notice of Action dated March 28, 2016, and in a substantially identical notice dated April 8, 2016, *see* Rule 56.3 statement, at ¶ 42; Exhibit U,  CBP explained that it had reappraised the goods on the basis of a claimed "transaction value," by increasing the entered deductive values by a factor of 123.18%; and in a letter dated April 25, 2016, *See* Rule 56.3 statement, at ¶ 44; Exhibit W, CBP further explained that this uplift was based entirely on Midwest-CBK's 2013 Financial Report.

After Midwest noted gross arithmetic errors in CBP's computation, the agency on August 6, 2016 issued a CF 29 Notice of Action *(see* Rule 56.3 statement, at ¶ 47; Exhibit Z), which undertakes to appraise Midwest entries at 75.75% above the entered deductive value. Of course, Midwest does not concede or admit that there is any "sale for exportation to the U.S." involved with the merchandise entered, and while the company insists that deductive value appraisement under 19 U.S.C. § 140la(d) is correct, even if, *arguendo,* a transaction value could be calculated, CBP's uplift calculations of 123.18% and 75.75% are both demonstrably incorrect in several respects, meaning that the resultant liquidations are excessive.

Customs' appraisement in liquidation is arbitrary, and it is well settled that arbitrary appraisements cannot stand. See *Ashland Chemical Co. v. United States*, 7 CIT 362 (1984).

### IV.   Certain of the Protested Entries Are Deemed Liquidated By Operation of Law Pursuant to 19 U.S.C. § 1504(b).

In additional to the foregoing, Midwest further contends that certain protested entries were liquidated by operation of law, as entered, pursuant to Section 504(b) of the Tariff Act, 19 U.S.C. § 1504(b). In this regard, Midwest submits that CBP had no basis to extend liquidation of entries after June 14, 2015, because at that time, CBP had in its possession "the information needed" for the appraisement of Midwest's entries. *Id.* The consequence of CBP's unjustified extensions is that the illegally extended entries were liquidated "as entered," by operation of law, on their anniversary dates.

By law, CBP is obligated to liquidate entries within one year of their date of entry. 19 U.S.C. § 1504(b). If CBP fails to liquidate any entry within one year, the entry is deemed liquidated "by operation of law" at the rate and amount of duty asserted by the importer at the time of entry. Extensions of the one year liquidation period are permitted in certain circumstances where (i) "the information needed for the proper appraisement ... is not available to [CBP]" or the importer

requests an extension; (ii) notices of each extension are provided to the importer and its surety; and (iii) the cumulative extensions of the liquidation period may not bring the liquidation date beyond four years from the date of entry (i.e., only three one-year extensions of the liquidation period are possible). 19 U.S.C. § 1504(b).

Here, Midwest never requested an extension of liquidation of the protested entries; and thus, subsection § 1504(b)(2) is inapplicable. Rather, CBP officials, on their own initiative, extended the liquidation of the protested entries while engaged in a quick response audit of Midwest's entries. The issue presented is whether CBP's extensions of the liquidation of Midwest's entries were justified.

The conduct, requests for information, and follow-up requests of CBP's audit team indicates that the extensions are not justified. CBP's audit field work began on February 24, 2014, and continued through February 26, 2014. During this time, CBP's audit team gathered information to appraise the subject entries. Midwest provided substantial documentation and never received a notice of deficiency. **All initial and supplemental requests for information were issued by CBP to Midwest, and all requested information was provided by Midwest to CBP, on or before June 14, 2014.** Despite several requests from Midwest for status updates from CBP, there was **no further correspondence from CBP for more than a year, until, July 2015 when** the auditors issued the Draft Audit Report (*see* Rule 56.3 statement, at ¶ 36; Exhibit Q), and invited Midwest to comment thereon. Because CBP's Draft Audit Report was so brief -- spanning only one-and-a-half pages in length -- and so bereft of citations to evidence/authority -- containing no specific findings, no citation to documents or individual transactions, and no citations to legal authority -- Midwest submitted its comments to the auditors less than ten days later, on July 8, 2015. *See* Rule 56.3 statement, at ¶ 37; Exhibit R. Due to the agency's cursory analysis, Midwest's submission contained only legal analysis, and no new factual information. Thus, CBP had received the last

35

piece of information that it "needed" to appraise the protested entries more than a year before the date when the auditors issued the Draft Audit Report.

Customs then went silent for another seven months. Nothing further was heard from CBP until February 1, 2016, when Raymond Baker, Assistant Regulatory Audit Director for the Port of Buffalo, contacted Midwest's counsel to advise that a final audit report would be issued forthwith.

Almost two months later, on March 28, 2016, Import Specialist Wisniewski of Buffalo CBP issued a CF 29 Notice of Action which indicated that certain entries (included in this protest) would be liquidated with the 123.13% uplift. These first liquidations occurred on April 8, 2016, which is nearly two years after CBP's auditors received the last of the information requested from Midwest, and almost exactly two years after the agency received the final accounting data of Midwest on which the liquidations were based. Subsequently, by letter dated April 25, 2016 (*see* Rule 56.3 statement, at ¶ 44; Exhibit W), Import Specialist Wisnewski explained the basis of CBP's 123.13% uplift calculation. According to Mr. Wisnewski, CBP's assessment was based solely on information taken from financial statements which Midwest had provided to CBP in April, 2014.

From the foregoing, it is clear that during the period June 14, 2014 through April 8, 2016, CBP was not lacking any of the information CBP determined was "needed" to calculate the appraised value of Midwest's entries. The consequence that all extensions of liquidation issued during that period are null and void. It follows that the entries at issue were deemed liquidated, as entered, on their respective anniversary dates falling within that time. 19 U.S.C. § 1504(b).

It is well-established that CBP may not extend the liquidation of an entry without statutory cause, and the statute is clear that an extension is only valid if CBP lacks "the information needed for the proper appraisement" of an importer's entries. *Id.* Where CBP does not require additional

information to liquidate an entry, and is not awaiting the submission of data necessary for liquidation, no basis in law exists for extending liquidation under 19 U.S.C. § 1504(b). *See St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763 (Fed. Cir. 1993); *Universal Percussion Inc. v. United States,* 19 CIT 546 (1995).

To the extent that CBP here may claim that information necessary for the appraisement of Midwest's merchandise was at one time "not available," that lack of availability ended no later than June 14, 2014 when CBP received the last of the information requested by the audit team. Because no other import specialist, or other CBP official requested any new information after this date, CBP's extensions of liquidations are *per se* unlawful.

In *Ford Motor Co. v. United States,* 157 F.3d 849 (Fed. Cir. 1998), CBP officials sought information that it deemed necessary to appraise certain merchandise. There were deficiencies in the data which the importer provided, but CBP took no action to liquidate the entries for more than three years, and did not reach out to the importer with a notice of deficiency or to request any additional-i.e., new-information. On appeal, the Federal Circuit held, "[i]n light of this record, a reasonable fact finder could determine that Customs did virtually nothing for nearly two years." *Id.* at 856. Notably in *Ford,* CBP defended its extensions of liquidation on the basis that it was conducting a fraud investigation, but the Court held this merely created an issue of fact to be decided at trial.[22]

A full airing of the facts in this case reveals that CBP' s delay was unreasonable and therefore an abuse of the agency's discretion, resulting in the affected entries being found to have deemed liquidation by operation of law pursuant to 19 U.S.C. §l504(b). Customs in *Ford* indicated that it was

---

[22] Stated another way, the information required by Customs which would justify extension of liquidation of an entry cannot be information Customs is awaiting to receive from itself.

conducting an investigation of the importer, and that the investigation justified.  In this case, clearly CBP did not need any additional information to appraise Midwest's goods. There was no fraud or other investigation of Midwest being conducted, nor any outstanding requests for information by the auditors concerning Midwest's entries. Import Specialist Wisniewski's letter of April 25, 2016 (*see* Rule 56.3 statement, at ¶ 44; Exhibit W), further demonstrates that CBP had all of the information required for its appraisement calculation in early 2014.

CBP's own internal deliberations concerning the proper basis of appraisement of Midwest's goods do not constitute a "need" on the agency's part for additional information required for appraising the entries. Mere lassitude, or prolonged internal deliberations, do not provide a basis for extending the liquidation period. Rather, there must be a lawful reason for the extension; however, the record shows that the information which CBP used to appraise the merchandise was in the agency's possession in early 2014--approximately two years before the entries in question liquidated.

Absent a need for additional appraisement liquidation, it follows that the extensions of liquidation issued between June 14, 2014 and April 8, 2016, were invalid. The result of CBP's delay is that these entries were deemed liquidated by operation of law, at the values asserted by Midwest at the time of entry. The instant liquidations are thus invalid, and summary judgement should be entered for plaintiff on this claim.

## CONCLUSION

For the reasons set forth herein, Plaintiff requests that this Court issue an order (i) granting Plaintiff's Motion for Partial Summary Judgment; and (ii) determining that the subject goods in the protested entries should be liquidated according to the "deductive value" appraisement methodology. There is no basis to determine a transaction value for the merchandise, and the goods

are subject to appraisement on the basis of deductive value under 19 U.S.C. § 140la(d). There is also no basis for CBP's uplift calculations; they too are incorrect, not in accordance with law, arbitrary and capricious.

                                        Respectfully submitted,

                                        NEVILLE PETERSON LLP

                                        /s/ John M. Peterson
                                            John M. Peterson
                                            Patrick B. Klein
                                            One Exchange Plaza
                                            55 Broadway, Suite 2602
                                            New York, NY 10006
                                            (212) 635-2730
                                            jpeterson@npwny.com

Dated:  July 20, 2021

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JENNIFFER CHOE-GROVES, JUDGE**
-------------------------------------------------------------------- X
**MIDWEST-CBK, LLC.,**                                               :
                                                                     :
               **Plaintiff,**                                        :
                                                                     :
        *v.*                                                         :      **Consol. Court No. 17-cv-00154**
                                                                     :
**THE UNITED STATES,**                                               :
                                                                     :
               **Defendant.**                                        :
-------------------------------------------------------------------- X

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff, Midwest-CBK, LLC.'s Motion for Partial Summary

Judgment, Memorandum of Points and Authorities in Support, and Statement of Material Facts

Not in Dispute was served electronically by this Courts CM/ECF system on July 20, 2021.


                                        Respectfully submitted,
                                        /s/ Patrick B. Klein
                                        Patrick B. Klein



July 20, 2021

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JENNIFFER CHOE-GROVES, JUDGE**

-------------------------------------------------------------- X

MIDWEST-CBK, LLC.,                                          :
                                                           :
      Plaintiff,                                        :
                                                           :
      v.                                                :        Consol. Court No. 17-cv-00154
                                                           :
THE UNITED STATES,                                         :
                                                           :
      Defendant.                                        :

-------------------------------------------------------------- X

## <u>CERTIFICATE OF COMPLIANCE</u>

      Plaintiff, Midwest-CBK, LLC., by and through undersigned counsel, hereby certified, in accordance with Chambers Procedure 2(B)(2) of the Court, that Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Partial Motion for Summary Judgment contains 13,355 words, as measured by the word processing system used to prepare the document, excluding those portions that do not count toward the word limitation.

<div style="margin-left:50%">

Respectfully submitted,
<u>/s/ Patrick B. Klein</u>
Patrick B. Klein

</div>

July 20, 2021