UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____
                                                                :
MIDWEST-CBK, LLC,                                               :
                                                                :
                            Plaintiff,                          :
                                                                :        Consol. Court No. 17-00154
                     v.                                         :
                                                                :
UNITED STATES,                                                  :
                                                                :
_____Defendant._____:

## <u>ORDER</u>

Upon reading plaintiff's motion for partial summary judgment, defendant's cross-motion for partial summary judgment, and the parties' respective responses thereto; and upon consideration of other papers and proceedings had herein; it is hereby

**ORDERED** that plaintiff's motion for partial summary judgment be, and hereby is, denied; and it is further

**ORDERED** that defendant's cross-motion for partial summary judgment be, and hereby is, granted; and it is further

**ORDERED** that the sales between plaintiff and its customers located in the United States satisfy the statutory requirements for sales "for exportation to the United States," as identified in 19 U.S.C. § 1401a(b)(1); and it is further

**ORDERED** that the imported merchandise shall be appraised on the basis of the "transaction value" of the sales between plaintiff and its customers located in the United States pursuant to 19 U.S.C. § 1401a(b)(1); and it is further

**ORDERED** that the entries that are the subject of this consolidated action did not liquidate by operation of law (under the framework of 19 U.S.C. § 1504) at the rate of duty, value, quantity, and amount of duties asserted by the importer.

_____
JENNIFER CHOE-GROVES, SENIOR JUDGE

Dated: New York, New York
      This _____ day of _____ , 2021.

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE
_____

|  |  |
|---|---|
| MIDWEST-CBK, LLC, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| UNITED STATES, | : |
|  | : |
|  | : |
| Defendant. | : |

Consol. Court No. 17-00154

**DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully moves this Court for an order: (1) denying plaintiff's motion for partial summary judgment; (2) granting our cross-motion for partial summary judgment; (3) holding that the sales between plaintiff and its customers located in the United States satisfy the statutory requirements for sales "for exportation to the United States," as identified in 19 U.S.C. § 1401a(b)(1); (4) holding that the imported merchandise shall be appraised on the basis of the "transaction value" of the sales between plaintiff and its customers located in the United States pursuant to 19 U.S.C. § 1401a(b)(1); and (5) holding that the entries that are the subject of this consolidated action did not liquidate by operation of law (under the framework of 19 U.S.C. § 1504) at the rate of duty, value, quantity, and amount of duties asserted by the importer.

The bases for defendant's cross-motion for partial summary judgment are set forth in the attached memorandum, the exhibits submitted with plaintiff's motion for partial summary judgment, and the exhibits submitted with our cross-motion.

WHEREFORE, defendant respectfully requests that an order be entered denying plaintiff's motion for partial summary judgment, granting defendant's cross-motion for partial summary judgment, and granting such other and further relief as may be just and appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

BY:     /s/ Justin R. Miller
        JUSTIN R. MILLER
        Attorney-In-Charge
        International Trade Field Office

        /s/ Monica P. Triana
        MONICA P. TRIANA
        BRANDON A. KENNEDY
        Trial Attorneys
        U.S. Dept. of Justice, Civil Division
        Commercial Litigation Branch
        26 Federal Plaza – Suite 346
        New York, New York 10278
        Tel. (212) 264-9240 or 9230
        *Attorneys for Defendant*

September 24, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE
_____
                                                        :
MIDWEST-CBK, LLC,                                       :
                                                        :
                    Plaintiff,                          :
                                                        :        Consol. Court No. 17-00154
                    v.                                  :
                                                        :
UNITED STATES,                                          :
                                                        :
                                                        :
                    Defendant.                          :
_____

---

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

---

BRIAN M. BOYTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

MONICA P. TRIANA
BRANDON A. KENNEDY
Trial Attorneys
Civil Division, Dept. of Justice
Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
New York, New York 10278
Tel. No. 212-264-9240 or 9230
*Attorneys for Defendant*

Of Counsel:
Mathias Rabinovitch
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

A.  History Of The Company ............................................................................. 3

B.  Midwest's Operations In Canada After The Acquisition By Ganz..................... 5

C.  Specifics Of Midwest Import Operations Beginning In 2013 ............................ 6

      1.  Midwest Suppliers .................................................................... 7

      2.  Sales Orders ........................................................................... 8

      3.  Delivery Of The Merchandise ................................................... 9

      4.  Payment By U.S. Customers .....................................................12

D.  The Administrative Proceedings Involving Midwest .........................................13

E.  The Liquidation And Reliquidation Of The Entries ..........................................18

QUESTIONS PRESENTED .................................................................................19

SUMMARY OF ARGUMENT ............................................................................19

ARGUMENT .......................................................................................................20

   I.   STANDARD OF REVIEW ..............................................................20

   II.  THE MERCHANDISE SHOULD BE APPRAISED ON THE BASIS OF
       TRANSACTION VALUE BECAUSE THE SALES BETWEEN MIDWEST AND
       ITS U.S. CUSTOMERS MEET THE STATUTORY REQUIREMENTS AS SALES
       FOR EXPORTATION TO THE UNITED STATES....................................................21

      a.  The "Sale" Of The Merchandise.............................................................22

      b.  The Sale "For Exportation To The United States" ...................................23

   III. MIDWEST'S APPLICATION OF 19 U.S.C. § 1401a IS NOT SUPPORTED
       BY THE LAW ................................................................................................26

      a.  The Statue Does Not Require An International Sale For The Application  Of
         Transaction Value.............................................................................26

b.  The Method Of Shipment Is Not Relevant To The Statutory Analysis ...................28

c.  The Exportation Of The Merchandise To The United States Does Not Meet The Legal Requirements For A Consignment ...............................................................31

d.  Midwest's Reliance On The *Orbisphere* Decision Is Misplaced ............................33

   i.   The Analysis Of *Orbisphere* Involved The Predecessor Value Statute ..............33

   ii.  Even If The Court Were To Apply The Standard Of *Orbisphere*, Which It Should Not, Judgment Is Warranted For The United States ..............................37

IV. THE ARGUMENTS RAISED BY MIDWEST INVOLVING DEDUCTIVE VALUE AND CBP'S UPLIFT CALCULATIONS ARE OUTSIDE THIS PHASE OF THE LITIGATION AND SHOULD NOT BE CONSIDERED ............................................39

V. THE ENTRIES DID NOT LIQUIDATE BY OPERATION OF LAW AT THE RATE OF DUTY, VALUE, QUANTITY, AND AMOUNT OF DUTIES ASSERTED BY THE IMPORTER......................................................................................................39

CONCLUSION......................................................................................................44

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ........................................................................................21

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................20

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ........................................................................................26

*Detroit Zoological Society v. United States*,
  630 F. Supp. 1350 (Ct. Int'l Trade 1986) ........................................................41

*E.C. McAfee Co. v. United States*,
  842 F.2d 314 (Fed. Cir. 1988) ............................................................. 23, 24, 35

*Ford Motor Co. v. United States*,
  157 F.3d 849 (Fed. Cir. 1998) ............................................................. 21, 40, 41

*Generra Sportswear Co. v. U.S.*,
  905 F.2d 377 (Fed. Cir. 1990) ................................................................... 35, 36

*Jarvis Clark Co. v. United States*,
  733 F.2d 873 (Fed. Cir. 1984) ........................................................................41

*La Perla Fashions, Inc. v. United States*,
  9 F. Supp. 2d 698 (Ct. Int'l Trade 1998) *aff'd without opinion*,
  185 F.3d 885 (Fed. Cir. 1999) ............................................................. 27, 29, 30

*Litecubes, LLC v. Northern Lights Products, Inc.*,
  523 F.3d 1353 (Fed. Cir. 2008) ......................................................................29

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................................21

*Moss Mfg. Co. v. United States*,
  896 F.2d 535 (Fed. Cir. 1990) ........................................................................36

*Nissho Iwai Am. Corp. v. United States*,
  982 F.2d 505 (Fed. Cir. 1992) ................................................................. passim

*Orbisphere Corp. v. United States*,
   726 F. Supp. 1344 (Ct. Int'l Trade 1989) ........................................................ passim

*St. Paul Fire & Marine Ins. Co. v. United States,*
   6 F.3d 763 (Fed. Cir. 1993) ........................................................................ 40, 41

*Synergy Sport Int'l, Ltd., v. United States*,
   17 CIT 18 (1993) ....................................................................... 23, 25, 27, 28

*Texas Apparel Co. v. United States*,
   698 F. Supp. 932 (Ct. Int'l Trade 1988), aff'd,
   883 F.2d 66 (Fed. Cir. 1989), *cert. denied*,
   493 U.S. 1024 (1990) ................................................................................ 20, 21

*United States v. Massce & Co.*,
   21 C.C.P.A. 54 (1933) ................................................................... 34, 35, 36, 37

*VWP of Am., Inc. v. United States*,
   175 F.3d 1327 (Fed. Cir. 1999) .................................................................... *passim*

**Statutes**

19 U.S.C. § 1401a ............................................................................................ *passim*

19 U.S.C. § 1504 ............................................................................................. *passim*

19 U.S.C § 1500 ......................................................................................... 14, 39, 42

28 U.S.C. § 2639 .............................................................................................. 22, 40

The Tariff Act of 1930 ...................................................................................... 34, 36

**Rules**

USCIT Rule 56 ................................................................................................ 1, 21

**Regulations**

19 C.F.R. § 159.12 .............................................................................................. 40

19 C.F.R. § 177.11 .............................................................................................. 16

**Other Authorities**

HQ H275056 (July 1, 2016) ................................................................................... 17

"FOB Free on Board", Incoterms 2010 Edition,  International Chamber of Commerce
    *https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010/*..............29

Trade Agreements Act of 1979, Pub. L. No. 96-39, tit. II, § 201(a), 93. Stat. 194 .................1, 34

S. Rep. No. 96-249, 96th Cong. 1st Sess. at 119 (1979) ...........................................................36

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE
_____

|  |  |  |
|---|---|---|
| MIDWEST-CBK, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Consol. Court No. 17-00154 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT**

Defendant, the United States (Government), respectfully submits this memorandum of

law in opposition to the motion for partial summary judgment filed by plaintiff, Midwest-CBK,

LLC (Midwest or plaintiff), and in support of its cross-motion for partial summary judgment,

pursuant to Rule 56 of the Rules of the United States Court of International Trade (USCIT).

## <u>INTRODUCTION</u>

This consolidated action concerns the appropriate valuation of giftware, housewares, and

decorative items imported by Midwest. The merchandise was manufactured in China,

transported to Canada for storage, sold to customers in the United States, and then exported from

Canada to the United States in fulfillment of those sales.

Merchandise imported into the United States is appraised for customs purposes in

accordance with Section 402 of the Tariff Act of 1930, as amended by the Trade Agreements Act

of 1979 (19 U.S.C. § 1401a). By statute, the primary method of appraisement is transaction

value, which is defined as "the price actually paid or payable for the merchandise when sold for

exportation to the United States," plus certain statutorily enumerated additions.  19 U.S.C. § 1401a(b)(1).  When transaction value cannot be applied, then the appraised value is determined based on the other valuation methods in the order specified in 19 U.S.C. § 1401a(a).

CBP appraised the merchandise on the basis of transaction value between Midwest and its customers located in the United States.  Midwest challenges CBP's selection of transaction value arguing that Midwest's sales do not qualify as sales for exportation to the United States.  Midwest claims that, by operation of 19 U.S.C. § 1401a(a), the deductive value or fall back method should be used to appraise its merchandise.  Midwest also alleges that the entries deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted by operation of 19 U.S.C. § 1504.

The Court bifurcated the case into two phases to facilitate the most expedient resolution of this matter.  Phase One "encompass[es] [1] whether Plaintiff['s] . . import transactions reflect a sale for exportation to the United States" – a threshold issue in determining whether transaction value is the proper method of valuation  – "and [2] whether the entries became deemed liquidated by operation of law."  May 10, 2020 Order, Docket No. 52.  Phase Two covers "all remaining issues in this action, such as the proper method of valuation of the imported merchandise or whether [CBP's] calculation of transaction value was in accordance with the law."  *Id.*  Before the Court are the parties' cross-motions for partial summary judgment as to Phase One.

Contrary to plaintiff's assertions, the sales between Midwest and its customers located in the United States meet the statutory requirements for sales "for exportation to the United States." 19 U.S.C. § 1401a(b)(1).  Indeed, the record shows that, after production, Midwest transported the merchandise to Canada for storage.  While in storage, Midwest executed the sale of the merchandise to customers in the United States, and then exported the merchandise from Canada

to the United States in fulfillment of those sales. The undisputed facts show that at the time of entry the merchandise was labeled and clearly intended for delivery to a particular U.S. customer on the basis of the sale to the customer.

With respect to the second issue, the undisputed facts show that the entries did not become deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted by Midwest. Here, CBP extended the liquidation of the entries to obtain the information needed for the proper appraisement of the merchandise and to ensure Midwest's compliance with the law. Midwest fails to show an abuse of discretion in this process. Indeed, from the time of entry until liquidation, CBP actively sought the information needed to process the entries, and properly reviewed and considered that information in selecting the proper method of valuation and applying that method to calculate the value of the merchandise. For these reasons, we respectfully request that partial summary judgment be rendered in our favor.

## STATEMENT OF FACTS

### A.    History Of The Company

Midwest of Cannon Falls, Inc., plaintiff's predecessor company, was a gift store, founded in 1953, that sold seasonal items such as nutcrackers, music boxes and other holiday decorations/ornaments. Def. Ex. 1 (Interrogatories) at 2; Def. Ex. 2 (Deposition of Owen Rogers (Rogers Dep.)) at 24:7-9. At that time, both the corporate headquarters and the warehouse/distribution facility for Midwest of Cannon Falls were located in Cannon Falls, Minnesota. Def. Ex. 1 (Interrogatories) at 2. It purchased its merchandise from Chinese manufacturers, imported it directly into the United States from the foreign vendors, and then warehoused the merchandise in Cannon Falls until sale. *Id.* The company executed its sales through a United States sales force, and it shipped its merchandise from Cannon Falls to its U.S.

customers using the shipping terms, "FOB Cannon Falls, Minnesota." *Id*. During this time period, Midwest appraised its merchandise on the basis of the transaction value of the sale from the foreign supplier to Midwest. Def. Ex. 1 (Interrogatories) at 2; Pl. Br. at 3.

Beginning in 2009, Midwest's assets and business operations changed hands a number of times. *Id*. at 3. On December 5, 2012, the Ganz family, a group of investors based in Canada, acquired the assets of the company through Giftware Holdings, LLC (Giftware Holdings), a Delaware limited liability company owned by Ganz. Def. Ex. 1 (Interrogatories) at 3; Def. Ex. 2 (Rogers Dep.) at 16:19-17:11, 28:18-29:1; Def. Ex. 3 (Asset Purchase Agreement). Midwest, the importer of record for the merchandise, was formed by Ganz to acquire those assets. *Id*.; Entry Papers, Court File. The Ganz family owns businesses in both the United States and Canada through several Canadian trusts, Def. Ex. 4 (Ganz Canada); Def. Ex. 5 (Ganz USA); Def. Ex. 2 (Rogers Dep.) at 29:7-10, among other assets. Def. Ex. 2 (Rogers Dep.) at 16:19-17:11, 61:1-13. Together, the Ganz businesses (including Midwest) should be "look[ed] at . . . as a Ganz family enterprise," *id.*, at 16:19-17:11, or the "Ganz organization of companies." *Id*. at 34:25-35:4. Ganz Partnership (Ganz) is based out of One Pearce Road in Woodbridge, Ontario. *Id*. at 61:1-13.

Midwest designated Mr. Owen Rogers, Vice President of Ganz, as its corporate representative in this litigation. *Id*. at 192:2-4. He works on behalf of the Ganz family, overseeing all of its businesses, but had no role with Midwest other than to oversee its acquisition by Ganz. Def. Ex. 2 (Rogers Dep.) at 8:3-10:20. Mr. Howard Ganz, a beneficiary of the Ganz family trusts based in Canada, is the CEO of Midwest. Def. Ex. 6 (Midwest Officers); Def. Ex. 2 (Rogers Dep.) at 15:12-17:11, 29:7-10.

**B.**    **Midwest's Operations In Canada After The Acquisition By Ganz**

After the acquisition by the Ganz family, Midwest changed the structure of its business and the location of its facilities. Under this restructuring, Midwest kept its corporate office in Cannon Falls, Minnesota, where the following departments were located: product development; supply chain, procurement, purchasing and compliance; financial analysis, planning & accounting; and sales managers. Def. Ex. 2 (Rogers Dep.) at 39:12-40:21, 42:19-46:12, 48:1-50:6; Pl. Ex. B (January 30, 2013). However, Midwest shifted its warehouse, distribution and order processing operation to Canada, where the Ganz family and its companies were based. Pl. Ex. B (January 30, 2013 Letter).

Specifically, by January 2013, Midwest transitioned warehousing operations to a leased facility located at 610 Hanlan Road, Woodbridge, Ontario. Pl. Ex. D (Ganz Realty Lease); Def. Ex. 2 (Rogers Dep.) at 34:2-35:13. This facility was owned by Ganz Realty Limited (based in Canada), *id.*; Def. Ex. 4 (Ganz Canada); it housed distribution and warehousing as well as invoicing and order control departments. Def. Ex. 2 (Rogers Dep.) at 40:22-41:2, 54:5-55:2, 55:12-21; Def. Ex. 7 (Midwest Departments). These departments were responsible for, among other things, picking, packing, invoicing and delivery of merchandise. Def. Ex. 2 (Rogers Dep.) at 54:5-55:2, 55:12-21, 142:12-147:20. Midwest leased additional storage space from Ganz Realty, located at 260 Hanlan Road. *Id.* at 60:8-17.

Midwest also leased a two-story office building from Ganz Realty located at 555 Hanlan Road, Woodbridge, Ontario. *Id.* at 54:2-4. Approximately 22 Midwest employees worked in that building from the following six departments: order processing, inventory control, customer service, key accounts, information technology and customer accounts. Def. Ex. 8 (Deposition of Sandra Ruffolo (Ruffolo Dep.)) at 31:8-17, 34:23-35:12; Def. Ex. 7 (Midwest Departments);

Def. Ex. 2 (Rogers Dep.) at 51:6-52:12, 55:22-59:5, 59:12-60:1.  Individuals working in these departments were responsible for, among other things, setting up customer accounts, assisting with technology issues, managing key customer accounts, fielding customer inquiries, handling applications for credit and delinquent accounts, and assisting with order fulfillment at the warehouse.  *Id.*; Def. Ex. 8 (Ruffolo Dep.) at 40:7-41:11.

Midwest kept records at both Midwest locations – in Cannon Falls, Minnesota and Woodbridge, Ontario, Canada.  Records related to "product development, advertising, visual display, marketing, creative design, budgets and forecast, sales[], sourcing and vendor records and digital photography" were located in Cannon Falls.  Def. Ex. 11 (Undated Letter).  In Canada, Midwest maintained a data center and mainframe (AS400) system at One Pearce Road, which stored "the order management, inventory, customer account and source accounting records."  *Id.*; Def. Ex. 2 (Rogers Dep.) at 63:19-64:14, 65:7-66:12; Def. Ex. 1 (Interrogatories) at 10-11.  Use of the space at One Pearce Road (where Ganz offices are located) was governed by a contract with Ganz Studios, a software development company also owned by Ganz.  *Id.* at 67:21-69:24;  Def. Ex. 12 (Ganz Studios); Def. Ex. 4 (Ganz Canada).  Midwest servers located at One Pearce Road were maintained by an employee of Ganz.  *Id.* at 67:21-69:24.

Finally, beginning in 2013, Midwest maintained an additional showroom in the Ganz facility at One Pearce Road.  Def. Ex. 13 (Home Accents 2013 Catalog); Def. Ex. 2 (Rogers Dep.) at 88:12-89:6.  It did not pay any additional sums for use of this space.  Def. Ex. 2 (Rogers Dep.) at 88:12-89:6.

## C.   Specifics Of Midwest Import Operations Beginning In 2013

After the acquisition by the Ganz family in 2013, Midwest changed its import operations. As explained below, after production in China, Midwest transported the merchandise to Canada

for storage. While in storage, Midwest executed the sale of the merchandise to customers in the United States, and then exported the merchandise from Canada to the United States in fulfillment of those sales. Because, on these facts, Midwest could no longer appraise the merchandise based on the transaction value of the sale between Midwest and its Chinese supplier, Midwest changed its import procedures. As explained by Midwest, it "intentionally structured" the transactions between Midwest and its U.S. customers to "ensure that there was no sale of the goods 'for exportation to the United States' and that no basis would exist for appraisement under 'transaction value.'" Def. Ex. 14 (February 3, 2014 Letter).

### 1. Midwest Suppliers

When Midwest's warehouse and distribution operations relocated to Canada, it began importing merchandise directly from its Chinese supplier into Canada, where it was brought to Midwest's Canadian facilities. Def. Ex. 1 (Interrogatories) at 4; Def. Ex. 2 (Rogers Dep.) at 96:21-97:2, 102:24-103:2. Midwest paid all taxes, freight, fees, and Canadian import duties on those shipments. Def. Ex. 1 (Interrogatories) at 4; Def. Ex. 2 (Rogers Dep.) at 103:11-20. When merchandise was subsequently exported out of Canada, Midwest claimed drawback on the Canadian import duties paid. Def. Ex. 2 (Rogers Dep.) at 103:11-20. Midwest's inventory that is warehoused in Canada is available for purchase by any customer of Midwest, whether that customer is located in the United States or elsewhere. Def. Ex. 2 (Rogers Dep.) at 100:8-102:23.

### 2. Sales Orders

Consistent with the business operations before Midwest was purchased by Ganz, sales were made primarily through a U.S. based sales force. Def. Ex. 2 (Rogers Dep.) 104:18-105:7; Def. Ex. 1 (Interrogatories) at 5. Sales personnel visited customers with an electronic device that had point of sale software loaded; the software allowed the customer to view Midwest's

catalog(s) and make purchases. Def. Ex. 1 (Interrogatories) at 7. Midwest utilized two different point of sale software systems during the relevant time period, Emun and WhereOWare, both of which had similar functionality. *Id.*; Def. Ex. 2 (Rogers Dep.) at 105:8-107:21; Def. Ex. 15 (March 24, 2014 Letter) at 419. Both software systems were set up with specific parameters dictating the information necessary to place an order. If the parameters were met, and all necessary information provided (customer account information, *etc.*), the order would be accepted into the electronic system for processing, and made available to personnel in both Cannon Falls, Minnesota and Canada through the global distribution system. Def. Ex. 2 (Rogers Dep.) at 123:1-129:24, 131:7-18, 132:1-25; Def. Ex. 1 (Interrogatories) at 13.

Prior to transmission to the distribution system, however, orders are batched together and routed through a third-party server located in Alabama. Def. Ex. 2 (Rogers Dep.) at 122:15-124:9; Def. Ex. 15 (March 24, 2014 Letter.) at 419. The order processing department (located in Canada), which was responsible for managing orders, were the first Midwest employees to access the purchase order information after download into the AS400 mainframe. Def. Ex. 8 (Ruffolo Dep.) at 9:19-11:11; 24:8-25:9; 25:16-26:24.

Purchase orders reflecting the details of the order were provided to the U.S. customer (either in hard copy or via email). *See e.g.,* Def. Ex. 15 (March 24, 2014 Letter) at 424-425; Def. Ex. 2 (Rogers Dep.) at 110:20-113:21. They included the date, the name and address of the U.S. purchaser, the merchandise ordered, its quantity, the price to be paid and a purchase order number. *Id.* The purchase orders also included terms of the sale, including the phrase "All *prices* FOB Buffalo, New York as defined by the New York State Uniform Commercial Code." *Id.* (emphasis added). The complete terms and conditions, as noted on the purchase order, could

be obtained by contacting the customer services department by phone or email. *Id.*[1] The terms and conditions included contact information for customer service, order processing, customer accounts, and customer finance, all of which are located in Canada. Pl. Ex. O (Terms and Conditions); Def. Ex. 2 (Rogers Dep.) at 116:19-117:15.

After order processing, employees in the fulfillment department (in Canada) access the purchase order from the distribution system and generate a pick ticket. Def. Ex. 15 (March 24, 2014 Letter) at 419-420, 427; Def. Ex. 2 (Rogers Dep.) at 137:13-138:24. This document, which includes the same information as the purchase order, doubles as a packing slip for shipment to the U.S. customer. *Id.* Midwest personnel consult the inventory system (known as Kardex) to determine availability. If available, the item would be removed from the electronic inventory records. Def. Ex. 15 (March 24, 2014 Letter) at 420, 429-433; Def. Ex. 2 (Rogers Dep.) at 138:25-140:10. The pick ticket is then sent to the warehouse so the merchandise in each order can be picked, packed and labeled for delivery to the U.S. customer. Def. Ex. 2 (Rogers Dep.) at 142:7-144:15. An individual picker is assigned to each specific order, and will pick the merchandise and prepare the box(es) for shipment. *Id.* at 142:12-18. The pick ticket/packing slip is attached to the box for delivery. *Id.* at 142:19-23.

### 3.  Delivery Of The Merchandise

After Midwest executes the sales to the U.S. customers, the merchandise is delivered from Canada to its U.S. customers in two phases. First, pre-labeled boxes are sent by truck from the warehouse to a United Parcel Service (UPS) or FedEx facility in Buffalo, New York; second, the pre-labeled boxes are shipped from Buffalo to the U.S. customers.

---

[1] The complete terms and conditions similarly state, "Freight Charge is in addition to our Buffalo, N.Y. F.O.B. cost." Pl. Ex. O (Terms and Conditions).

While at the warehouse in Canada, the merchandise that is picked and packed for individual U.S. customers is weighed by Midwest personnel using UPS software (that is located in the Canadian warehouse) to determine the freight charge from Buffalo to the U.S. customer. Def. Ex. 15 (March 24, 2014 Letter) at 420; Def. Ex. 2 (Rogers Dep.) at 142:24-145:11.   A UPS bar code and address label (with the U.S. customer's address) is then printed and placed on each individual box.  *Id.*  Also on each box is a pouch with the packing slip (listing the items ordered and the price to be paid by the U.S. customer).  *Id.*  Individually labeled boxes are then loaded onto third-party trucks that arrive at the warehouse, Def. Ex. 2 (Rogers Dep.) at 145:12-146:17; these trucks are contracted and paid for by Midwest.  Def. Ex. 16 (Trucking Agreement); Def. Ex. 17 (Trucking Bill).  As the boxes are loaded onto the truck, picking/packing slips are either electronically scanned, or a hard copy is detached to be sent back to the office for invoicing. Def. Ex. 2 (Rogers Dep.) at 146:7-17, 148:10-149:1.  Each truckload leaving Midwest's warehouse is identified by batch number.  *Id.* at 146:7-17;  147:21-148:1.

A batch record identifying the merchandise on each truck is then created.  *Id.* at 152:19-153:20; Def. Ex. 15 (March 24, 2014 Letter) at 420, 435-445.  The batch record includes a list of the items, Midwest's calculated entered value, and the tariff code for each.  *Id.*  The batch record is then provided to the Customs broker, FedEx Trade Networks, to prepare the necessary papers to make entry in the United States.  Def. Ex. 2 (Rogers Dep.) at 151:2-16.  Midwest's calculated entered value for each piece of merchandise included on the batch record (and entry documents) is different from (and often less than) the price of the merchandise that is paid by the U.S. customer.  *Id.* at 150:1-19, 151:2-16, 152:19-153:20.  For example, Def. Ex. 15 (March 24, 2014 Letter.) at 435-445 is the batch record that includes merchandise purchased by Augusta Winery. *Id.* at 420.  The first item on the purchase order to Augusta Winery, *id.* at 424-425, is a "Small

Owl Lantern Cast Iron," which has a price of $12.00 per unit.  *Id.*  On the batch record, that same item, identified on the third to last line on page 443, has a unit price of $7.65.  *Id.* at 443.

Midwest, as the exporter and importer of record, makes entry of the merchandise into the United States, *id.* at 420, 447; Def. Ex. 1 (Interrogatories) at 9; Def. Ex. 10 (Broker Invoices), where it is brought directly to a U.S. carrier, most often a UPS facility (located at either 60 Industrial Parkway in Cheektowaga, New York or 1907 James E. Casey Drive in Buffalo, New York).  *See* Def. Ex. 1 (Interrogatories) at 14; Def. Ex. 2 (Rogers Dep) at 75:10-19; 165:19-166:23; Def. Ex. 10 (Broker Invoices); Def. Ex. 16 (Trucking Agreement); Def. Ex. 17 (Trucking Bill); Def. Ex. 18 (UPS Agreement).  At UPS, pursuant to an agreement with Midwest, the previously labeled boxes are deconsolidated from the truckload batch, the shipping labels are scanned into the UPS system, and the merchandise is shipped to Midwest's U.S. customers in fulfillment of the orders.  Def. Ex. 1 (Interrogatories) at 14; Def. Ex. 2 (Rogers Dep.) at 75:10-77:15; Def. Ex. 15 (March 24, 2014 Letter) at 420; Def. Ex. 18 (UPS Agreement).[2]  No Midwest personnel work at the UPS facility or at any location in Buffalo.  Def. Ex. 2 (Rogers Dep.) at 74:14-18.

Midwest prints invoices to its U.S. customers, in Canada, at approximately the time that the merchandise is picked.  Def. Ex. 2 (Rogers Dep.) at 156:24-161:1;  *see e.g.*, Def. Ex. 15 (March 24, 2014 Letter.) at 475.  Ganz has a postage machine for the U.S. postal service in its

---

[2]  Although Midwest identified 1907 James E. Casey Drive, Buffalo, New York, as the address for the customer service department in its catalog, Def. Ex. 9 (Winter 2013 Catalog), and for the company on certain other import documents, Def. Ex. 10 (Broker Invoices), this was the address of the UPS facility.  *Id.*; Def. Ex. 2 (Rogers Dep.) at 85:24-86:2, 162:22-163:14; Def. Ex. 15 (Trucking Bill).  This address was also used as Midwest's U.S. "postal address" for customer returns.  Merchandise returned to the UPS facility was then redirected by UPS personnel to the Canadian warehouse, pursuant to an agreement with UPS.  *Id.* at 85:13-86:9.  As explained above, no Midwest personnel work at that or at any location in Buffalo.  *Id.* at 74:14-18.

mailroom in Canada. Def. Ex. 2 (Rogers Dep.) at 160:2-161:1. The invoices are printed and stuffed in envelopes and U.S. postage is applied in the Ganz mailroom in Canada, so that the invoices can be placed in the mail in Buffalo. *Id.* The invoices contain much of the same information as the purchase order, including the name of the U.S. customer, the type of merchandise and its cost to that customers, but with the addition of the UPS freight fee from Buffalo to the customer (calculated in the Canadian warehouse). Def. Ex. 15 (March 24, 2014 Letter.) at 475; Def. Ex. 2 (Rogers Dep.) at 157:23-158:18, 160:9-15. The invoices are then couriered from the Midwest/Ganz facility in Canada to the United States, and placed in the mail in Buffalo. *Id.*

The following documents reflect a sample transaction, as provided by Midwest:

- Purchase Order from Augusta Winery, dated February 24, 2014, Def. Ex. 15 (March 24, 2014 Letter.) at 424-425;
- Picking slip, issued at Midwest's Canadian office/warehouse, dated February 25, 2014, *id.* at 427;
- Kardex inventory inquiry, conducted at Midwest's Canadian office/warehouse, also dated February 25, 2014, *id.* at 429-433;[3]
- Midwest invoice issued, from Midwest's Canadian office/warehouse, to Augusta Winery, on February 25, 2014, *id.* at 475;
- Merchandise being sent to August Winery is placed on a truck at Midwest's Canadian warehouse on February 26, 2014, *id.* at 435-445; and
- U.S. Customs entry made on February 26, 2014. *Id.* at 420, 447-473.

**4.  Payment By U.S. Customers**

Payments to Midwest were directed to P.O. Box 529 in Buffalo, New York. *Id.* at 475. However, Midwest has no personnel in Buffalo. Def. Ex. 2 (Rogers Dep.) at 74:14-18. Consequently, Midwest contracted with a bank's lockbox services, for pick up and deposit of

---

[3] The date on the Kardex inquiry for the order to Augusta Winery was February 25, 2014, meaning it was likely picked on that date. Def. Ex. 2 (Rogers Dep.) at 138:25-140:16; Def. Ex. 15 (March 24, 2014 Letter) at 429-433.

these payments. *Id.* at 74:14-18,  79:18-25.  The sale was then recorded on Midwest's General
Ledger journal.  *Id.* at 170:16-171:15.

D.    **The Administrative Proceedings Involving Midwest**

This consolidated case covers 562 entries filed with the Port of Buffalo, New York in
2013 and 2015.  Entry Documents, Court File.

Prior to the acquisition by Ganz, the merchandise being imported by Midwest was
appraised on the basis of the transaction value of the sales from the Chinese supplier to Midwest.
Def. Ex. 1 (Interrogatories) at 2; Pl. Br. at 3.  On January 30, 2013, following its acquisition by
Ganz, Midwest notified CBP of a change in its operations.  Pl. Ex. B (January 30, 2013 Letter).
Midwest notified CBP that it would enter its merchandise using the "deductive" value method of
appraisement.  *Id.*; *see* 19 U.S.C. § 1401a.

After a meeting with Midwest, and in early 2013, CBP requested additional information
about Midwest's operations and import procedures, and Midwest provided certain requested
information.  *See e.g.,* Pl. Ex. P (March 22, 2013 Letter).

In March of 2013, Import Specialists at the Port of Buffalo requested that CBP's Office
of Regulatory Audit (Regulatory Audit) conduct an audit of Midwest.  Def. Ex. 19 (Declaration
of James Conrad (Conrad Decl.) at ¶ 3.  Although the audit officially began in February 2014,
preliminary work began in 2013 with respect to whether Midwest properly appraised its
merchandise, which was shipped from Midwest's warehouse in Canada, through the Port of
Buffalo, and ultimately to a U.S. customer.  *Id.* at ¶¶ 3, 5, 7.  The scope of the audit was to
determine the proper basis of appraisement, *i.e.* whether there existed a "sale for exportation to
the United States," with respect to the transactions that took place from January 2013 to
December of 2013.  *Id.* at ¶ 7; Pl. Ex. S (Audit Report).  If Regulatory Audit determined that the

correct basis of appraisement under 19 U.S.C. § 1401a was transaction value, CBP, at the Port of Buffalo, would, as a second step, be required to determine how to properly calculate the transaction value of the merchandise at liquidation.   Def. Ex. 19 (Conrad Decl.) at ¶ 10; *see also* 19 U.S.C § 1500(a) (stating that CBP "shall . . . fix the final appraisement of merchandise by ascertaining or estimating the value thereof.").

The audit conducted by CBP's Buffalo Field Office of Regulatory Audit was known as a Quick Response Audit.  Def. Ex. 19 (Conrad Decl.) at ¶ 3.  A Quick Response Audit involves a number of steps, including a risk assessment of the relevant issue, a questionnaire tailored to that issue, a walkthrough of import practices or entries, interviews with company personnel and the issuance of a final audit report.  *Id*. at ¶ 4.

As part of the audit, CBP conducted an on-site review of Midwest facilities in Canada from February 24-25, 2014.  *Id*. at ¶ 8(b).  CBP also made a number of requests for information, to which Midwest responded.  *See e.g.*, Def. Ex. 15 (March 24, 2014 Letter).  In one request, CBP asked for all the documentation underlying twelve specific line items on the entry papers, each of which covered one or more transactions between Midwest and its U.S. customers.  Def. Ex. 19 (Conrad Decl.) at ¶¶ 6, 8(e); Pl. Ex. F (February 22, 2014 Letter).  Midwest provided the information for one transaction, but either partial or no information with respect to the rest.  Def. Ex. 19 (Conrad Decl.) at ¶ 8(e).  CBP conducted fieldwork, which included developing an understanding of how to match invoices to U.S. customers with a specific line item on the entry paperwork.  *Id*. at ¶ 8(c).  Each of the more than 560 entries could be comprised of more than 100 line items.  *See* Entry Papers, Court File.  Each line item for a single entry was then made up of a particular classification (not a particular item), and each classification could include multiple

different items of merchandise that may have been sold to different U.S. customers. Def. Ex. 19 (Conrad Decl.) at ¶ 6.

CBP continued to make inquiries, and Midwest continued to provide information in response to CBP's inquiries through June of 2014. Pl. Br. at 35, 37, 39.

On July 12, 2014, Regulatory Audit performed a review of the sample transaction provided by Midwest, which included import documentation, purchase orders, invoices, bills of lading and accounting data. Def. Ex. 19 (Conrad Decl.) at ¶ 8(e). CBP completed its fieldwork on October 14, 2014. *Id*. at ¶ 8(f). As part of the audit process, auditors prepared "workpapers," which are detailed documents describing the fieldwork conducted and the findings reached. *Id*. at ¶¶ 8(d), (f). In addition, the auditors prepared the audit report. *Id*. at ¶ 8(h). The audit process further required review of these workpapers by both other auditors as well as the Assistant Field Director. *Id*. at ¶¶ 8(f), (g). Thereafter, a senior auditor reviewed the workpapers and prepared an audit document review sheet. *Id*. This process ensured the accuracy and completeness of the workpapers and the conclusions reached. *Id*. at ¶ 8(g). CBP completed the audit document review sheet by December 1, 2014. *Id*.

On March 10, 2015, the CBP Assistant Field Director completed an audit report review sheet, the purpose of which was to ensure that the report was in compliance with Generally Accepted Government Auditing Standards (GAGAS). *Id*. at ¶ 8(i). Further review of the report was then conducted by CBP's Report Referencing Review (which confirms the accuracy of all information and conclusions in the report) as well as CBP's Field Quality Assurance Program (which also ensures compliance with GAGAS). *Id*. at ¶¶ 8(i), (j), (k). Both reviews were completed in April, 2015. *Id*. at ¶¶ 8(j), (k). During the process of review, workpapers were returned for changes and questions by auditors. *Id*. at ¶¶ 8(g), (j) & (k). Regulatory Audit

15

continued to work with the Field Quality Assurance Program into June of 2015 to further ensure all regulatory standards had been met. *Id.* at ¶ 8(l).

On July 1, 2015, CBP issued a draft findings sheet and audit report, concluding that transaction value was the proper basis of appraisement. Pl. Ex. Q (Draft Audit Response). Shortly thereafter, on July 8, 2015, Midwest submitted a rebuttal. Pl. Ex. R. (July 8, 2015 Response). CBP issued its final audit report on February 24, 2016, Pl. Ex. S (Final Audit Report), finding, consistent with the draft report, that the proper basis of appraisement was transaction value. *Id.* The final report included a "rejoinder" by CBP. *Id.*

On August 20, 2015, after the draft report was issued but before the report was finalized (while the audit continued), Midwest made a request for internal advice for CBP's Office of Regulations & Rulings, pursuant to 19 C.F.R. § 177.11, with respect to the proper basis of appraisement for Midwest's merchandise. Def. Ex. 20 (August 20, 2015 Letter). A request for internal advice is handled by CBP's Headquarters office, and is a process separate from audits. 19 C.F.R. § 177.11.

Beginning at the time the draft audit report was issued in July of 2015, CBP's import specialists at the Port of Buffalo, tasked with determining how to assess the transaction value for each item of merchandise, began working on that assessment in conjunction with Regulatory Audit. *Id.* at ¶ 11. Liquidation, however, could not occur absent a final report. *Id.* The import specialists could not conduct a standard calculation of transaction value (based on the actual sale to the customer) without the invoices that Midwest issued to its U.S. customers and the information matching the invoice to the line item on the entry documents, neither of which were provided by Midwest. *Id.* at ¶ 12; Entry Papers, Court File. Therefore, CBP calculated

transaction value for each entry using Midwest's 2013 financial records.  Def. Ex. 2 (Conrad Decl.) at ¶ 12; Pl. Ex. W (April 26, 2016 Letter).

Specifically, CBP deducted certain amounts from Midwest's total U.S. sales, and subtracted the total entered value to determine the percentage that each entry was undervalued. *Id.*  In doing so, CBP identified a formula to arrive at the transaction value, which consisted of a percentage uplift to be added to the entered value for all entries.  *Id.*; Pl. Ex. W (April 25, 2016 Letter).  On March 28, 2016 and April 6, 2016, shortly after issuance of the final audit report, CBP issued notices of action, noting that hundreds of entries would be appraised using an uplift of 123.18 percent.[4]  Pl. Ex. U (Notices of Action).  On April 16, 2016, after receiving the notices of action, Midwest asked CBP to extend the liquidation of its entries so that it could submit data, not presently available, to appraise the merchandise in accordance with the Audit report -- according to transaction value.  Pl. Ex. V (April 15, 2016 Letter).  On May 13, 2016, Midwest submitted comments to the Notice of Action, noting "specific errors" in CBP's calculated uplift formula.  Pl. Ex. X (May 13, 2016 Letter).  These comments were considered by CBP.  *See* Def. Ex. 19 (Conrad Decl.) at ¶ 13.

On July 1, 2016, CBP issued HQ H275056 (July 1, 2016), in response to Midwest's request for internal advice finding, consistent with its audit results, that the proper basis of appraisement is transaction value.  Pl. Ex. T (HQ H275056).

**E.    The Liquidation And Reliquidation Of The Entries**

Subsequent to importation, CBP extended the liquidation of the entries two or three times, as needed, to allow CBP time to gather information and to complete the audit process.

---

[4] The Court will review the calculation of transaction value as part of Phase Two of this case.

17

Def. Ex. 21 (Extensions).   CBP liquidated  336 entries in April,  May  and June, 2016 and it

liquidated  the remaining  226 entries in August,  September  and October,  2016.   Entry Papers,

Court File.

CBP appraised the 336 entries liquidated  in April,  May,  and June of 2016 using

transaction value and an uplift of 123.18 percent over the entered value.   *Id.*; Def. Ex. 19 (Conrad

Decl.) at ¶ 13.  Based, in part, on the comments provided by Midwest, CBP later recalculated the

valuation  and amended the percentage uplift  to be applied  to 75.75 percent. Pl. Ex. Z (August 6,

2016 Notice of Action); Def. Ex. 19 (Conrad Decl.) at ¶ 13.[5]  The uplift  was modified  as a result

of a change in the calculated entered value and total sales price for the entries in 2013.  The new

uplift  was applied  to the remaining  entries liquidated  in August,  September  and October,  2016.

*Id.*, Entry Papers, Court File.

Plaintiff  timely  protested the 336 entries liquidated  at 123.18 percent.  Protests, Court

File.   Midwest challenged CBP's appraisal of the subject merchandise using  transaction value, as

well as the use of the markup.   *Id.*  Midwest also claimed that the entries deemed liquidated  at

the rate and amount asserted at entry because CBP improperly  extended the liquidations.   *Id.*

With respect to the issue of valuation,  CBP approved the protests in part, indicating  that the

entries should be reliquidated  at 75.75 percent.  *Id.*  CBP, thereafter, reliquidated  these entries at

a 75.75 percent markup in January and February of 2017.[6]  Plaintiff  timely  filed two protests

challenging  the 2017 reliquidations.   CBP denied the protests in full.  *Id.*

_____

[5] The Court will  review the calculation  of transaction value as part of Phase Two of this case.

[6] Due to various errors for Entry Nos. 799-0291383-3  and 112-2628978-9,  the liquidation  at the
123.18 percent markup remains in full  effect.  During Phase Two we will  discuss further why
this markup should  be lowered  to 75.75 percent.

As to the entries liquidated in August, September and October 2016, Midwest protested the liquidations and CBP denied the protests in full. *Id.*

The consolidated court action seeks review of the liquidations (Court No. 17-00154 & 17-00155) and re-liquidations (Court No. 17-00272), to the extent relevant, of the entries in question. Consolidated Complaint, Consolidated Case No. 17-00154, Docket No. 26.

## QUESTIONS PRESENTED

1. Whether the sales between Midwest and its customers located in the United States satisfy the statutory requirements for sales "for exportation to the United States," as identified in 19 U.S.C. § 1401a(b)(1); and by extension

2. Whether the imported merchandise shall be appraised on the basis of the "transaction value" of the sales between plaintiff and its customers located in the United States pursuant to 19 U.S.C. § 1401a(b)(1); and

3. Whether the entries covered by this consolidated action liquidated by operation of law (under the framework of 19 U.S.C. § 1504) at the rate of duty, value, quantity, and amount of duties asserted by the importer.

## SUMMARY OF ARGUMENT

By statute, the primary method of appraisement is transaction value, which is defined as "the price actually paid or payable for the merchandise when sold for exportation to the United States," plus certain statutorily enumerated additions. 19 U.S.C. § 1401a(b)(1). Pursuant to the plain language of the statute, there are only *two* requirements for application of transaction value: (1) the item must be "sold" and (2) that sale must be "for exportation to the United States." The U.S. Court of Appeals for the Federal Circuit has clarified that the second requirement is met when the merchandise is "clearly destined for export to the United States" at the time of the sale in question. *Nissho Iwai Am. Corp. v. United States*, 982 F.2d 505, 509 (Fed. Cir. 1992).

In this case, the undisputed facts show that the sales between Midwest and its customers located in the United States meet the definition of sales "for exportation to the United States" and that transaction value should be applied to calculate the value of the imported merchandise. The merchandise was manufactured in China and transported to Canada for storage. While in storage in Canada, Midwest executed sales of the merchandise to customers in the United States, and then exported the merchandise from Canada to the United States in fulfillment of those sales. The merchandise was packaged and individually labeled for delivery to specific U.S. customers, based on the sales to those customers. The individually labeled boxes were placed on a truck in Canada and entered into the United States (at the Port of Buffalo) "clearly destined" for the U.S. customer who agreed to pay a certain price for that merchandise. There was plainly a sale "for exportation to the United States" and transaction value is the proper basis of appraisement.

Midwest's method of valuation should be disregarded because it is based on an erroneous interpretation of the statute. Similarly, Midwest's claim of deem liquidation should also be disregarded because Midwest fails to show that CBP abused its discretion in extending the liquidation of the 562 entries to allow the agency additional time to gather and assess the relevant information in liquidating the entries at issue.

## ARGUMENT

### I.    STANDARD OF REVIEW

Under Rule 56 of the United States Court of International Trade (USCIT), summary judgment is appropriate "if the movant shows that there is no genuine dispute to any material fact and the movant is entitled to judgment as a matter of law." USCIT Rule 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must determine "whether there are any factual disputes that are material to the resolution of the action." *Texas Apparel Co. v. United*

*States*, 698 F. Supp. 932, 934 (Ct. Int'l Trade 1988), aff'd, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In determining whether a genuine, material issue of fact exists, a court reviews the evidence submitted drawing all inferences against the moving party. *See Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant bears the burden of demonstrating that there exists no genuine issue of material fact that would warrant a trial. *See, e.g.*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1998). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249 (emphasis added).

## II.    THE MERCHANDISE SHOULD BE APPRAISED ON THE BASIS OF TRANSACTION VALUE BECAUSE THE SALES BETWEEN MIDWEST AND ITS U.S. CUSTOMERS MEET THE STATUTORY REQUIREMENTS AS SALES FOR EXPORTATION TO THE UNITED STATES

Imported merchandise must be appraised so that the final amount of duty can be fixed, and by law, Customs is required to appraise imported merchandise in the manner set forth in 19 U.S.C. § 1401a. *VWP of Am., Inc. v. United States*, 175 F.3d 1327, 1330 (Fed. Cir. 1999). In a civil action commenced in the Court of International Trade to challenge a Customs appraisment, the appraisment decision is "presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision." *Id.* at 1342; *see also* 28 U.S.C. § 2639(a).

"The primary method of valuation is the 'transaction value' of the merchandise provided for under 19 U.S.C. § 1401a(b)(1)." *VWP*, 175 F.3d at 1330. It is only when this "primary

method" either "cannot be determined or cannot be used" that Customs will look to the "secondary valuations methods in the order listed in 19 U.S.C. § 1401a(a)(1)." *Id*.

Section 1401a(b)(1) provides that the transaction value of imported merchandise "is the price actually paid or payable for the merchandise when sold for exportation to the United States," plus specified additions. 19 U.S.C. § 1401a(b)(1). The "price actually paid or payable" is "the total payment . . . made, *or to be made*, for imported merchandise by the buyer to, or for the benefit of, the seller." 19 U.S.C. § 1401a(b)(4)(A) (emphasis added). Pursuant to the plain language of the statute, there are only *two* requirements for application of transaction value: (1) the item must be "sold" and (2) that sale must be "for exportation to the United States." *See VWP,* 175 F.3d at 1338-39.

The threshold question presented by this case is whether the sales between Midwest and its customers located in the United States satisfy the statutory requirements for sales "for exportation to the United States." *Id*. The undisputed evidence shows that the answer is yes.

a. **The "Sale" Of The Merchandise**

The Court of Appeals has held that, "for merchandise to be 'sold' for purposes of 19 U.S.C. § 1401a(b)(1), there must be a transfer of title from one party to another for consideration." *VWP*, 175 F.3d at 1339 (citation omitted). The parties agree that there was a sale of merchandise from Midwest to each of its U.S. customers. Pl. Br. at 15. Indeed, under the specific terms of the contract, Midwest transferred title to, and possession of, the merchandise to its U.S. customers, Midwest issued invoices to its U.S. customers, and the U.S. customers made payment to Midwest against those invoiced amounts (by check, credit card or line of credit). These payments were recorded in the books of the company. *See supra* at 8-13. Therefore, the first element of the statute is satisfied.

**b.  The Sale "For Exportation To The United States"**

This Court and the Court of Appeals have provided parameters for the second element of the statute – whether a sale occurred "for exportation to the United States."  *See, e.g., E.C. McAfee Co. v. United States,* 842 F.2d 314, 319 (Fed. Cir. 1988); *VWP*, 175 F.3d at 1330, 1338-39; *Nissho Iwai*, 982 F.2d at 509.

In *Nissho Iwai*, for example, the merchandise traveled through a three-tiered transaction: (1) the merchandise originated with a Japanese manufacturer, (2) it was sold to a Japanese distributor middleman (NIC), and then (3) it was sold to a U.S. customer.  *Nissho Iwai*, 982 F.2d at 506.  The Court of Appeals considered whether the sale from the Japanese manufacturer to the Japanese middleman (NIC) was a valid sale "for exportation to the United States" that satisfied the statutory definition of "transaction value."  *Id.* at 506-07.  The merchandise at issue consisted of subway vehicles purchased by the Metropolitan Transit Authority (MTA) from a U.S. subsidiary of NIC.  *Id.* at 506.

In considering whether the sale from the Japanese manufacturer to NIC satisfied the statutory requirements for "transaction value," the Court looked at whether the merchandise was "clearly destined for export to the United States."  *Id.* at 509.  The Court held that the sale satisfied the statutory requirements because the subway vehicles "were manufactured for a specific United States purchaser, the MTA," and that they were "*unquestionably intended* 'for exportation to the United States' and had no possible alternative destination."  *Id.* (emphasis added); *see also Synergy Sport Int'l, Ltd., v. United States*, 17 CIT 18, 20 (1993) (citing *Nissho Iwai* and holding that "[a] transaction viable under the statute is a sale negotiated at arm's length

free from any nonmarket influences *and involving goods clearly destined for export to the United States*.")[7]

Similarly, *E.C. McAfee* involved a three-tiered transaction whereby U.S. customers ordered custom-made clothing from a Hong Kong distributor (who took orders in the United States and Hong Kong), which were then produced by a separate tailor in Hong Kong. *E.C. McAfee*, 842 F.2d at 315. The distributor, upon receipt of the finished product from the tailor, packed the clothing, addressed the box and arranged for shipment to the U.S. customer. *Id.* at 316. In determining whether the sale from the Hong Kong tailor to the Hong Kong distributor satisfied the statutory criteria for "transaction value," the Court held that, "[w]here clothing is made-to-measure for individual United States customers and ultimately sent to those customers, *the reality of the transaction* between the distributors and the tailors is that the goods, *at the time of the transaction* . . . are 'for exportation to the United States.'" *Id.* at 319 (emphasis added). That is, "from the time of the initial contact until eventual importation, the goods were being made for a specific [U.S.] consumer." *Id.* Because the merchandise was clearly destined for the United States at the time of the sale between the distributor and tailor (both foreign companies), the Court held that the sale is one for export to the United States.

Although the facts of *E.C. McAfee*, *VWP*, and *Nissho Iwai* focused on the sale of the merchandise from the foreign manufacturer to the middleman, the analysis of the statutory factors of 19 U.S.C. § 1401a(b)(1) is nonetheless relevant and binding for the review of any sale,

---

[7] Notably, the Court observed that the sales from *both* segments of the three-tiered transaction satisfied the statutory requirement for transaction value (*i.e.*, the sale between the Japanese supplier and the middleman, NIC, and the sale between the NIC's U.S. subsidiary and the U.S. customer). *Nissho Iwai*, 982 F.2d at 510. When those circumstances occur, however, the Court selects the price between the manufacturer and the middleman, NIC. *Id.*

including the sale from Midwest (middleman) to its customers located in the United States.[8] And, there is generally no question that the sale from the middleman to the U.S. customer satisfies the statutory requirements. *See VWP*, 175 F.3d at 1334; *Nissho Iwai*, 982 F.2d at 510.

Taken together, these cases show that transaction value should be applied when there is a sale and the merchandise that is the subject of that sale is "clearly destined for export to the United States." *Nissho Iwai*, 982 F.2d at 509. In the instant case, the undisputed evidence demonstrates that Midwest stores the merchandise in Canada, and that while in storage, Midwest executes sales of the merchandise to U.S. customers. Midwest then exports the merchandise to the United States *based on the specific sale of that merchandise* to its U.S. customers. This sale satisfies both of the relevant requirements of 19 U.S.C. § 1401a(b)(1).

Indeed, from the moment the U.S. customers placed their orders for merchandise, Midwest intended for its Chinese goods to be exported from Canada to the United States in fulfillment of those orders. *See supra* at 8-13. The orders were sent to multiple Midwest's facilities in Canada, where they were processed, picked, packed and labeled for delivery to those individual U.S. customers. *Id.* The individually labeled boxes were then placed on a truck in Canada and entered into the United States (at Buffalo) "clearly destined" for the U.S. customer who contracted to pay a certain price for that merchandise. *Id.; see, e.g., Synergy*, 17 CIT at 20 (finding merchandise to be clearly destined for the United States when it is shipped directly to California and the shipping labels reflect that the goods are destined for particular customers.).

---

[8] Midwest does not claim that the value of the sale from the Chinese supplier to Midwest can be considered a sale "for exportation to the United States." As mentioned above, the merchandise stored in the warehouse in Canada was available for purchase by any Midwest customer, not just those located in the United States. Def. Ex. 2 (Rogers Dep.) at 100:8-102:23. Because there was no certainty that the merchandise would be sold in the United States, that sale was not one "for exportation to the United States" and the transaction value cannot be based on that sale.

The sales between Midwest and its U.S. customers, therefore, were plainly "for exportation to the United States."

Because Midwest's transactions with its U.S. customers qualify as *bona fide* "sales" that are "for exportation to the United States" under 19 U.S.C. § 1401a(a)(1), and no other sale meets the necessary criteria, the valuation statue mandates that Midwest's sales to its U.S. customers be used as a basis for assessing transaction value. *See* 19 U.S.C. § 1401a(a)(1)(A); *VWP*, 175 F.3d at 1335.

## III.   MIDWEST'S APPLICATION OF 19 U.S.C. § 1401a IS NOT SUPPORTED BY THE LAW

Midwest agrees that "transaction value" is the "[p]rincipal basis of appraisement" and that two elements must be satisfied – there must be a "sale," and that sale must be "for exportation to the United States." Pl. Br. at 14. However, Midwest's analysis of the second requirement is not supported by the plain terms of the statute, nor by relevant case law.

### a.   The Statue Does Not Require An International Sale For The Application Of Transaction Value

Midwest analyzes the phrase "for exportation to the United States" as requiring not just any "sale," but "an *international sale* in which goods enter the customs territory of the United States." Pl. Br. at 14 (emphasis added). There is, however, no reference to an "international sale" in the statutory language, nor is it suggested or supported by the statute's plain terms. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (noting that, in construing any statute, a court must first look to its plain language.) "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* If the drafters had intended to impose a requirement of international sales, it would have expressly included that

26

requirement in the statute.  Midwest fails to cite any case or statutory authority either requiring an "international sale" or defining that term.

Moreover, the location of the parties or the location of the sale of the merchandise (*i.e.,* in the United States or abroad) is not relevant to the statutory analysis.  Indeed, the cases discussed above reflect examples of sales meeting the statutory requirements of transaction value, notwithstanding the middleman and the customer being located in the United States.  *See*, *e.g.*, *Nissho Iwai*, 982 F.2d at 510 (discussion *supra* at 23-24); *VWP*, 175 F.3d at 1334.

Indeed, in *VWP,* VWPC (located in Canada) sold fabrics to VWPA (a distributor located in the United States), who sold these fabrics to U.S. customers.  175 F.3d at1330.  Although the Court focused on whether the transaction between the Canadian manufacturer (VWPC) and the U.S. distributor (VWPA) could serve as the basis for transaction value, the Federal Circuit held that, if it could not, "the transaction value *must be* based upon sales by VWPA [a U.S. company] to its U.S. customers," which took place in the United States.  *VWP*, 175 F.3d at 1331, 1334 (emphasis added).

Similarly, in *La Perla Fashions, Inc. v. United States,* 9 F. Supp. 2d 698 (Ct. Int'l Trade 1998), *aff'd without opinion*, 185 F.3d 885 (Fed. Cir. 1999), the transaction involved an Italian manufacturer, a New York distributor and a U.S. customer.  9 F. Supp. 2d at 699-700.  The Court found that the price from the Italian manufacturer to the New York distributor could not be the basis for transaction value, and subsequently held that the transaction value "*can only be* based on" the price of the transaction from the New York distributor to its U.S. customer.  *Id*. at 704. That is, if there is only one *bona fide* sale, it must be the transaction considered for purposes of assessing transaction value.  *Id.*  As this Court in *Synergy* aptly noted, "the site of incorporation or the nationality of the parties" is not important for ascertaining whether a sale "is for

exportation to the United States." *Synergy,* 17 CIT at 21, fn. 4.  Indeed, "[e]xcess reliance on the incorporation or nationality of the parties can only lead to misapplication of the statute." *Id.*

The Federal Circuit, instead, considers the "reality of the transaction" to determine whether a sale is "for exportation to the United States," paying particular attention to whether at the time of the transaction, the merchandise was "clearly destined for" or "unquestionably intended" for export to the United States. *Nissho Iwai,* 982 F.2d at 509.  These factors are demonstrated by the undisputed record evidence. *See supra* at 8-13.

### b.  The Method Of Shipment Is Not Relevant To The Statutory Analysis

Midwest argues that the delivery of the merchandise pursuant to the shipping terms F.O.B. Buffalo (which means that Midwest retains the risk of loss on the merchandise until it arrives in Buffalo), creates a "domestic sale" that cannot be used as a basis for transaction value. Pl. Br. at 15, 18-23.  Midwest points to several documents in support of its argument, Pl. Br. at 19-20: (1) the invoice, which includes the phrase "FOB Buffalo, New York as defined by the New York State Uniform Commercial Code," *see* Def. Ex. 15 (March 24, 2014 Letter) at 475; (2) the terms and conditions for the sale, which provides that "Freight Charge is in addition to our Buffalo, N.Y. F.O.B. Cost," *see* Pl. Ex. O (Terms and Conditions); and (3) the packing slip, (received at the time of delivery), which provides "FOB Buffalo: New York as defined by the New York State Uniform Commercial Code." *see* Pl. Ex. F (February 22, 2014 Letter) at 381.[9]

---

[9] Midwest references the pro forma invoice, which plaintiff's customs broker prepared at plaintiff's direction. Pl. Br. at 19. That plaintiff's broker calls the movement from Canada to Buffalo a "consignment" is simply not relevant. This is not a document whose terms are agreed to between Midwest and its customers.

Midwest claims that because there was "no transfer of property until after importation, there is no possible export or international 'sale' to the U.S. from which to calculate transaction value." Pl. Br. at 16. Again, Midwest is misguided.

We agree that F.O.B. means "free on board" and that this phrase designates a "method of shipment whereby goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of loss passes from seller to buyer." *Litecubes, LLC v. Northern Lights Products, Inc.*, 523 F.3d 1353, 1358, note 1 (Fed. Cir. 2008) (emphasis added) (citations omitted); *see also* "FOB Free on Board," Incoterms 2010 Edition, International Chamber of Commerce (which defines the term as follows, "the seller delivers the goods on board the vessel nominated by the buyer at the named port of shipment or procures the goods already so delivered. The risk of loss of or damage to the goods passes when the goods are on board the vessel, and the buyer bears all costs from that moment onwards."). [10]

However, the inclusion of this shipping term is not relevant to the statutory analysis. Pursuant to the plain language of the statute, there are only two requirements for application of transaction value: (1) the item must be both "sold" and (2) that sale must be "for exportation to the United States." 19 U.S.C. § 1401a. Consequently, an importer cannot circumvent the parameters of 19 U.S.C. § 1401a by selecting a particular method of shipment. The facts of *VWP* and *La Perla* demonstrate the error in Midwest's argument.

As discussed above, in *VWP,* VWPC (the Canadian manufacturer) sold fabrics to VWPA (the U.S. distributor), who sold these fabrics to U.S. customers. For the time relevant to the Court's analysis, the terms of the sale from the U.S. distributor to the U.S. customer were "FOB Jackman, Maine, or other *U.S. port of entry*." *VWP*, 175 F.3d at 1331 (emphasis added).

---

[10] *Available at https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010/*

Despite this fact, the Court held that this sale could be an alternative basis for transaction value – *i.e.* that it satisfied the statutory requirements for transaction value – even though the seller maintained the risk of loss until the merchandise arrived in the United States. *Id.* at 1331 ("[I]f sales by VWPC [Canadian manufacturer) to VWPA [U.S. distributor] *cannot* serve as the basis for transaction value, the transaction value *must be* based upon sales by VWPA to its U.S. customers.") (emphasis added). The method or terms of shipment did not factor into the Court's analysis. *Id.* at 1331, 1334.

Similarly, the facts of *La Perla* involved an Italian manufacturer, a New York distributor and a U.S. customer, and the "terms of sale between La Perla [New York] and its U.S. customers were delivered *at customer's premises, duty-paid*." 9 F. Supp. 2d at 700 (emphasis added). Plaintiff in *La Perla* made a similar argument to the one being made by Midwest, that the sale to the U.S. customer was simply a domestic sale that could not form the basis of transaction value. *Id.* at 703. This Court disagreed, holding that when the Court cannot use the price from the Italian manufacturer to the U.S. distributor, the transaction value can only be based on the price of the transaction from *La Perla* (New York) to its U.S. customer. *Id.* at 704. The holding of the Court was affirmed by the Federal Circuit. *See* 185 F.3d 885. Again, the FOB or delivery terms did not factor into the Court's analysis.

Midwest further argues that the sales to its customers lack any reference to the payment of import duties or clearance charges, which in Midwest's view, show that they were domestic transactions as opposed to international sales. Pl. Br. at 23. Midwest also argues that it was permitted to contract away the use of "transaction value" through its FOB terms, and that the Government was improperly trying to "re-write" the contract. *Id.* at 23-26. There is no support for these arguments.

The selection of shipment terms or the reference to payment of import duties in a contract does not determine the basis of appraisal for the imported merchandise. Although Midwest claims that it did not manipulate the terms of sale in its favor, Pl. Br. at 24-25, it nevertheless admits that its business model was "intentionally structured" as a means to "ensure that there was no sale of the goods 'for exportation to the United States' and that no basis would exist for appraisement under 'transaction value.'" Def. Ex. 14 (February 3, 2014 Letter.)  In short, Midwest's chosen methods of shipment do not factor into the statutory analysis. As stated above, the primary consideration is whether the merchandise in a valid sale was *clearly destined for the United States*, a consideration that has been satisfied for this proceeding. *See supra* at 23-26.

### c.   The Exportation Of The Merchandise To The United States Does Not Meet The Legal Requirements For A Consignment

Midwest argues that the exportation of the merchandise from Canada to Buffalo, New York (part of the delivery of merchandise to its U.S. customers based on that sale) constitutes a "consignment" of that merchandise from a storage location to a delivery location (UPS). Pl. Br. at 15, 19. Midwest claims that it consigns the merchandise to "Midwest CBK, LLC at an address in Buffalo." *Id.* at 19. The location in Buffalo, New York (1907 James E. Casey Drive, listed on the pro forma invoice), is the UPS facility that Midwest uses to ship merchandise to its U.S. customers. Def. Ex. 10 (Broker Invoices); Def. Ex. 2 (Rogers Dep.) at 85:24-86:2, 162:22-163:14; Def. Ex. 15 (Trucking Bill).

Midwest misunderstands the nature of a consignment.  The verb consign means "1) to deliver goods to a merchant to sell on behalf of the party delivering the items, as distinguished from transferring to a retailer at a wholesale price for re-sale. Example: leaving one's auto at a dealer to sell and split the profit."  And, a "consignment" is "the act of consigning goods to one

31

who will sell them for the owner or transport them for the owner." Def. Ex. 22 (Law.com).

Similarly, in Black's Law Dictionary, the verb "consign" is defined "**1.** To transfer to another's

custody or charge. **2.** To give (goods) to a carrier for delivery to a designated recipient. **3.** To

give (merchandise or the like) to another to sell, usu. with the understanding that the seller will

pay the owner for the goods from the proceeds." Def. Ex. 23 (Black's Law Dictionary, 11th

Edition).

> The noun "consignment" is defined as:

>> **1.** The act of consigning goods for custody or sale . . . . **2.** A quantity of goods that are sent somewhere, esp. in a single shipment, usu. to be sold. **3.** Under the UCC, a transaction in which a person delivers goods to a merchant for the purpose of sale, and (1) the merchant deals in goods of that kind . . . (2) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery, (3) the goods are not consumer goods immediately before delivery, and (4) the transaction does not create a security interest that secures an obligation. UCC § 9-102(a)(20). • A consignment creates an agency relationship. **4.** See *bailment for sale* under bailment (1).
>> - **commercial consignment.** (1919) A consignment made by a merchant who delivers goods to another for the purpose of sale, lease, or other disposal when both parties deal in goods of that kind in the ordinary course of business.

*Id.*

In short summary, a consignment involves the transfer of merchandise to another party

***without a sale***, so that the other party can effectuate a sale on behalf of the original transferor or

hold the merchandise for the transferor.

In this case, the exportation of the goods from Canada to the United States does not

constitute a consignment because, as Midwest concedes, when the goods are transported to the

United States, it is in fulfillment of a sale after the sale to the customer in the United States has

been executed. Consequently, each item being transported *is* the subject of a sale to a U.S.

customer.  *See* Pl. Br. at 15.  Indeed, each item that crosses the border is labeled for delivery to specific U.S. customers.  That Midwest maintains the risk of loss until the merchandise arrives at UPS does not make that movement from Canada to Buffalo a consignment.

### d.  Midwest's Reliance On The *Orbisphere* Decision Is Misplaced

Midwest relies on *Orbisphere Corp. v. United States*, 726 F. Supp. 1344 (Ct. Int'l Trade 1989) to support its analysis.  Pl. Br. at 26-32.  This reliance is misplaced because, as we show below, the Court adopted reasoning from a decision by the Court of Customs and Patent Appeals that interpreted a different (predecessor) statute.  Regardless, even if the Court were to apply the standard from *Orphisbere*, the facts show that judgment is warranted for the United States.

### i.  The Analysis Of *Orbisphere* Involved The Predecessor Value Statute

*Orbisphere* involved two companies, Orbisphere Corp. and its subsidiary, Orbisphere Labs., both Delaware corporations.  Orbisphere Labs was located in Geneva, Switzerland and Orbisphere maintained four sales offices in the United States.  All sales solicited by its U.S. sales force were forwarded to the New Jersey office, which assigned each order a purchase order number, and sent it to the Geneva office – likely Orbisphere Labs – for manufacture with a note to "please accept" the order.  *Orbisphere,* 726 F. Supp. at 1344-1345.  After manufacture, the merchandise was shipped back to the New Jersey office where it was "unpacked, inspected, adjusted if necessary, repacked in a different container, and then shipped to the U.S. purchaser." *Id*. at 1345.  Invoices were prepared, payments were received, and delivery was made from the New Jersey office, and revenue was remitted to Geneva.  *Id.*

In determining whether to use transaction value (based on the price paid by the U.S. customers) or deductive value to appraise the merchandise, the Court incorrectly held that the analysis "depends substantially upon where the sales of the merchandise are deemed to have

occurred." *Id.* at 1348, 1350.  The holding relied on the decision in *United States v. Massce & Co.*, 21 C.C.P.A. 54 (1933), which interpreted an earlier version of Section 402 of the Tariff Act of 1930 (the predecessor statute), which was not applicable in *Orbisphere* and is not applicable here.  *See* Trade Agreements Act of 1979, Pub. L. No. 96-39, tit. II, § 201(a), 93. Stat. 194 (revising the statutory standards for appraising the value of imported merchandise to conform to the Customs Valuation Agreement).

The earlier version of Section 402 identified "export value" and "United States value" as methods of valuation, not "transaction value and "deductive value."  Section 402(d), Tariff Act of 1930.  Although the location of the transaction or the sale may have been relevant under the predecessor statute, that is no longer the case under the current statute.

The Court defined "export value" as:

> the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise *is freely offered for sale to all purchasers **in the principal markets of the country from which exported***, in the usual wholesale quantities and in the ordinary course of trade, ***for exportation to the United States***  . . . .

*Orphisphere*, 726 F. Supp. at 1349 (quoting Section 402(d), Tariff Act of 1930) (emphasis added).

Conversely, the Court defined "United States value" as:

> the price at which such or similar imported merchandise *is freely offered for sale*, packed ready for delivery ***in the principal market of the United States*** to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance . . .

*Id.*  Quoting *Massce,* the Court in *Orbisphere* noted that "where offers of sale, agreements to sell, and sales are all made in the United States, and none in a foreign country, there cannot be an

*export value* of the exported merchandise." *Orbisphere*, 726 F. Supp. at 1350 (emphasis added) (quoting *Massce*, 21 CCPA at 60). This analysis may be reasonable in the context of the predecessor statute, which required the identification of the market in which the merchandise was "freely offered for sale."

The current version of the value statute, 19 U.S.C. § 1401a, is not structured in the same manner. Nonetheless, the Court in *Orbisphere* improperly equated "export value" to "transaction value," holding that while the definitions "are not identical, the crucial element of each for purposes of the present inquiry is the requirement [] that there have been a sale *abroad* for *export to the United States . . .*" *Orbisphere*, 726 F. Supp. at 1350-51 (emphasis in original). The Court's omission of relevant portions of the definition of "export value" in arriving at its comparison is problematic. *Id.* Missing from the *Orbisphere* Court's recitation of the predecessor statute is the requirement that the merchandise be freely offered "to all purchasers in the principal markets of the country from which exported" – a requirement not included in the current statute. *See Id.*

Although the predecessor valuation statute may offer guidance when the statutory language is similar, *see, e.g., E.C. McAfee*, 842 F.2d at 318, it is not universally considered. Indeed, the Federal Circuit in *Generra Sportswear Co. v. U.S.*, 905 F.2d 377, 381 (Fed. Cir. 1990), refused to apply case law analyzing the predecessor statute in deciding whether quota charges are included in transaction value. In doing so, the Court acknowledged "[t]he critical difference[] between 'export value' and 'transaction value'" – that the focus of the current law is on the specific agreement between the buyer and the seller. *Id.*; *see VWP*, 175 F.3d at 1334. Indeed, the legislative history, identified in both *E.C. McAfee* and *VWP*, provides:

> The use of transaction value as the primary basis for customs
> valuation will allow the use of *the price which the buyer and seller*

35

> *agreed to* in their transaction as the basis for valuation, rather than
> having to resort to more difficult concepts of 'freely offered,'
> 'ordinary course of trade,' 'principal markets of the country of
> export" and 'wholesale quantities' contained in existing U.S. law.

S. Rep. No. 96-249, 96th Cong. 1st Sess. at 119 (1979). "As [the Federal Circuit] said in *Moss*

*Mfg. Co. v. United States*, 896 F.2d 535, 539 (Fed. Cir. 1990), the 'straightforward approach

[of section 1401a(b)] is no doubt intended to enhance the efficiency of Customs' appraisal

procedure; it would be frustrated were we to parse the statutory language in the manner, and

require Customs to engage in the formidable fact-finding task, envisioned by [plaintiff]."

*Generra*, 905 F.2d at 380. As was the case in *VWP*, the trial court in *Orbisphere* erred when it

"expand[ed] its analysis beyond the parameters of § 1401a[] and consider[ed] factors . . . relevant

under the now-superseded export value statute." 175 F.3d at 1336.

The intended focus on the actual transaction, as expressed through the statutory language

requiring only a sale "for exportation to the United States," dictates a different analysis than is

necessary under the Tariff Act of 1930. The location of sale is tied to "export value" whereas the

plain language and legislative history of the current statute require that the focus be on the actual

sale – "the price which the buyer and seller agreed to in their transaction." *VWP*, 175 F.3d at

1334 (quoting S. Rep. No. 96-249, 96th Cong. 1st Sess. at 119). The analysis is *Orbisphere* (and

therefore *Massce*) should not be applied in the present circumstances.

The prices agreed to between Midwest and its U.S. customers for the imported goods is

the statutorily-mandated basis for the valuation of Midwest's imported goods. As set forth

above, *see supra* at 28, when merchandise is the subject of a *bona fide* sale and is "clearly

destined for export to the United States," transaction value must be used.

36

### ii. Even If The Court Were To Apply The Standard Of *Orbisphere*, Which It Should Not, Judgment Is Warranted For The United States

Separate from its legal errors, the facts of *Orbisphere* are distinguishable from the present circumstances. Again, the Court in *Orbisphere* looked to the location of certain activities, including the offers to sell, agreements to sell and sales in rendering its holding. *Orbisphere*, 726 F. Supp. at 1350 (quoting *Massce*, 21 CCPA at 60). If the Court were to consider those factors in this case, which it should not given the structure of the value statute, the Court would reach a different conclusion than the one reached in *Orbisphere*.

Unlike in *Orbisphere*, Midwest has significant operations in Canada. Employees in Midwest's facilities in Canada (1) set up customer accounts; (2) establish customer credit; (3) process orders and assign P.O. numbers; (4) review inventory; (5) pick, pack, label and prepare the merchandise for delivery; (6) prepare entry documents; (7) prepare invoices to U.S. customers; and (8) arrange for mailing of merchandise to U.S. customers. *See supra* at 8-13.

Comparatively, in *Orbisphere*, the employees in the company's facility in New Jersey (1) process the order, (2) receive and inspect the merchandise after manufacture in Geneva; (3) pack the merchandise; (4) ship the merchandise to the U.S. customers; and (5) prepare the invoice to its customers. *Orbisphere*, 726 F. Supp. at 1344-45.

Midwest argues, in support of its assertion that the sales at issue were domestic sales, that orders from Midwest's U.S. customers were accepted in Cannon Falls, Minnesota. Pl. Br. at 28. Not so. As Midwest admits, activity in Cannon Falls occurred long before an order is placed. Specifically, personnel in Cannon Falls set up the parameters for the AS400 (the operating system), which dictates what information must be submitted with an order. If the parameters were met, and all information provided (customer account information, etc.), the order would be

accepted into the electronic system for processing, and made accessible to personnel in both Cannon Falls and Canada through the global distribution system. *See supra* at 8. There is no evidence showing action by the employees located in Cannon Falls once an order is placed.

And, after an order is placed, it was Midwest's office in Canada that took action, including order processing, preparing the order for shipment, and participating in any follow up communications with customers. The entire customer service department for Midwest is located in Canada, and the terms and conditions on Midwest's purchase orders include contact information for several departments in Canada – customer service, order processing, customer accounts, and customer finance, Pl. Ex. O (Terms and Conditions); Def. Ex. 2 (Rogers Dep.) at 116:19-117:15. Although plaintiff asserts that "customers [of Midwest] had no communication with the warehouse *prior to acceptance of orders*," contact with a single department during one point in time is not relevant to the analysis. Pl. Br. at 28 (emphasis added). A significant point of distinction is that, in *Orbisphere*, unlike in Midwest, there was no communication between the U.S. customers and the office in Geneva. *Orbisphere*, 726 F. Supp. at 1357.

In short, even if this Court were to compare the activities that occurred abroad to those that occurred in the United States in determining whether transaction value was the appropriate method of valuation (which, again, is not the governing legal framework under 19 U.S.C. § 1401a) the outcome of the two cases would be different. Indeed, significant Midwest operations occur in Canada. That Midwest downplays its Canadian operations in its brief does not change the facts.

**IV.    THE ARGUMENTS RAISED BY MIDWEST INVOLVING DEDUCTIVE VALUE AND CBP'S UPLIFT CALCULATIONS ARE OUTSIDE THIS PHASE OF THE LITIGATION AND SHOULD NOT BE CONSIDERED**

Midwest argues that "Deductive Value Appraisement is the Proper Methodology" and that, even if "Transaction Value is Proper, the Uplift Calculation CBP Utilized" was improper. Pl. Br. at 32-34. These arguments are outside the scope of Phase One of this litigation and cannot be considered here. As set forth above, Phase One "encompass[es] [1] whether Plaintiff['s] . . . import transactions reflect a sale for exportation to the United States and [2] whether the entries became deemed liquidated by operation of law." May 10, 2020 Order, Docket No. 52. Phase Two covers "all remaining issues in this action, such as the proper method of valuation of the imported merchandise or whether [CBP's] calculation of transaction value was in accordance with the law." *Id.* Accordingly, we reserve all arguments regarding these issues, and the Court should not consider these issues at this time.

**V.    THE ENTRIES DID NOT LIQUIDATE BY OPERATION OF LAW AT THE RATE OF DUTY, VALUE, QUANTITY, AND AMOUNT OF DUTIES ASSERTED BY THE IMPORTER**

Midwest contends that "certain protested entries were liquidated by operation of law, as entered, pursuant to Section 504(b) of the Tariff Act, 19 U.S.C. § 1504(b)." Pl. Br. at 34. Specifically, Midwest argues that "CBP had no basis to extend liquidation of entries after June 14, 201[4]," because Midwest claims that "at that time, CBP had in its possession 'the information needed' for the appraisement of Midwest's entries." *Id.* Not so. Although liquidation was extended for each entry two or three times, as appropriate, CBP acted in accordance with the law.

According to 19 U.S.C § 1500(a), CBP is responsible for "fix[ing] the final appraisement of merchandise by ascertaining or estimating the value thereof . . . by all reasonable ways and

means in [its] power." Generally, Customs has one year to liquidate entries or they liquidate by operation of law. 19 U.S.C. § 1504(a). However, Customs may extend the period in which to liquidate an entry if "the information needed for the proper appraisement . . . of the imported or withdrawn merchandise, . . . or for ensuring compliance with applicable law, is not available to" Customs. 19 U.S.C. § 1504(b); 19 C.F.R. § 159.12(a)(1). Customs can extend the time period for liquidating an entry three times (for a length of one year each time). 19 C.F.R. § 159.12(a), (d), & (e). After four years, regardless of extensions, if Customs has not liquidated the entry, it will liquidate by operation of law. *See* 19 U.S.C. § 1504(b); 19 C.F.R. § 159.12(f).

Challenges to the reasons for CBP's extensions are reviewed under an abuse of discretion standard. *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 768 (Fed. Cir. 1993). As the Court of Appeals explained in *St. Paul Fire & Marine Ins. Co*,

> Customs may for statutory purposes . . . employ up to the four years to effect liquidation so long as the extensions it grants *are not abusive of its discretionary authority*. Such an abuse of discretionary authority may *arise only* when an extension is granted even following *elimination of all possible grounds* for such an extension.

*Id.* (emphasis added)*; see Ford Motor Co. v. U.S.*, 157 F.3d 849, 855 (1988) (holding that "The Court of International Trade can only rule an extension improper if Customs abused its discretion.")

"In determining whether Customs' decisions to extend the periods of liquidation for [plaintiff's] imports were sufficiently unreasonable to constitute an abuse of discretion, [the Court] must accept the fact that Congress has directed the Court of International Trade to presume that Customs' decisions are correct and that it is [plaintiff's] burden to prove otherwise." *St. Paul Fire & Marine*, 6 F.3d at 768 (citing 28 U.S.C. § 2639(a)(1)). Indeed, "Customs' decisions to extend are entitled to a presumption of legality unless [plaintiff] can

prove that these decisions were unreasonable."  *Id.*; *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984); *Ford*, 157 F.3d at 855.  Midwest has failed in this showing.

Midwest claims that "all requested information was provided by Midwest to CBP, on or before June 14, 2014," and as a result, any extension after that time was improper.  Pl. Br. at 35 (emphasis omitted).  This argument finds no support in either the law or the record evidence.[11]

First, "the statute does not require that information justifying a delay must come *from the importer.*  A need for internal information from other Customs personnel might also satisfy section 1504(b)(1)."  *Ford*, 157 F.3d 856 (emphasis added).  And, as this Court held, "[t]he term 'information,' as it is used in the statute . . . should be construed to include whatever is reasonably necessary for proper appraisement or classification of the merchandise involved."  *Detroit Zoological Society v. United States*, 630 F. Supp. 1350, 1356 (Ct. Int'l Trade 1986) (noting that "[a]n extension of liquidation is  . . . justified  . . . if additional time is needed to obtain the internal advice and to consider it before making the classification decision.").  Thus, that CBP did not request further information from Midwest after June 2014 is of no import to the legal framework of the deemed liquidation statute.

Second, as we explain below, during the time period in which the extensions were sought, CBP was collecting and reviewing information from the importer, conducting a quick response audit[12] to determine the proper basis of appraisement of the merchandise, and thereafter determining a methodology for calculating transaction value when the necessary information was

---

[11]  In making this argument, Midwest effectively concedes that any extension of liquidation that occurred prior to June 14, 2014 was proper.

[12] As the auditor, James Conrad noted, the type of audit conducted is no longer referred to as a "quick response audit" as the name was "not representative of both the work performed and the time expended."  Def. Ex. 19 (Conrad Decl.) at ¶ 4.

not provided.  Indeed, not only did Midwest fail to establish that CBP abused its discretion in extending liquidation (in order to perform its statutorily mandated tasks), but the extensions were necessary and proper. *See supra* at 13-19.

Here, CBP had to review and consider all information provided by Midwest, and ensure that (1) the proper basis of appraisement was being applied (here transaction value) – a task performed by the Office of Regulatory Audit; and (2) that the methodology for assessing transaction value (here using a percentage uplift from entered value), was proper – a task led by Import Specialists at the Port of Buffalo.  During this process, CBP ensured that all steps were completed in compliance with both statute and regulation. *Id.*

The draft audit report addressed only the basis of appraisement, in accordance with the scope of the quick response audit, Pl. Ex. S (Final Audit Report), and does not reflect the entirety of the analysis being conducted or the work that was completed prior to liquidating the entries. After completion of the audit process, CBP was required to effectuate the liquidation of all 562 entries. *See Supra* at 13-19.  However, CBP personnel at the port responsible for setting the appraised value of the merchandise under 19 U.S.C § 1500 had no basis for liquidating the merchandise until the proper basis of appraisement was determined by the Office of Regulatory Audit. Def. Ex. 19 (Conrad Decl.) at ¶ 11.

As set forth above, determining the proper basis of appraisment was difficult, and required document review, analysis, as well as approval and verification of the workpapers and audit report by a number of different groups within CBP. *See supra* at 13-19.  A review of the sample transaction provided by Midwest was conducted by the auditors on July 12, 2014 and fieldwork was not concluded until October 14, 2014.  Thereafter, both the workpapers and the audit report underwent substantial review by other members of Regulatory Audit, the Assistant

42

Field Director, Report Referencing Review and members of Field Quality Assurance Program. *Id*.

Specifically, the workpapers were reviewed by the Assistant Field Director and a senior auditor, and an audit document review sheet was prepared to ensure their accuracy and completeness; this process was completed by December 1, 2014. Then, an audit report review sheet was prepared by the Assistant Field Director, a process completed by March 10, 2015, the purpose of which is to ensure accuracy of the report and its compliance with applicable accounting standards. Subsequent review of the report was then conducted by Report Referencing Review and the Field Quality Assurance Program; both reviews were completed by April of 2015. Work on the report, however, continued by Regulatory Audit, in conjunction with the Field Quality Assurance program into June of 2015. *Id*. Contrary to Midwest's contentions, these were not "mere lassitude, or prolonged internal deliberations," Pl. Br. at 38, but necessary considerations and discussions in a complicated value assessment.

Although the Import Specialists began the process of establishing a methodology to calculate transaction value (without invoices) in 2015, absent the final Audit Report, the Import Specialists did not have all of the requisite information to appraise the merchandise. Def. Ex. 19 (Conrad Decl.) at ¶ 11. Ultimately, the Port of Buffalo utilized information obtained by the auditors to calculate transaction value by using the uplift formula previously described. Liquidation, then, required re-opening entries and re-appraising every line item for all 562 entries at issue in this litigation. The final audit report was issued in February 24, 2016 and notices of action were issued shortly thereafter, on March 28, 2016 and April 6, 2016. Between April and October 2016, CBP appraised and liquidated all entries at issue. *See supra* at 13-19. Notably, on April 15, 2013, when it received the notice of action, and in acknowledgment that

the entries had not yet liquidated by operation of law, Midwest asked that CBP extend the liquidation and "permit the submission of data necessary." Pl. Ex. V (April 15, 2016 Letter). Liquidation was properly extended so as to effectuate the proper appraisal of the merchandise.

Certainly, given the administrative procedures set forth above, and the need for information and expertise from not only Midwest, but a number of offices at CBP, including Regulatory Audit, which conducted the preliminary task of determining the proper basis of appraisement, Midwest cannot establish that extending liquidation was an abuse of discretion.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny plaintiff's motion for partial summary judgment, and grant partial summary judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

By:     /s/ Justin R. Miller
        JUSTIN R. MILLER
        Attorney in Charge
        International Trade Field Office

        /s/ Monica P. Triana
        MONICA P. TRIANA
        BRANDON A. KENNEDY
        Trial Attorneys
        Civil Division, Dept. of Justice
        Commercial Litigation Branch
        International Trade Field Office
        26 Federal Plaza, Room 346
Of counsel:                     New York, New York 10278
Mathias Rabinovitch            *Attorneys for Defendant*
Office of Assistant Chief Counsel   Tel. No. 212-264-9240 or 9230
International Trade Litigation
U.S. Customs and Border Protection

44

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE
_____

|  |  |  |
|---|---|---|
| MIDWEST-CBK, LLC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Consol. Court No. 17-00154 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT
STANDARD CHAMBER PROCEDURE 2(B)

I, Monica P. Triana, trial counsel in the Office of the Assistant Attorney General, Civil
Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for
the foregoing brief, relying upon the Microsoft Word word count feature of the word processing
program used to prepare the brief, certify that this brief complies with the type-volume limitation
under USCIT Standard Chamber Procedure 2(B) and contains 13,913 words.


/s/ Monica P. Triana