**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE**

---------------------------------------------------------------------- X

| | | |
|---|---|---|
| **MIDWEST-CBK, LLC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| *v.* | : | **Consol. Court No. 17-cv-00154** |
| | : | |
| **THE UNITED STATES,** | : | |
| | : | |
| **Defendant.** | : | |

---------------------------------------------------------------------- X

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S CROSS MOTION
FOR SUMMARY JUDGEMENT**

**NEVILLE PETERSON LLP**

**John M. Peterson
Richard F. O'Neill
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com**

**Dated:  October 29, 2021**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ ii

ARGUMENT .............................................................................................................. 4

I.      The Law Provides for a Hierarchy of Appraisement Methodologies. ................................. 4

II.     A Domestic Sale is Not a "Sale for Export to the United States" ......................................... 7

III.   CBP's Liquidated Values Cannot Serve as the Basis for Transaction Value. ................... 18

      A.    CBP's Liquidated Values Were Not Based on "Prices" Paid or Payable. ............. 18

      B.    CBP's Liquidations Were Not Based on any Lawful Value Method. .................. 20

IV.   Certain Entries Were Deemed Liquidated By Operation of Law. .................................... 26

      A.    Chronology of CBP Activities. ............................................................... 27

      B.    CBP Had No Basis to Extend Liquidations. ............................................. 29

            1.    Lawful Bases for CBP to Extend Liquidations are Not Satisfied. ............. 29

            2.    No New Information Was Requested Externally or Internally That Would Justify CBP's Extensions. ......................................................... 32

CONCLUSION .......................................................................................................... 33

## **TABLE OF AUTHORITIES**

**Cases**

*Brousterhous, Coleman & Co. v. United States*, 14 C.I.T. 307 (1991) ........................... 13, 14, 15

*Ford Motor Co. v. United States*, 157 F.3d 849 (Fed. Cir. 1998).......................................... 31, 32

*J.L. Wood v. United States*, 62 C.C.P.A. 25 (1974)....................................................................... 4

*La Perla Fashions, Inc. v. United States*, 185 F.3d 885 (Fed. Cir. 1999) ..................................... 3

*La Perla Fashions, Inc. v. United States*, 9 F. Supp. 2d 698 (Ct. Int'l Tr. 1998)......... 3, 15, 16, 17

*Nissho-Iwai American Corp. v. United States,* 982 F.2d 505 (Fed. Cir. 1992) .......... 12, 13, 14, 15

*North Dakota v. United States*, 480 F. Supp 3d 917 (D.N.D. 2020) ............................................ 30

*Orbisphere Corp. v. United States*, 13 C.I.T. 866 (1989).................................................. 2, 3, 4, 17

*St. Paul Fire & Marine Ins. Co v. United States*, 6 F.3d 763 (Fed. Cir. 1993) .................... 30, 31

*Synergy Sport International v. United States*, 17 C.I.T. 18 (1993)........................... 12, 13, 14, 15

*United States v. Getz Bros. & Co*., 55 C.C.P.A. 11 (1967) .......................................................... 4

*VWP of Am., Inc. v. United States*, 175 F.3d 1327 (Fed. Cir. 1999).......................................... 4

**Statutes**

19 U.S.C. § 1401a............................................................................................................... passim

19 U.S.C. § 1504................................................................................................................. passim

19 U.S.C. § 1592 ....................................................................................................................... 28

**Other Authorities**

19 C.F.R. § 177.9........................................................................................................................ 7

19 C.F.R. Part 152..................................................................................................................... 20

**Rules**

<u>CBP HQ Ruling 543789</u> (February 17, 1987) ...................................................... 7, 9, 10, 11

<u>CBP HQ Ruling H309839</u> (September 9, 2020)........................................................ 2, 3, 9, 15

Definition: INCOTERM, Black's Law Dictionary (8th ed. 2004) .............................. 17

<u>HQ Ruling 275076</u> (July 1, 2016)......................................................................................... 18, 19

<u>HQ Ruling 536786</u> (September 15, 1986) ............................................................................... 11

Int'l Chamber of Commerce, Incoterms 2010 .............................................................. 17, 24, 25

New York Uniform Commercial Code........................................................................................ 25

S. Rep. 96-249, 96th Cong., 1st Sess., at 108-109 (1979) ........................................................ 18

Symposium Issue: International Academy of Commercial and Consumer Law, 15th
   Biennial Meeting, Toronto, July 21-24, 2001: International Trade: Incoterms 2010, 29
   Penn St. Int'l L. Rev. 415 .................................................................................................. 24

WCO Customs Valuation Code, Agreement on the Implementation of Article VII of the
   General Agreement on Tariffs and Trade, 1868 U.N.T.S. 279 (1994)................................ 18, 21

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE
------------------------------------------------------------------- X

MIDWEST-CBK, LLC,                                    :
                                                    :
                    Plaintiff,                      :
                                                    :
          v.                                        :          Consol. Court No. 17-cv-00154
                                                    :
THE UNITED STATES,                                  :
                                                    :
                    Defendant.                      :
------------------------------------------------------------------- X


**<u>REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S CROSS MOTION
FOR SUMMARY JUDGEMENT</u>**

The issue presented in the current phase of this case is what constitutes a "sale for exportation to the United States" for purposes of Section 402(b) of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1401a(b), such that the price charged for merchandise in that sale may be used to determine a dutiable "transaction value." As discussed herein and in Plaintiff's principal brief (ECF 56-1), Plaintiff Midwest-CBK, LLC ("Midwest-CBK"), a U.S. company, contracted in the U.S. to sell goods to its unrelated retailer customers in purely domestic sales. Plaintiff's U.S. sales force took orders from U.S. customers for delivery of the goods in the U.S., using the terms "F.O.B. Buffalo, New York, as defined in the New York Uniform Commercial Code." The sales were effected, and title transferred to Midwest-CBK's customers, when Midwest-CBK delivered the goods to the customers' designated carriers in Buffalo, New York. The customers were charged in U.S. currency; they provided States' sales tax waivers to Plaintiff; and they made payment for the goods to Plaintiff in the U.S.

More particularly stated, the question is whether these purely domestic sales can be characterized as sales "for exportation to the United States" simply because, at the time the orders

were placed, plaintiff was storing the goods in a warehouse located in Canada. The Government here claims that these purely domestic sales may serve as the basis of dutiable transaction value. The courts—and U.S. Customs and Border Protection ("CBP" or "Customs") itself—have certainly not agreed.

This Court has previously considered the question presented, in *Orbisphere Corp. v. United States*, 13 C.I.T. 866, 875 (1989), in which a U.S. company took orders from unrelated U.S. customers for goods to be delivered in the U.S. At the time the contract was formed, the goods were not physically located in the U.S.—they were produced in Germany. That the goods were outside the U.S. when the contract was made did not convert that domestic sale into a "sale for export" to the U.S. Considering the meaning of the terms "export value" (the principal basis of Customs appraisement in the Tariff Act prior to 1980) and "transaction value" (the principal basis of Customs appraisement since 1980), the *Orbisphere* court noted:

> While these definitions of "export value" and "transaction value" are not identical, the crucial element of each for purposes of the present inquiry is the requirement, implicit in the highlighted language, that there have been **a sale abroad** for export to the United States before either measure is applicable.

*Orbisphere*, 13 C.I.T. at 875 (emphasis added). Deductive value was determined to be the applicable basis of appraisement.

Indeed, for its part, CBP appears to agree with Plaintiff that it is the *terms of the sale* are determinative of whether a sale is "for exportation to the United States, or a "domestic" sale. Recently, in CBP Headquarters ("HQ") Ruling H309839 (September 9, 2020), CBP noted:

> It would be nonsensical to conclude that two parties sitting within the United States could not form a contract for a sale of merchandise for export to the United States simply because the parties are sitting in the United States at the time the contract is formed. **It is the terms of the contract for sale** and not the location of the parties to the contract that determines whether the sale is a sale of merchandise for export to the United States.

(Emphasis added). In <u>HQ Ruling H309839</u>, CBP focused on this Court's decision in *La Perla Fashions, Inc. v. United States*, 9 F. Supp. 2d 698 (Ct. Int'l Tr. 1998), *aff'd without opinion*, 185 F.3d 885 (Fed. Cir. 1999), a case which is the focal point of the Government's Cross-Motion for Summary Judgment, and which involved a transaction between a U.S. seller and a U.S. purchaser. CBP observed (emphasis added):

> Further support of our view may be found in *La Perla Fashions, Inc. v. United States*, 9 F. Supp. 2d 698 (1998), *aff'd without opinion*, 185 F.3d 885 (Fed. Cir. 1999). *La Perla* involved a three-tiered transaction wherein La Perla imported merchandise from its parent company and resold that merchandise to U.S. retailers. The imported merchandise was appraised based upon the sale between La Perla, the importer, and its U.S. customers, *a.*, the U.S. retailers. La Perla contended the correct transaction value was the price paid by La Perla to its related supplier. The terms of sale between La Perla and its related supplier was ex-works, plus insurance. **The terms of sale between La Perla and its U.S. customers were delivered at customer's premises, duty-paid.**

*See* <u>HQ Ruling H309839</u>. Precisely. The terms of sale in *La Perla* evidenced an *international* sale of the goods at bar, one in which the parties used one of the International Commercial Terms ("INCOTERMS"), to wit, "Delivered Duty Paid" ("DDP"), a sales term used only in international transactions, which provides for division of risks and responsibilities, including the payment of Customs duties. Use of the "DDP" INCOTERM shows that the sale was one for goods to be "exported to" the U.S.

By contrast, in the instant case, the terms of sale between Midwest-CBK and its customers are purely *domestic* terms of sale—"FOB Buffalo, New York, in accordance with the New York Uniform Commercial Code." This is a term in which goods are delivered, and title transferred, when the goods are delivered to the buyer's carrier at a named place in this country. Importation, payment of duty and other entry formalities have already been handled by Plaintiff prior to the transfer of the merchandise to its customers (as in *Orbisphere, supra*), and are not part of the contract of sale. Midwest-CBK's customers are not contracting for the exportation of merchandise

3

from a foreign location to the U.S., and indeed, likely do not even know that the goods are, or were, imported.

Plaintiff submits that there is no sale of the merchandise at bar "for export to the United States," and thus, no "transaction value" of that merchandise may be determined under 19 U.S.C. § 1401a(b). However, the Customs valuation statute anticipates such an eventuality, and provides at 19 U.S.C. § 1401a(c) through (f) a hierarchy of alternative bases for appraising imported goods. Plaintiff contends the goods at bar (as in *Orbisphere, supra*) are subject to appraisement on the basis of deductive value. *See* 19 U.S.C. § 1401a(d).

The Government invites the Court in this case to *ignore* the terms of sale between Midwest-CBK and its U.S. customers, or to rewrite those terms. This is an invitation this Court must decline.

## ARGUMENT

### I.    The Law Provides for a Hierarchy of Appraisement Methodologies.

An appraisement analysis under current 19 U.S.C. § 1401a begins by investigating whether the goods can be appraised on the basis of their transaction value—*i.e.,* whether there is a *bona fide* "sale" at arm's length between a buyer and seller of goods "for export to the United States." There can be no "transaction value" of imported merchandise unless two conditions are satisfied: (i) there must be a "sale" of merchandise—*i.e.,* "a transfer of title from one party to another for consideration," *VWP of Am., Inc. v. United States*, 175 F.3d 1327, 1339 (Fed. Cir. 1999); *see also*, *J.L. Wood v. United States*, 62 C.C.P.A. 25, 33 (1974); and (ii) the "sale" must be "for exportation to the United States"—*i.e.,* an international sale in which the goods enter the United States. *See e.g., Orbisphere, supra; see also e.g., United States v. Getz Bros. & Co.*, 55 C.C.P.A. 11 (1967). Unless the subject merchandise was the subject of a "sale for exportation to the United States," the

4

goods must be appraised according to one of the other bases of appraisement set out in 19 U.S.C.

§ 1401a, which are applied in hierarchical order, as follows:

> (1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:
>
> > (A) The transaction value provided for under subsection (b).
> >
> > (B) The transaction value of identical merchandise provided for under subsection (c), if the value referred to in subparagraph (A) cannot be determined, or can be determined but cannot be used by reason of subsection (b)(2).
> >
> > (C) The transaction value of similar merchandise provided for under subsection (c), if the value referred to in subparagraph (B) cannot be determined.
> >
> > (D) The deductive value provided for under subsection (d), if the value referred to in subparagraph (C) cannot be determined and if the importer does not request alternative valuation under paragraph (2).
> >
> > (E) The computed value provided for under subsection (e), if the value referred to in subparagraph (D) cannot be determined.
> >
> > (F) The value provided for under subsection (f), if the value referred to in subparagraph (E) cannot be determined.
>
> (2) If the value referred to in paragraph (1)(C) cannot be determined with respect to imported merchandise, the merchandise shall be appraised on the basis of the computed value provided for under paragraph (1)(E), rather than the deductive value provided for under paragraph (1)(D), if the importer makes a request to that effect to the customs officer concerned within such time as the Secretary shall prescribe. If the computed value of the merchandise cannot subsequently be determined, the merchandise may not be appraised on the basis of the value referred to in paragraph (1)(F) unless the deductive value of the merchandise cannot be determined under paragraph (1)(D).

As detailed herein, the sales at issue in this action are not sales "for export to the United States" because *inter alia,* there is no "sale abroad." A domestic sale is not transformed into a "sale for exportation" simply because, at the time the contract is made, the subject goods are (unbeknownst to the buyer) located outside the U.S. Nor is the sale a "sale for exportation to the United States" simply

because, prior to delivery of the goods to the buyer at a domestic location, the seller had arranged the importation of the goods, payment of applicable Customs duties, and satisfaction of import formalities.

A customer walks into a Toyota dealership in Buffalo, New York, and enters into a contract to purchase a Toyota automobile. The contract calls for delivery of the goods "FOB dealer's location, Buffalo NY, as defined by the New York Uniform Commercial Code." That domestic purchase agreement is not transformed into an international "sale for exportation" simply because, at the time the goods were contracted for, the automobile was outside the U.S., in Japan.

Similarly, the customer walks into the Toyota dealership in Buffalo and orders a Toyota vehicle. At the time the order is placed, the vehicle is owned by the dealer and stored in inventory in a lot in Canada. The dealer arranges to have the vehicle brought from Canada to the U.S., clears it through Customs, pays applicable duties, and handles import formalities so that he can deliver it to the U.S. customer in the domestic "FOB Buffalo" transaction. That does not transform the domestic contract into an international "sale for exportation." That the dealer already owned the goods in Canada and moved them to the U.S. without a sale—the vehicle was already the dealer's property—does not change this. It may create a situation where there is no "sale for export to the United States" which can serve as the basis of transaction value under 19 U.S.C. § 1401a(b). In such cases, the law does not call on CBP to transform the dealer's domestic sale into a "sale for export"—it does not allow this—it merely requires that the next basis of valuation in the statutory hierarchy be considered and, if applicable, used.

A "delivered" price in a domestic transaction will typically provide for recovery of at least three expenses which are *never* dutiable under any basis of appraisement—(1) customs duties; (2) international transportation charges; and (3) the selling costs which the seller incurs in the U.S. But Defendant here seeks to include those amounts in dutiable value. The law does not countenance that position.

6

The "deductive value" basis of appraisement, 19 U.S.C. § 1401a(d), *does* allow for the use of a delivered price in a domestic sale to serve as the starting point in the Customs appraisement of goods. But it requires that the three categories of expenses noted above—duties, international transportation expenses and domestic sales expenses/profit—be deducted from that number to reach a dutiable value.

That Defendant's proposed basis of appraisement in this case would encompass three major categories of non-dutiable expenses should give the Court pause.

## II.  A Domestic Sale is Not a "Sale for Export to the United States"

In its Cross Motion for Summary Judgment, ("Def.'s Br.") (ECF 60), Defendant asserts that Plaintiff's purely domestic sales to its United States customers are "sales for exportation to the United States" despite overwhelming evidence demonstrating that Plaintiff's U.S.-based sales representatives take orders in the United States from United States customers for goods to be delivered in the United States: "FOB Buffalo, New York (as provided in the New York Uniform Commercial Code)," with payment being made to Plaintiff in the United States. According to Defendant, these sales can serve as the basis for determining dutiable "transaction value" under 19 U.S.C. § 1401a(b).  Further, contrary to unbroken judicial authority, Defendant claims a "sale for exportation to the United States" need not be an international sale. Def.'s Br. at 26.

The position taken by Defendant's counsel *should* come as a surprise to its client, CBP, which, for the past thirty-four (34) years has taken an explicitly contrary position in published rulings. These rulings represent CBP's official position and are binding on all of the agency's officials. 19 C.F.R. § 177.9(a). In fact, a circumstance virtually identical to that presented in the instant case was discussed in <u>HQ Ruling 543789</u> (February 17, 1987), and CBP took the position Plaintiff now advances in this action. We reproduce the ruling in its entirety below (emphasis added):

7

HQ 543789

FEB. 17, 1987
FILE: CLA-2 CO:R:CV:V
543789 EK
HQ 543789

This is in response to your letter of June 27, 1986, requesting a ruling as to the proper valuation of merchandise imported by your client (hereinafter referred to as importer).

You state that the importer is a Canadian corporation which intends to buy merchandise in various foreign countries for resale to customers in the United States. The merchandise is to be delivered directly to a public warehouse facility in the United States where it will be prepared for subsequent delivery to the ultimate purchasers. The importer retains total control of all aspects of the transaction with regard to the merchandise, including bearing the risk of loss from the time of importation into the United States until delivery to the ultimate purchaser. The importer is responsible for the payment of ocean freight, insurance charges, and inland transportation subsequent to importation. You further indicate that while the merchandise is in the warehouse facility, preparation for delivery to the ultimate purchasers may include relabelling of packages and repackaging. You state that some of the imported merchandise may be held in inventory, however, usually the importer will have found a customer by the time the merchandise is imported. The issue to be resolved is which sale, *i.e.,* the sale between the foreign manufacturer and the importer or the subsequent sale between the importer and the ultimate United States purchaser, should determine the "price actually paid or payable" for the merchandise when sold for exportation to the United States, assuming transaction value pursuant to section 402(b) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 (TAA), is applicable. It is your contention that the "price actually paid of payable" is represented by the sale between the foreign manufacturer and the importer.

From the facts provided by your June 27, 1986, letter, it is our conclusion that the sale for exportation to the United States upon which transaction value should be based is that between the foreign manufacturer and the importer. **The subsequent sales between the importer and the ultimate United States purchasers are domestic sales and do not properly represent the "price actually paid or payable" for the merchandise when sold for exportation to the United States.**

8

As noted in <u>HQ Ruling H309839</u> (September 9, 2020), it is the terms of sale which are paramount. Where the terms of sale indicate that a United States buyer and United States seller are engaging in a purely domestic sales transaction, the sale is a domestic one which does not "properly represent the "price actually paid or payable for the merchandise when sold for exportation to the United States."

The parallels between <u>HQ Ruling 543789</u> and the instant case are truly striking. Like the company at issue in <u>HQ Ruling 543789</u>, Plaintiff Midwest-CBK is "a … corporation [albeit a United States corporation] which intends to buy merchandise in various foreign countries for resale to customers in the United States."[1] Midwest-CBK's merchandise is "delivered directly to a public warehouse facility in the United States where it will be prepared for subsequent delivery to the ultimate purchasers" to wit, the UPS warehouse in Buffalo/Cheektowaga, New York.[2] As in <u>HQ Ruling 543789</u>, Plaintiff here exercises "total control of all aspects of the transaction with regard to the merchandise, including bearing the risk of loss from the time of importation into the United States until delivery to the ultimate purchaser. The importer, Midwest, is "responsible for the payment of ocean freight, insurance charges, and inland transportation subsequent to importation." *Id.*

But wait, there's more! Like the importer in <u>HQ Ruling 543789</u>, Midwest "usually … will have found a customer by the time the merchandise is imported." *Id.* And after Midwest-CBK has cleared the goods through CBP, paid all duties, taxes and fees, together with international transportation and post-import transportation charges, it delivers the goods to U.S. customers,

---

[1] *See* Plaintiff's 56.3 Statement, Exhibit A (Deposition of Owen Rogers pp. 30-33 (June 22, 2021)) (ECF 56-3).

[2] *See* Plaintiff's 56.3 Statement Exhibit N (Deposition of Owen Rogers pp. 162-165 (June 22, 2021)) (ECF 56-3).

consummating domestic sales by a U.S. seller, negotiating deals in the U.S. with U.S.-based customers for delivery in the U.S. on domestic delivery terms: "FOB, Buffalo, New York, in accordance with the New York Uniform Commercial Code."[3] Plaintiff is paid in the U.S. by its U.S.-based customers, in U.S. Dollars, with funds deposited in a U.S. bank.  The customers have no idea that the goods they are purchasing domestically were physically located outside the U.S. at the times they placed their purchase orders (but are brought into the U.S. and delivered to the customers domestically when the sales are effected, delivery is made, and title is transferred to those U.S. purchasers).  As noted in plaintiff's principal brief, the location of these sales is New York, not any point abroad.

The conclusion is inescapable: as in HQ Ruling 543789, the "sales between the importer"—*i.e.,* Midwest-CBK—"and the ultimate United States purchasers are domestic sales and do not properly represent the 'price actually paid or payable' for the merchandise when sold for exportation to the United States." HQ Ruling 543789 (February 17, 1987) (citing 19 U.S.C. § 1401a(b)).

The only difference between HQ Ruling 543789 and the instant case is that the sales from the foreign manufacturers to Plaintiff Midwest-CBK are not sales "for exportation to the United States."[4] They were *sales for exportation to Canada* and could not serve as the basis for a United States transaction value. The goods at issue in this were not "irrevocably destined for the United States" and indeed, some of them were disposed of in Canada, and some for export outside of North America. However, the fact that the sales from the foreign manufacturers to Midwest-CBK

---

[3] *See* Plaintiff's 56.3 Statement, Exhibit F (Midwest-CBK Letter (Feb. 22, 2014) (regarding representative transaction structure) (ECF 56-3).

[4] *See* Plaintiff's 56.3 Statement, Exhibit G (Deposition of Owen Rogers pp. 174-181 (June 22, 2021)) (ECF 56-3).

were not "for exportation to the United States" does not transform Midwest's domestic sales to its customers into sales "for exportation to the United States." According to HQ 543789, these sales remain U.S. sales. By CBP's own reasoning, these sales are disqualified from serving as the "transaction value" for the goods. *Id.; see also,* 19 U.S.C. § 1401a(b).

CBP has consistently held that domestic transactions cannot serve as the basis for dutiable "transaction value," and that, in some instances, this will eliminate transaction value as the basis of appraisement. Thus, for instance, in HQ Ruling 536786 (September 15, 1986), a parent company sent components to a subsidiary in Mexico for further assembly into finished goods, which were then imported into the United States. After their U.S. importation, the goods were sold by the parent company to unrelated customers. In certain transactions, the Mexican manufacturing subsidiary was not compensated for its services. Against these facts, CBP held that the lack of payment from the parent to the subsidiary precluded the finding of a "sale for exportation." But this did not mean that the domestic sale was somehow converted into a "sale for exportation." Indeed, CBP held to the contrary:

> Regarding the transaction between the domestic parent corporation and its subsidiary in Mexico, the component parts are consigned to the subsidiary for assembly into a finished product. Although we have allowed the use of transaction value in cases in which the "price actually paid or payable" represents an amount for assembly of the merchandise, such is not proper in the instant case because based on the information submitted, the subsidiary is not paid for the services. (*See* 19 C.F.R. § 152.103(a)(3); 807.00 Tariff Schedules of the United States). Likewise, **the sale between the parent corporation and its customer, is one between two domestic companies and is not a sale for exportation** within the meaning of the valuation statute. Therefore, **transaction value pursuant to section 402(b) is eliminated as a basis of appraisement.**

*Id.* (emphasis added).

This case involves a substantially identical situation. There is no sale of the goods from the foreign manufacturer/assembler "for export to the United States." That fact, however, does not transform the post-importation U.S.-based sale into one "for exportation to the United States."

Defendant offers no reasoning or precedent for the notion that a purely domestic sale may be taken as a "sale for exportation to the United States" under the transaction value statute. Defendant cites *Nissho-Iwai American Corp. v. United States,* 982 F.2d 505 (Fed. Cir. 1992); *see* Def.'s Br. at 23, but *Nissho-Iwai* did not, in any way, shape or form, involve a domestic sale. Rather, *Nissho-Iwai* involved two distinct sales of goods "for export to the United States": (i) a sale from a Japanese manufacturer to a Japanese distributor/reseller (*i.e.,* Nissho Iwai Corp.) on terms indicating that the goods were being sold for export to the United States; and (ii) a resale from a foreign seller, NIC, to a U.S. customer. This second sale was also an international sale on terms showing that it was "for exportation to the United States." The clear holding of the Federal Circuit in *Nissho-Iwai* finds that dutiable transaction value could be based on the *first* of these two international "sales for exportation" (*i.e.,* the "price of the sale from the manufacturer to the middleman," *id.* at 512) so long as the sales are made at arms' length. Defendant misapprehends *Nissho-Iwai*—there was no domestic sale involved in *Nissho-Iwai*, nor did the Federal Circuit suggest that any domestic sale could serve as the basis for determining dutiable transaction value for purposes of Section 402(b).

Defendant's reference to *Synergy Sport International v. United States*, 17 C.I.T. 18 (1993), is similarly unavailing. Def.'s Br. at 27-28. In *Synergy Sport*, a foreign manufacturer located in China, Chinatex, sold goods to Hong Kong-based Synergy—the plaintiff—"for exportation to the United States." Synergy, which acted as importer of record, subsequently resold the goods to U.S.-based purchaser, J.C. Penney, in an international transaction which was "for exportation to the

12

United States." Applying *Nissho-Iwai*, this Court held that the dutiable transaction value should be based on the price in the *first* arms-length "sale for exportation," in that case, the sale from Chinatex to Synergy. 17 C.I.T. at 20-21. At no point did the *Synergy Sport* court look to a domestic sale (presumably a sale from U.S.-based J.C. Penney to its U.S.-based customers) as the basis for dutiable value. The same result should obtain here.

In its Brief, Defendant suggests that because Midwest-CBK unilaterally moved the goods from its Canadian inventory to the United States delivery point, this somehow converted the domestic sales into sales which caused the "Chinese goods to be exported from Canada to the United States in fulfillment of these orders" Def.'s Br. at 25.[5] The suggestion is that CBP and the Court should look to the sale which "most directly caused" the importation of the merchandise into the United States. However, the notion that statutory transaction value should be based on the sale which "most directly caused" the importation of the goods was wholly squashed and prohibited by the Federal Circuit in *Nissho-Iwai* nearly three decades ago.

In *Brousterhous, Coleman & Co. v. United States*, 14 C.I.T. 307 (1991), this Court considered a transaction in which a U.S.-based firm, Crown Zellerbach, contracted with a foreign firm, Lurgi, to import and build a papermaking plant. Lurgi, in turn, contracted with various German manufacturers to make modules of the plants, which were exported from Germany to the U.S. in sales "for exportation to the United States." Choosing between two sets of international "sales for exportation" to the U.S.—involving sales from the (i) German manufacturers to foreign firm, Lurgi; and (ii) Lurgi to Crown Zellerback—this Court appraised the goods on the basis of

---

[5] The Government also argues at some length that Plaintiff's repositioning of the goods from the Canadian warehouse to the Buffalo, New York delivery point was not a "consignment." Def.'s Br. at 31. Whether the movement can be styled as a consignment is immaterial and irrelevant to the issue presented here. The key factor is that the goods moved to the U.S. without a "sale for export to the United States." They were moved in order to satisfy domestic sales at a U.S. delivery point.

the prices at which the German manufacturers sold the goods to Lurgi, "for exportation to the United States," holding that these were the sales which "most directly caused" the goods to be exported from Germany to the United States. *Id.* at 310.

The reasoning in in *Brousterhous* was expressly overruled in *Nissho-Iwai, supra*, where transaction value was held by the Federal Circuit to be based on the price in the *first* "sale for exportation," which was made at arms'-length, rather than the sale which "most directly caused" the international movement of the goods. *Nissho-Iwai*, 982 F.2d at 511. To eliminate doubt, in overruling *Brousterhous* on this point, the Federal Circuit struck down the "most directly caused" test. This was explicitly noted in *Synergy Sport*:

> Although this court in the past has acknowledged Customs' policy of valuing imports based on the sale which most directly caused the exportation, *see, e.g.*, *Brousterhous, Coleman & Co. v. United States*, 14 C.I.T. 307, 309, 737 F. Supp. 1197, 1199 (1990), recent Federal Circuit law has expressed serious disapproval of the "most direct cause of exportation" test:
>
> > we can discern nothing in the legislative history of the 1979 amendment that suggests that Customs, in determining the transaction value of imported merchandise, should undertake an investigation focusing on which of two transactions most directly caused the exportation. The "Customs policy" followed by *Brousterhous* proceeds from an invalid premise. To the extent *Brousterhous* ... require[s] a weighing of the relative importance of two viable transactions, it is overruled.
>
> *Nissho Iwai American Corp. v. United States*, No. 92-1239, slip op. at 16 (Fed. Cir. Dec. 28, 1992). This court also notes that if the "most direct cause of exportation" test compels use of the middleman-retailer price whenever the retailer's order causes the middleman to complete a sale with the exporter, Customs likely will have enacted a system requiring use of the alternative higher price in conflict with 19 U.S.C. 140la(f)(2)(B).
>
> In place of the "most direct cause of exportation" test, the Federal Circuit in *Nissho Iwai* applied the standard followed in *E.C. McAfee Co. v. United States*, 6 Fed. Cir. (T) 92, 842 F.2d 314 (Fed. Cir. 1988). *Nissho Iwai*, No. 92-1239, slip op. at 16. The standard in McAfee is that "if the transaction between the manufacturer and the middleman falls within the statutory provision for valuation, the manufacturer's pride, rather than the price from the middleman to his customer, is used for appraisal." *McAfee*, 6 Fed. Cir. (T) at 97, 842 F.2d at 318.

17 C.I.T. at 20. It should be noted, initially, that all of the sales under consideration in *Brousterhous*, *Nissho-Iwai,* and *Synergy Sport* were international sales "for exportation to the United States." None were sales from a U.S.-based seller to a U.S.-based buyer. To the extent Defendant here rests its case on the notion that the domestic sales from Midwest-CBK to its U.S.-based customers "most directly caused" the goods to move to the U.S., *Nissho-Iwai*'s overruling of *Brousterhous* makes "causation" wholly irrelevant to a statutory transaction value determination. Defendant is attempting to resurrect a long deceased interpretation of Section 402, buried by the Court of Appeals, and this Court should not allow it.[6] And certainly nothing in any of these cases supports the notion that a domestic sale is a "sale for exportation" under any circumstances.

Defendant has suggested that the case of *La Perla, supra*, supports the notion that a "domestic sale" can be used as the basis of transaction value. This argument is also unavailing.

While the Plaintiff in *La Perla* claimed that the transactions which CBP used to determine transaction value (*i.e.,* resales from La Perla USA to U.S.-based customers) were "domestic" transactions, the record in that case, and the Court's decision, indicates otherwise.

The sale at issue in La Perla was, like the instant sales, between a United States seller and a United States buyer. But the terms of sale (the primacy of which is conceded by CBP in HQ Ruling H309839 (September 9, 2020) clearly denominated that sale as an *international* sale.

In *La Perla,* an Italian parent company, Gruppo La Perla ("GLP") sold goods "for export to the United States" to La Perla Fashions ("La Perla"), a related United States company. La Perla resold these goods, in turn, to unrelated United States customers on terms indicating that the goods

---

[6] Fans of Monty Python's Flying Circus might suggest that the *Brousterhous* "most directly caused" doctrine is neither "resting" nor "pining for the Fjords." Rather, bereft of life, it is an "ex doctrine." *See Monty Python's Flying Circus: Dead Parrot* (BBC television broadcast Dec. 7, 1969), accessible at http://www.montypython.50webs.com/scripts/Series_1/53.htm (last accessed October 29, 2021).

were "delivered duty-paid" ("DDP") to the customer's premises. The use of the DDP INCOTERM, which expressly allocates responsibility for payment of Customs duties assessed upon importation of goods, clearly indicates that the sale from La Perla to its customers was an international sale "for exportation to the United States."

GLP also sold identical or similar goods directly to unrelated customers in the United States. The court found that while the prices charged by GLP and La Perla to their respective unrelated customers were very close, the prices from GLP to La Perla were 35% lower. The court agreed with CBP that the relationship between GLP and La Perla affected paid the "price paid or payable," making that sale not an acceptable basis for determining transaction value. The court then held that the second "sale for exportation to the United States," from LaPerla to its unrelated customers, formed a viable basis for determining "transaction value."[7]

Had the sale from La Perla to its customers not been an international sale, the Court could have appraised the imported merchandise in *La Perla* on the basis of the "transaction value of identical or similar merchandise" pursuant to 19 U.S.C. § 1401a(a)(c). But there was no need to do this.

It bears noting that there is nothing in the terms of sale from Midwest-CBK to its customers in this case that suggests an international sale. No INCOTERM is used; rather, the terms of sale are based on the New York Uniform Commercial Code, which covers domestic transactions. There is no reference to payment of duties or allocation of responsibility for same.

---

[7] Curiously, the *La Perla* Court conducted a comparison of the "second sale" prices from La Perla to its customers to the prices at which GLP sold goods directly to U.S. customers. ("Since the price between La Perla and its U.S. customers is approximately the same price as the price GLP sells to unrelated parties in the U.S., the court finds that this price fairly reflects the price of the subject merchandise." *See La Perla,* 22 C.I.T. at 399. Technically, such an analysis was unnecessary, since CBP presumes prices between unrelated parties to be at arms' length and thus acceptable as the basis of transaction value.

The *La Perla* decision does not provide any support to Defendant in this case.[8] Rather, the result in this action should be guided by this court's decision in *Orbisphere, supra*. Contrary to Defendant's contention, Def.'s Br. at 33, *Orbisphere* did not arise under a prior version of the Customs valuation statute. It dealt squarely with whether a transaction subject to the current version of Section 402 of the Tariff Act was subject to appraisement under "transaction value," 19 U.S.C. § 1401a(b); or "deductive value," 19 U.S.C. § 1401a(d). In *Orbisphere*, the goods imported were the subject of a domestic sale between a U.S. seller and a U.S. purchaser. The goods were to be delivered in the U.S. The sales agreements were accepted in the U.S., by a U.S. corporation, and did not require any acceptance or approval by any entity abroad. The court correctly concluded that the domestic sale was not one "for exportation to the United States," and could not serve as the basis of transaction value under 19 U.S.C. § 1401a(b). This case presents precisely the same situation, and the same result should be applied.

In short, Defendant has pointed to no instance—because none exists—where a domestic sale of imported goods was interpreted to be a sale "for exportation to the United States" upon which a transaction value could be based or determined under Section 402. CBP has itself, in its rulings, repeatedly rejected the notion that domestic sales are a "sale for exportation to the United

---

[8] The sales used for determining transaction value in *La Perla* were international sales because La Perla USA sold the goods on the basis of the Delivered Duty Paid ("DDP") INCOTERM[8] to its U.S.-based customers, for U.S. delivery to the U.S. customer's premises. An Incoterm is "[a] standardized shipping term, defined by the International Chamber of Commerce, that apportions the costs and liabilities of international shipping between buyers and sellers." Black's Law Dictionary 782 (8th ed. 2004). According to the Incoterms 2010:

> [DDP] means that the seller delivers the goods when the goods are placed at the disposal of the buyer, cleared for import on the arriving means of transport ready for unloading at the named place of destination. The seller bears all the costs and risks involved in bringing the goods to the place of destination and has an obligation to clear the goods not only for export but also for import, to pay any duty for both export and import and to carry out all customs formalities.

*See* Int'l Chamber of Commerce, Incoterms 2010, at 69 (2010) ("Incoterms 2010"). The use of the DDP INCOTERM, with its allocation of obligations for payment of duty to the seller, clearly indicates that the sales herein at issue were international sales "for export to the United States."

States." Thus, the instant case is one where no "sale for exportation to the United States" exists. However, Section 402—like the WCO Customs Valuation Code,[9] upon which it is based[10]— anticipates that such situations will arise. In such situations, the Statute and the WCO Customs Valuation Code do not clumsily reach for a post-importation domestic resale value to U.S.-based customers to serve as the basis of "transaction value," as the Government seeks to do here. Rather—in the absence of a sale for exportation of identical or similar goods, *see* 19 U.S.C. § 1401a(c)[11]—the statute requires that the domestic resale value serve as the *starting point* for the calculation of a "deductive value" pursuant to 19 U.S.C. § 1401a(d). That is the basis on which Plaintiff made entry of its goods, and, we submit, the proper basis of appraisement.

## III.   CBP's Liquidated Values Cannot Serve as the Basis for Transaction Value.

### A.   CBP's Liquidated Values Were Not Based on "Prices" Paid or Payable.

In its Brief, Defendant has left no room to doubt that CBP's reappraisal of Midwest-CBK's merchandise was based entirely on information outside of the transaction value for the merchandise. Rather, CBP relied entirely on figures derived from plaintiff's 2013 Financial Report, Def.'s Br. at 17, rather than the price paid or payable for any of the merchandise. Indeed, the Declaration of James Conrad, CBP auditor for the Boston Regulatory Audit and Advisory Service in Buffalo, NY ("Conrad Declaration" or "Conrad Decl."), Def.'s 56.3, Exhibit 19 (ECF 61-4), explicitly states that—although both CBP's Final Audit report and CBP HQ Ruling 275076 (July 1, 2016), called for CBP to liquidate plaintiff's entries on the basis of "transaction

---

[9] *See* Agreement on the Implementation of Article VII of the General Agreement on Tariffs and Trade, 1868 U.N.T.S. 279 (1994).

[10] *See* S. Rep. 96-249, 96th Cong., 1st Sess., at 108-109 (1979).

[11] The parties agree that there are no sales which can serve in the instant case as the basis of a 19 U.S.C. § 1401a(c) appraisement. *See e.g.,* ECF 56-2 (Pl.'s 56.3 Statement); *see also e.g.,* ECF 61-1 (Def.'s 56.3 Statement).

value" based on plaintiff's "FOB Buffalo, New York" prices to its customers –CBP, in liquidating

the protested entries, did something completely different:

> I worked with Import Specialists at the Port of Buffalo, and we calculated the price paid to Midwest by its U.S. customers using the <u>sale prices identified in Midwest's financial statements for 2013</u>[12]. The total dutiable value of all merchandise was calculated using the income on sales of all merchandise entered into the United States, subtracting non-dutiable costs identified on the financial statements. The difference between the total dutiable value and the total entered value represented the undervaluation of the merchandise caused by Midwest's appraisement methodology. <u>We appraised the dutiable value of each line item in all entries subject to this action by multiplying the entered value on the line item by the ratio of the total undervaluation</u>. This uplift calculated each line item's transaction value based on the total sales price found on the financial statements. <u>The uplift was performed on every line item of all 562 entries at issue</u>.

*Id.* at ¶ 12 (emphasis added). Mr. Conrad explains that the CBP-calculated uplift was then applied

to Midwest-CBK's entries via a March 28, 2016 Notice of Action, which announced that CBP

would begin liquidating entries dating back to 2013 "on the basis of transaction value, in

accordance with the final Audit Report issued by the Office of Regulatory Audit[.]" *Id.* at ¶ 13.

The particular uplift applied was initially calculated at 123.18% above the deductive values which

plaintiff had declared at entry, according to the March 28, 2016 Notice of Action, *see also*, April

4, 2016 Notice of Action, but was later recalculated and reduced to an uplift of 75.75% above the

declared deductive values, after Midwest-CBK submitted a letter dated May 13, 2016, disputing

the methodologies and calculations employed by the auditors. *Id.*; *see also e.g.*, Pl.'s 56.3

Statement, Exhibit U (Notice of Action (April 6, 2016)); Exhibit X (Midwest-CBK Letter (May

13, 2016) to CBP Commenting on Appraised Values of Certain Entries); Exhibit Z (Notice of

Action (August 6, 2016)) (ECF 56-4).

---

[12] It should be noted that Midwest-CBK's Financial Statement notes aggregate revenues from the sale of goods, but does not contain or disclose a single "sales price."

Whatever one cares to call this appraisement methodology, it is certainly not "transaction value" as set out in 19 U.S.C. § 1401a(b). It appears to be a method which uses information derived from an importer's financial statements to apply an arbitrary uplift to the 19 U.S.C. § 1401a(d) deductive values that plaintiff declared at the time of entry. One can spend a long, intense day (and sleepless night) poring over the valuation statute, 19 U.S.C. § 1401a, CBP's implementing regulations, 19 C.F.R. Part 152, and countless CBP rulings on valuation matters without finding any reference to the appraisement method which CBP used here. Even to the extent that 19 U.S.C. § 1401a(f) allows for a "residual" or "fallback" method of appraisement derived from other lawful bases of appraisement, the appraisement method used by CBP is not so derived; it is based on application of an arbitrary uplift to 19 U.S.C. § 1401a(d) deductive values. It is an appraisement based on an "arbitrary or fictitious values," prohibited by the statute. 19 U.S.C. § 1401a(f)(2)(G).

## B.    CBP's Liquidations Were Not Based on any Lawful Value Method.

A few other observations concerning "deductive value" are appropriate here. First, CBP in no way challenges the accuracy of the deductive values which plaintiff declared at the time of entry. Indeed, it incorporated those deductive values in its wacky calculation of value, as Auditor Conrad admits. Second, before Customs could resort to a "residual" valuation, under 19 U.S.C. § 1401a(f), it would first need to determine that none of the preceding bases of valuation in the statutory hierarchy are unavailable. However, deductive value under 19 U.S.C. § 1401a(d) is available, and was used here.[13] Third, a deductive value seeks to approximate what a "transaction

---

[13] The appraisement of merchandise is, in all cases, dependent on the availability of information. In order for a "transaction value" to apply, one must have information concerning the price at which goods are "sold for exportation to the United States." If, as here, the goods move into the United States without such a sale, transaction value of the merchandise cannot be determined. The same is true of the transaction value of identical or similar merchandise.

When no transaction value can be determined, the statute provides alternative bases of appraisement. "Deductive value," 19 U.S.C. § 1401a(d), is a "market minus" method of appraisement which begins with the resale price of the merchandise in the United States, and then allows deductions for international transportation charges, duties as well as "for profit and general expenses, in connection with sales in the United States of imported

value" should be. The transaction value statute seeks to assess duties on the value of the merchandise, as reflected in an arms-length price. Countries adopting the WCO Customs Valuation Code have the option to determine transaction value on an "FOB" (free on board, port of exportation) or "CIF" (cost, insurance and freight to port of importation) basis.[14] The U.S. has elected to determine customs value on an "FOB" basis, and does not include international transportation charges in dutiable values.

Thus, as one leading treatise notes, "[i]t will be recalled that the general approach to [deductive value] is that (a) valuation begins with the resale price in the country of importation, and (b) appropriate deductions are then made to arrive at a value at the point of importation (CIF countries) or exportation (FOB countries)." *See* Sherman & Glashoff, *Customs Valuation: Commentary on the GATT Customs Valuation Code,* 185 at 209 (2d. 1987).[15] The U.S. deductive value statute provides in relevant part (*see* 19 U.S.C. § 1401a(d)):

(d) Deductive value

(1) For purposes of this subsection, the term "merchandise concerned" means the merchandise being appraised, identical merchandise, or similar merchandise.

---

merchandise that is of the same class or kind, regardless of the country of exportation, as the merchandise concerned." Midwest-CBK has all of the information necessary to calculate these deductions.

Computed value, 19 U.S.C. § 1401a(e) is a "cost plus" basis of appraisement. In this case, Midwest does not have information from which a computed value can be calculated, since it is not the manufacturer of the imported goods and does not have access to manufacturing cost records.

[14] In other words, countries adopting the WCO Customs Valuation Code can determine whether international freight and insurance should be included in, or excluded from, "transaction value." Article 8(a)(2) of the WCO Customs Valuation Code provides that:

In framing its legislation, each party shall provide for the inclusion in or the exclusion from the customs value, in whole or in part, of the following:

(a) The cost of transport of the imported goods to the port or place of importation;

(b) Loading, unloading and handling charges associated with the transport of the imported goods to the place of importation; and

(c) The cost of insurance.

[15] In other words, a product's deductive value should not be much different than its transaction value.

21

(2)

    (A) The deductive value of the merchandise being appraised is whichever of the following prices (as adjusted under paragraph (3)) is appropriate depending upon when and in what condition the merchandise concerned is sold in the United States:

        (i) If the merchandise concerned is sold in the condition as imported at or about the date of importation of the merchandise being appraised, the price is the unit price at which the merchandise concerned is sold in the greatest aggregate quantity at or about such date.

*        *        *

(3)

    (A) the price determined under paragraph (2) shall be reduced by an amount equal to—

        (i) any commission usually paid or agreed to be paid, or the addition usually made for profit and general expenses, in connection with sales in the United States of imported merchandise that is of the same class or kind, regardless of the country of exportation, as the merchandise concerned;

        (ii) the actual costs and associated costs of transportation and insurance incurred with respect to international shipments of the merchandise concerned from the country of exportation to the United States;

        (iii) the usual costs and associated costs of transportation and insurance incurred with respect to shipments of such merchandise from the place of importation to the place of delivery in the United States, if such costs are not included as a general expense under clause (i);

        (iv) the customs duties and other Federal taxes currently payable on the merchandise concerned by reason of its importation, and any Federal excise tax on, or measured by the value of, such merchandise for which vendors in the United States are ordinarily liable;

CBP's value calculation, as explained by Auditor Conrad, *see* Conrad Decl. at ¶ 12, is not a "transaction value" calculation, nor could it be a deductive value calculation. Essentially, the calculation seeks to include in dutiable value the general expenses which Midwest-CBK incurs in marketing the goods in the U.S. (which includes the costs of its U.S. headquarters offices,

22

showrooms and a 300-person salaried U.S. sales staff) and its U.S. sales profits. These are not

included in any basis of appraisement allowed under 19 U.S.C. § 1401a. The calculation is also

fraught with other errors.[16] The facts are clear that Midwest-CBK and its U.S. customers lawfully

entered into domestic contracts for the sale of goods with title transferring to Midwest-CBK's

customers at the "F.O.B." point in Buffalo, NY. As discussed in Plaintiff's earlier brief

(ECF 56-1), Midwest-CBK's customers' domestic contracts are valid, and CBP concedes this

point, while badly misconstruing its authority:

> As part of our audit we also examined the terms of delivery and we determined that
> just as a related party can influence the price or payable, we found that <u>Midwest
> influenced the sale by use of the term of deliver [sic], Free-on-Board (FOB),
> Buffalo and manipulated where title transferred in conjunction with the terms of
> delivery</u>. There was no evidence where term of sale or title were negotiated or
> agreed upon, as in accordance with the UCC. The evidence suggests that Midwest
> designed each sale to its benefit. There appears to be no other options presented to
> the customer as to delivery or where title was transferred.

*See* Pl.'s R. 56.3 Statement, at ¶ 39; Exhibit S (CBP Final Audit Report), at Bates No. 000733.

There is no basis for the auditors' baseless suggestions of influence and manipulation, which quite

frankly are made far too cavalierly and, in a manner, showing a total lack of awareness for ordinary

commercial parlance. Neither the auditors nor CBP can articulate any legal basis for criticizing the

terms of sale used by private commercial actors to allocate responsibility for freight payment. The

valuation law deals with this situation objectively and mechanistically, by requiring the adjustment

of prices to an "FOB foreign port" basis. CBP's auditors, show a shocking ignorance of

commercial nomenclature, contracting norms, and the basic terminology used daily by

international businesspersons around the globe. Citing the election of an "FOB Buffalo, New

---

[16] For instance, the auditors' deduction for Customs duties are based upon the duties deposited at the time of
entry, rather than the much higher duties assessed at liquidation.

York" delivery term as an instrument of "influence" betrays either shocking ignorance or result-oriented reasoning.

While CBP has authority to examine *prices* in related party sales to determine if they influence the "price paid or payable" for goods, 19 U.S.C. § 1401a(b)(2)(B), nowhere does the statute give CBP the power to disallow the validity of a sale price based on the delivery terms used. If the use of a particular delivery term affects responsibility for payment of freight charges, CBP simply makes an adjustment for the freight amount to ensure that goods are appraised on an FOB foreign port of export basis.

Terms of sale are not terms for manipulation or influence. Speaking of the INCOTERMS, one commentary noted:

> Incoterms have a well recognized standing in international trade because they reflect contemporary trade practices. The methodology used in creating these rules firmly rests upon a thorough research through the medium of the National Committees of ICC in order to find out what is actually going on in practice and then to seek a common denominator.
>
> \*          \*          \*
>
> In order to induce traders to use Incoterms correctly, the ICC publication No. 715 E on the front cover indicates: "<u>ICC rules for the use of **domestic *and* international** trade terms</u>." It is important to note the word "domestic," since Incoterms is a short expression for international commercial terms, which seems to indicate that their use is restricted to international contracts of sale only. However, <u>by referring to Incoterms in any contract of sale they become incorporated as part of the contract in the same manner as other terms. The inclusion of the word "domestic" is intended to promote the use of Incoterms generally and particularly in countries such as United States</u> where the transport of the goods from seller to buyer may cover much longer distance than between parties in neighboring countries.

*See* Symposium Issue: International Academy of Commercial and Consumer Law, 15th Biennial Meeting, Toronto, July 21-24, 2001: International Trade: Incoterms 2010, 29 Penn St. Int'l L. Rev. 415, 419-20.

Here, Midwest-CBK and its customers followed commercial practices and specified a delivery term in their contracts, as noted at the bottom of the commercial documents:



*See* Pl.'s R. 56.3 Statement, at ¶ 10; Exhibit F at Bates No. 000381. For ease of reference, the above-quoted provide:

**FOB: BUFFALO, NEW YORK, AS DEFINED BY THE NEW YORK STATE UNIFORM COMMERCIAL CODE.**

While INCOTERMS can be used in domestic contracts, Midwest and its customers did not do so here. Rather, they opted to use a domestic delivery term taken from the New York Uniform Commercial Code. As one commentary notes:

> Trade practitioners in the U.S. will be aware that the terms FOB, CIF and so on are defined within the United States federal Uniform Commercial Code (UCC). First published in 1952, UCC covers many aspects of commercial contracts. It contains "shipment and delivery" provisions that have similar aims to those of the Incoterms rules.

> Some UCC expressions have the same three-letter abbreviations as those within the Incoterms system; but their definitions are totally different. Notoriously, "FOB" can have a number of different meanings within UCC, most of which do not correspond with the ICC Incoterms FOB definition.

> There is a crucial difference between UCC and the Incoterms rules.

> The Incoterms rules are by design independent of all legal systems—trading partners agree to incorporate a rule into their commercial agreements. However the UCC provisions must be adopted by each US state or territory.

*See* IncotermsExplained.com, The US View-Incoterms rules vs UCC, https://www.incotermsexplained.com/the-incoterms-rules/the-us-view/ (lasted accessed October 29, 2021).

In any event, CBP did not liquidate the entries at values which represented the terms in any contract of sale. It did not use "prices" as the basis of the liquidated values, in any way, shape or form. The liquidated values which were used to appraise plaintiff's entries in liquidation were in no way "transaction values."

Even if CBP wished to allege that these values represented "residual" or "fallback" bases of appraisement under 19 U.S.C. § 1401a(f)—which they do not—the agency would first need to work through the other bases of appraisement in the statutory hierarchy before utilizing the fallback basis. Had CBP done this, it would have concluded that the imported merchandise was subject to appraisement according to "deductive value" pursuant to 19 U.S.C. § 1401a(d).

## IV.    Certain Entries Were Deemed Liquidated By Operation of Law.

Certain of Plaintiff's entries at bar were "liquidated by operation of law" at the rate and amount of duties asserted at the time of entry, because CBP extended their liquidation dates without proper cause.

Section 504(a) of the Tariff Act, as amended, 19 U.S.C. § 1504(a), provides that CBP must liquidate an entry within one year, or the entry is deemed liquidated as entered. Section 504(b) provides that CBP may extend the liquidation date for an entry, but only when:

> (1) the information needed for the proper appraisement or classification of the imported or withdrawn merchandise, or for determining the correct drawback amount, or for ensuring compliance with applicable law, is not available to the Customs Service; or
>
> (2) the importer of record or drawback claimant, as the case may be, requests such extension and shows good cause therefor.

Certain of Midwest-CBK's entries liquidated under operation of the statute because the company did not request an extension and all the information needed for the proper appraisement of the imported merchandise was available to CBP no later than May 22, 2014. *See* Midwest-CBK

Letter (May 22, 2014), Pl.'s Response to Def.'s 56.3, at Exhibit CC. A chronology of events makes this clear: after May 22, 2014, CBP was not waiting on any "information needed for the proper appraisement … of the imported … merchandise."

**A.     Chronology of CBP Activities.**

A CBP field audit team began work on February 24, 2014 to evaluate the appraised value of Plaintiff's merchandise[17] the subject entries, and continued through February 25, 2014. Conrad Decl. at ¶ 8(b). Midwest-CBK provided substantial documentation and never received a notice of deficiency. *Id.* All initial and supplemental requests for information issued by CBP, seeking information was provided by Midwest to CBP, on or before May 22, 2014. *See* Midwest-CBK Letter (May 22, 2014), Pl.'s Response to Def.'s 56.3, at Exhibit CC. At this point, CBP had all the information it needed, and was "on the clock." Despite several requests from Midwest-CBK for status updates from CBP, there was no further correspondence from CBP for more than a year, until July 2015 when the auditors issued the Draft Audit Report and requested comment. *See* Plaintiff's 56.3 Statement, Exhibit Q (Draft Audit Report). CBP's Draft Audit Report was so brief—spanning only one-and-a-half pages in length, and so bereft of citations to evidence/authority, containing no specific findings, no citation to documents or individual transactions, and no citations to legal authority—that Midwest-CBK submitted its comments to the auditors less than ten (10) days later, on July 8, 2015. *See* Plaintiff's 56.3 Statement, Exhibit R (Audit Report Comments (July 8, 2015). Midwest-CBK's submission contained only legal analysis, and no new factual information. Thus, CBP had received the last piece of information

---

[17] Prior to undertaking its audit, CBP had extended the liquidation of certain entries pursuant to 19 U.S.C. § 1504(b). These "pre-audit" extensions are not questioned.

that it "needed" to appraise the protested entries more than a year before the date when the auditors issued the Draft Audit Report.

CBP then went silent for another seven months. Nothing further was heard from CBP until February 1, 2016, when Raymond Baker, Assistant Regulatory Audit Director for the Port of Buffalo, contacted Midwest-CBK's counsel to advise that a final audit report would be issued forthwith. The final audit report was issued on February 24, 2016. *See* Plaintiff's 56.3 Statement, Exhibit S (Final Audit Report (February 24, 2016)). Almost two months later, on March 28, 2016, Import Specialist Wisniewski of Buffalo CBP issued a CF 29 Notice of Action which indicated that certain entries (included in this protest) would be liquidated with the 123.13% uplift. *See* Plaintiff's 56.3 Statement, Exhibit U (Notice of Action (March 28, 2015)). These first of these liquidations occurred on April 8, 2016.

CBP asserts in its briefing and 56.3 statement that during the time period from June 2014 till April 2016 the agency was engaged in "review" CBP states that "the workpapers were reviewed by the Assistant Field Director and a senior auditor, and an audit document review sheet was prepared." Def.'s Br. at 43. "Then, an audit report review sheet was prepared by the Assistant Field Director." *Id*. "Review of the report was then conducted by Report Referencing Review and the Field Quality Assurance Program." *Id*. Work on the report, however, continued by Regulatory Audit, in conjunction with the Field Quality Assurance program into June of 2015. *Id*.

Finally in February 2016 the final audit report was published. The Government asserts that liquidation, however, could not occur absent a final report.[18] The final audit report did not contain any factual information, nor did it suggest that any information necessary to appraisement of the

---

[18] CBP states no authority for this assertion, Most Customs entries liquidate without audit. Most audits are conducted after entries liquidated and are final, with the aim of recovering "withheld duties" under 19 U.S.C. § 1592(d).

merchandise was missing. Indeed, the final audit report made no mention of how appraised value was to be calculated. It made no reference to Plaintiff's 2013 financial statements, nor to the calculation of any "uplift" to be applied to entered values. After the final report was issued, CBP calculated transaction value for each entry using Midwest-CBK's 2013 financial records, which had been provided to CBP nearly two years earlier, on May 22, 2014. *See* Midwest-CBK Letter (May 22, 2014), Pl.'s Response to Def.'s 56.3, at Exhibit CC. Any extensions of liquidation which CBP made after that date were without statutory basis, and are null and void. The consequence is that the entries in question were liquidated "as entered" on the next anniversary dates of their respective dates of entry.

### B.    CBP Had No Basis to Extend Liquidations.

#### 1.    Lawful Bases for CBP to Extend Liquidations are Not Satisfied.

Under 19 U.S.C. § 1504(b), there are only two statutory conditions which allow extension of liquidation: (1) the importer requested it, or (2) the "information needed for the proper appraisement is not available to the Customs Service." The record demonstrates that CBP had every bit of information it requested by May 22, 2014. *See* Midwest-CBK Letter (May 22, 2014), Pl.'s Response to Def.'s 56.3, at Exhibit CC. Neither CBP's final audit report, nor the liquidation calculations prepared by CBP's Import Specialists, reflect any other or later-received information.

Defendant argues that an "abuse of discretion" standard should apply to extension of liquidation of Midwest-CBK entries under 19 U.S.C. § 1504(b). *See* Def.'s Br. at 40. This is incorrect. The plain text of the statute should govern. Nowhere, however, does 19 U.S.C. § 1504(b) confer any "discretion" on the agency. Rather, it states an objective rule. CBP may extend only where (1) the information needed for the proper appraisement … of the imported … merchandise … is not available to the Customs Service."

The test for determining whether a statute allows for the exercise of discretion was recently restated in *North Dakota v. United States*, 480 F. Supp 3d 917, 923 (D.N.D. 2020):

> The first inquiry is whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being controlled by mandatory statutes or regulations." *Id.* (citing *United States v. Gaubert*, 499 U.S. 315, 328, 111 S. Ct. 1267, 113 L.Ed.2d 335 (1991)). "If the challenged conduct is not discretionary, the exception does not apply." *Id.* at 1046-47. In other words, if the **statutes** and regulations impose a **mandatory** obligation upon the government there is **no discretion** to act contrary to or ignore such an obligation, and the discretionary function exception is not implicated.

(Emphasis added). Section 504(b)(1) confers no discretion on the Government's power to extend liquidation under the facts presented here. To extend the liquidation, the agency must be lacking "information," necessary to appraisement of the merchandise.

The only question to be resolved is what information the Government lacked after receiving Plaintiff's submission of data from which appraised values were calculated. The Government has not pointed to any such information that was requested but not provided.[19]

The Government cites to *St. Paul Fire & Marine Ins. Co v. United States*, 6 F.3d 763 (Fed. Cir. 1993), as support for an "abuse of discretion" standard to resolve this issue. Def.'s Br. at 40. However, the facts in *St. Paul Fire* were markedly different from this case. In *St. Paul Fire*, an importer had agreed to provide CBP with cost updates every six (6) months, and had defaulted on this obligation. The question was whether CBP could further extend liquidation in the hope that the importer would come forward with the information. The Federal Circuit held that, in such circumstances—where CBP lacked information needed to appraise the merchandise—CBP had narrow discretion to extend liquidation:

> Although we agree that courts should ordinarily defer to a Customs' determination that it needs additional information in order to liquidate an entry, we cannot uphold

---

[19] It may be noted that CBP used the "uplift" formula based on Plaintiff's 2013 Financial Report to appraise entries made in 2014, 2015, 2016, 2017 and 2018.

a decision to extend the liquidation period if it can be shown that the importer, or some other entity, eliminated all reasonable bases for making that decision. Extending a period of liquidation with actual knowledge that no basis exists for so doing would be an abuse of Customs' discretion. *See Detroit Zoo*, 630 F. Supp. at 1357; *see also Heraeus-Amersil, Inc. v. United States*, 795 F.2d 1575, 1580 & n.7 (Fed. Cir. 1986) (Secretary's action on a request to find an established and uniform Customs practice reviewed for abuse of discretion) (citing *Rank Precision Indus. Inc. v. United States*, 68 C.C.P.A. 78, 660 F.2d 476, 480 (CCPA 1981), cert. denied, 479 U.S. 1064 (1987)). We thus conclude that Customs may, for statutory purposes and with the requisite notice, employ up to four years to effect liquidation so long as the extensions it grants are not abusive of its discretionary authority. Such an abuse of discretionary authority may arise only when an extension is granted even following elimination of all possible grounds for such an extension. **There is, in sum, a narrow limitation on Customs' discretion to extend the period of liquidation.**

*St. Paul Fire*, 6 F.3d at 768 (emphasis added).

Here, CBP had all the information requested from Midwest-CBK respecting appraisement, and the agency used that information, beginning nearly two (2) years later, to *begin* liquidating Midwest-CBK's entries with a duty increase. In this case, to avoid summary judgment, it is incumbent on CBP to proffer some evidence that it was somehow missing requested information after May 22, 2014. It has not done so.

The Federal Circuit in *Ford Motor Co. v. United States*, 157 F.3d 849, 855 (Fed. Cir. 1998), said that "the Court of International Trade cannot uphold a decision to extend a liquidation if an importer 'eliminates all reasonable bases for making that decision.'" Midwest eliminated any reasonable basis for making such a discretionary decision as of May 22, 2014. *See* Midwest-CBK Letter (May 22, 2014), Pl.'s Response to Def.'s 56.3, at Exhibit CC. Such narrow "discretion" as CBP may have under 19 U.S.C. § 1504(b), *see St. Paul Fire, supra,* does not exist here. As noted in *Ford, supra,* if the agency is engaged in active investigation, that might justify an extension. But administrative lassitude does not.

In this case all possible reasonable bases for CBP to require information have been excluded because CBP never asserts it lacked information necessary to liquidate the entries. In fact, when CBP finally did complete its audit process and liquidated the entries it did so using information provided years earlier.

### 2. No New Information Was Requested Externally or Internally That Would Justify CBP's Extensions.

As Courts have recognized "the statute does not require that information justifying a delay must come from the importer. A need for internal information from other Customs personnel might also satisfy Section 504(b)(1)." *Id.* at 856. In *Ford,* the Federal Circuit said it could be reasonable for Customs to cite an ongoing fraud investigation to contend "liquidation was not appropriate until completion of that investigation." However, no such assertions are made here. CBP relied on information that was in its possession for a long period of time to assert value when it liquidated the entries. Now new information was provided to anyone internally at CBP according to the agency. The Government's statement of facts makes no assertion that information was requested internally by the agency. Indeed, CBP's Audit Report and liquidations were like ships passing in the night, the Audit Report suggesting "transaction value" appraisement based on the "FOB Buffalo, New York" prices Midwest charged its clients while the liquidations were made using a strange "uplift" calculation derived from Plaintiff's 2013 Financial Statement.

CBP was not conducting any internal or external investigation for facts after May 22, 2014. *See* Midwest-CBK Letter (May 22, 2014), Pl.'s Response to Def.'s 56.3, at Exhibit CC. While it may have been taking an extended time to consider the information before liquidating, this is a luxury which 19 U.S.C. § 1504(b) does not afford it. Rather, Section 504(b) imposes a hard deadline, which Customs chose to ignore without proper legal cause. The affected entries must be deemed liquidated by operation of law pursuant to 19 U.S.C. § 1504.

## **CONCLUSION**

For the reasons set forth herein, the Court should grant partial summary judgment in favor of plaintiff, holding (1) that the "transaction value" of its imported merchandise cannot be based on the prices in its domestic sales of merchandise to customers on "FOB, Buffalo, New York" terms, as set out in the New York Uniform Commercial Code; and (2) that extensions of liquidation issued after May 22, 2014 were without legal authority, and that entries which were the subject of such extensions were deemed liquidated by operation of law pursuant to 19 U.S.C. § 1504.

Respectfully submitted,

/s/ John M. Peterson
John M. Peterson
Richard F. O'Neill
Patrick B. Klein
NEVILLE PETERSON LLP
*Counsel for Plaintiff*
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated:  October 29, 2021

33

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE**
-------------------------------------------------------------------- X
**MIDWEST-CBK, LLC.,**                                            :
                                                                 :
       **Plaintiff,**                                     :
                                                                 :
       *v.*                                              :    **Consol. Court No. 17-cv-00154**
                                                                 :
**THE UNITED STATES,**                                           :
                                                                 :
       **Defendant.**                                    :
-------------------------------------------------------------------- X

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance

upon the word count feature of the word processing program used to prepare the instant

Memorandum, I, Patrick B. Klein, of Neville Peterson LLP, who is responsible for the instant

Memorandum, certify that it contains 11,281 words.


                                      Respectfully submitted,

                                      /s/ Patrick B. Klein
                                      Patrick B. Klein