UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

————————————————————————— :
                                                    :
MIDWEST-CBK, LLC.,                                  :
                                                    :
                          Plaintiff,                :
                                                    :     Consol. Court No. 17-00154
                          v.                        :
                                                    :
UNITED STATES,                                      :
                                                    :
                          Defendant.                :
————————————————————————— :


---

**DEFENDANT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

MONICA P. TRIANA
Trial Attorney
Civil Division, Dept. of Justice
Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
New York, New York 10278
*Attorneys for Defendant*
Tel. No. 212-264-9240 or 9230

Of counsel:
Mathias Rabinovitch, Esq.
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

## <u>TABLE OF CONTENTS</u>

INTRODUCTION...................................................................................................…….1

ARGUMENT………………………………………………………………………….3

    I.    THE MERCHANDISE SHOULD BE APPRAISED ON THE BASIS OF
        TRANSACTION VALUE BECAUSE THE SALES BETWEEN MIDWEST
        AND ITS U.S. CUSTOMERS MEET THE STATUTORY REQUIREMENTS
        AS SALES FOR EXPORTATION TO THE UNITED STATES .........................3

        a.    The Sale To Midwest's U.S. Customers Is "For Exportation To The
               United States" ...........................................................................................4

        b.    Plaintiff's Analysis Of The Statute Is Inconsistent With The
               Law………………………………………………………………..5

               i.    International Sale Is Not Required By Statute Or Judicial
                       Authority…………………………………………………..6

               ii.    Plaintiff's Reliance On Rulings Is Misplaced……………………12

    II.    THE ARGUMENTS RAISED BY MIDWEST INVOLVING DEDUCTIVE
        VALUE AND CBP'S UPLIFT CALCULATIONS ARE OUTSIDE THIS
        PHASE OF THE LITIGATION AND SHOULD NOT BE CONSIDERED .......15

    III.    THE ENTRIES DID NOT LIQUIDATE BY OPERATION OF LAW AT THE
        RATE OF DUTY, VALUE, QUANTITY, AND AMOUNT OF DUTIES .
        ASSERTED BY THE IMPORTER ………………………………………..……16

    IV.    SEVERAL OF MIDWEST'S RESPONSES TO THE GOVERNMENT'S
        STATEMENT OF FACTS FAIL TO CONFORM TO THE RULES OF THE
        COURT………………………………………………………………..……20

CONCLUSION ...................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Detroit Zoological Society v. United States*,
   630 F. Supp. 1350 (Ct. Int'l Trade 1986) ............................................................... 17, 18

*E.C. McAfee Co. v. United States*,
   842 F.2d 314 (Fed. Cir. 1988) ................................................................................... *passim*

*Ford Motor Co. v. United States*,
   157 F.3d 849 (Fed. Cir. 1998) ................................................................................... 17, 18

*Jarvis Clark Co. v. United States*,
   733 F.2d 873 (Fed. Cir. 1984) ................................................................................... 12, 13

*La Perla Fashions, Inc. v.United States,*
   9 F. Supp. 2d 689 (Ct. Int'l Trade 1998),
   aff'd without opinion, 185 F.3d 885 (Fed. Cir. 1999) ............................................. *passim*

*Lerner New York, Inc. v. United States*,
   908 F. Supp. 2d 1313 (Ct. Int'l Trade 2013) ........................................................... 13

*Marbury v. Madison*,
   5 U.S. 137 (1803) ....................................................................................................... 12

*Nissho Iwai Am. Corp. v. United States*,
   982 F.2d 505 (Fed. Cir. 1992) ................................................................................... *passim*

*Orbisphere Corp. v. United States*,
   726 F. Supp 1344 (Ct. Int'l Trade 1989) ................................................................. 6, 7

*S.C. Johnson & Son, Inc. v United States*,
   415 F. Supp. 3d 1373 (Ct. Int'l Trade 2019),
   *aff'd* 999 F.3d 1382 (Fed. Cir. 2021) ....................................................................... 12

*St. Paul Fire & Marine Ins. Co. v. United States*,
   6 F.3d 763 (Fed. Cir. 1993) ...................................................................................... 17

*Synergy Sport Intern., Ltd. v. United States*,
   17 CIT 18 (1993) ....................................................................................................... 5, 10

*United States v. Massce & Co.*,
   21 C.C.P.A. 54 (1933) ............................................................................................... 6, 7

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ........................................................................................................ 13

*Univ. Elec. Inc. v. United States*,
   112 F. 3d 488 (Fed. Cir. 1997) ...................................................................................... 12

*VWP of Am., Inc. v. United States*,
   175 F.3d 1327 (Fed. Cir. 1999) ............................................................................. *passim*

*Warner-Lambert Co. v. United States*,
   407 F.3d 1207 (Fed. Cir. 2005) ...................................................................................... 12

## **Statutes**

19 U.S.C. § 3 ................................................................................................................. 17

19 U.S.C. § 1401a ............................................................................................... 1, 3, 6, 7

19 U.S.C. § 1500 ............................................................................................................. 3

19 U.S.C. § 1504 ..................................................................................................... 16, 18

28 U.S.C. § 2639 ............................................................................................................. 3

## **Regulations**

19 C.F.R. § 159.12 ........................................................................................................ 16

19 C.F.R. § 177.1 .................................................................................................... 12, 15

19 C.F.R. § 177.9 .................................................................................................... 12, 15

## **Rules**

USCIT R. 56 .................................................................................................................. 20

## **Other Authorities**

HQ 536786 (September 15, 1986) ................................................................................ 14

HQ 543789 (February 17, 1987) .................................................................................. 13

HQ H275056 (July 1, 2016) ......................................................................................... 12

HQ H309839 (September 9, 2020) ............................................................................ 9, 15

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____

|  |  |  |
|---|---|---|
| MIDWEST-CBK, LLC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Consol. Court No. 17-00154 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____

**DEFENDANT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, the United States (the Government), respectfully submits this memorandum in

reply to Plaintiff, Midwest-CBK, LLC (Midwest's) response (Pl. Opp. Br.) to our cross-motion for

partial summary judgment (Gov't MSJ).

**<u>INTRODUCTION</u>**

The issue presently before the Court is the proper basis of appraisement of certain foreign

merchandise, (manufactured in China and warehoused in Canada), which Midwest imported into the

United States, labeled for a specific U.S. customer to which it had been sold.  The entry of the

merchandise into the United States was part of Midwest's process of delivering that merchandise

from Canada to its U.S. customers.  The Court is tasked with determining whether Midwest's sale of

that merchandise to its U.S. customers is one "for exportation to the United States" such that

transaction value is the proper method of valuation.  19 U.S.C. § 1401a.  The undisputed facts

establish that it is.

Midwest maintains many of the same arguments identified in its opening submission.

Indeed, Midwest contends that the delivery terms "FOB Buffalo" in its import transaction shows

that there was no sale "for exportation to the United States," notwithstanding that the sale of its merchandise was the impetus for the exportation of that merchandise from Canada to the United States.  Plaintiff's analysis is wrong.  Indeed, it fails to address the clear standard set forth by the Court of Appeals for the Federal Circuit in *Nissho Iwai Am. Corp. v. United States*, 982 F.2d 505, 509 (Fed. Cir. 1992) and *E.C. McAfee Co. v. United States*, 842 F.2d 314, 319 (Fed. Cir. 1988) for determining whether transaction value is the proper method of valuation – whether there is a *bona fide* sale, and whether the merchandise that is the subject of that *bona fide* sale is "clearly destined for export to the United States" at the time of the sale in question.  The application of that standard to the facts of this case shows that Midwest's sale of merchandise to its U.S. customs is a sale "for exportation to the United States," and that the transaction value method of appraisement is proper.

The majority of Midwest's Opposition/Reply focuses on its incorrect statutory analysis.  Specifically, plaintiff contends that an "international sale" is required for a sale to be "for exportation to the United States."  This argument has no basis in the law.  In support of its erroneous analysis, plaintiff cobbles together case law and administrative decisions that, as we show below, are not applicable to the circumstances of this case.  The Federal Circuit has set forth a clear standard.  That test is satisfied here.

Moreover, the Court must determine whether U.S. Customs and Border Protection (Customs or CBP) abused its discretion in extending the liquidations.  From the time of entry until liquidation, CBP actively sought the information needed to process the entries, and reviewed and considered that information in selecting the proper method of appraisement and calculating the value of each entry.  The undisputed facts show that the entries did not become deemed liquidated at the rate of duty, value, quantity and amount of duties asserted by Midwest.

**ARGUMENT**

I.   **THE MERCHANDISE SHOULD BE APPRAISED ON THE BASIS OF TRANSACTION VALUE BECAUSE THE SALES BETWEEN MIDWEST AND ITS U.S. CUSTOMERS MEET THE STATUTORY REQUIREMENTS AS SALES FOR EXPORTATION TO THE UNITED STATES**

As set forth in our opening brief, imported merchandise must be appraised so that the final amount of duty can be fixed. *See* 19 U.S.C. § 1500(a). "By law, Customs is required to appraise imported merchandise in the manner set forth in 19 U.S.C. § 1401a," and CBP's actions in appraising imported merchandise are "presumed to be correct." *VWP of Am., Inc. v. United States*, 175 F.3d 1327, 1330, 1342 (Fed. Cir. 1999); 28 U.S.C. § 2639(a)(1).

The parties agree that the "primary method of valuation" – and the one that *must* be applied if possible – is transaction value, as set forth in 19 U.S.C. § 1401a(b)(1). *VWP*, 175 F.3d at 1330; *see* Pl. Opp. Br. at 5. It "is the price actually paid or payable for the merchandise when sold for exportation to the United States," plus specified additions. 19 U.S.C. § 1401a(b)(1). Legislative history makes clear that the current value statute was intended to be more straightforward than its predecessor, focusing on "the price which the buyer and seller agreed to in their transaction," instead of more convoluted concepts. S. Rep. No. 96-249, 96th Cong. 1st Sess. at 119 (1979). There are only *two* requirements necessary for application of transaction value: (1) the item must be "sold" and (2) that sale must be "for exportation to the United States." *See VWP,* 175 F.3d at 1338-39. The facts show a sale and the parties agree that the first element has been satisfied. The facts also show that the sale was "for exportation to the United States." Plaintiff disagrees. However, as we have demonstrated in our opening brief, plaintiff advances an erroneous interpretation of the law.

3

### a. The Sale To Midwest's U.S. Customers Is "For Exportation To The United States"

Plaintiff fails to conduct a proper analysis as to whether the sale to Midwest's U.S. customers is "for exportation to the United States." The Court of Appeals for the Federal Circuit has articulated a standard for whether a sale is "for exportation to the United States." *See*, *e.g.*, *Nissho Iwai*, 982 F.2d at 509; *E.C. McAfee*, 842 F.2d at 319. Indeed, transaction value should be applied when there is a *bona fide* sale and the merchandise that is the subject of that *bona fide* sale is "clearly destined for export to the United States" at the time of the transaction in question. *Id.* The Court must look to the "reality of the transaction" between the parties in making its determination. *See E.C. McAfee*, 842 F.2d 319.

Although many of the Federal Circuit cases analyzing this issue, *E.C. McAfee*, *VWP* and *Nissho Iwai*, considered *which* sale, in a three-tiered transaction (manufacturer, middleman, customer), should form the basis of transaction value, the same standard articulated therein applies to all relevant transactions, including this one. The reason there is only one sale to consider here is because the first sale in the three-tiered transaction of this case (from the Chinese supplier to Midwest) cannot meet the statutory test for transaction value – a fact to which the parties agree. Indeed, that sale cannot form the basis of transaction value because the merchandise was "clearly destined" for export "to Canada," where it was warehoused until a sale was made by Midwest; it was not yet sold "for exportation to the United States." Pl. Opp. Br. at 10; Gov't MSJ at 25, n. 8. The only sale to consider here as the basis for the transaction value of the merchandise is the sale between Midwest and its U.S. customers. The fact that there is only one transaction to consider does not alter the analysis as to that transaction; the Court must consider whether at the time of the sale to its U.S. customers, the merchandise was "clearly destined for export to the United States." The undisputed facts show this requirement is met.

As we previously explained, when customers in the United States placed their purchase orders, Midwest intended for the goods to be exported from Canada to the United States in fulfillment of those orders.  Gov't MSJ at 6-12.  All orders placed by Midwest's U.S. customers were processed in Midwest's Canadian offices, and the merchandise was picked, packed and labeled for delivery to the individual U.S. customers in Midwest's Canadian warehouse.  *Id.*  Boxes, which were individually labeled for U.S. customers in Canada, were then placed on a truck in Canada and entered into the United States (at the Port of Buffalo) as the first step in Midwest's process of delivering the orders placed by its U.S. customers.  *Id.*  From the time the order was placed to the time when the merchandise entered the United States, the merchandise was "clearly destined for export to the United States;" indeed, it was destined for the U.S. customer who contracted to pay – and did pay – an agreed price for that merchandise.  *Id.; see*, *e.g.*, *Synergy Intern., Ltd. v. United States*, 17 CIT 18, 20 (1993) (finding merchandise is clearly destined for the United States when shipped directly to California and the shipping labels reflect that the goods are destined for particular customers).  The vast majority of these facts are not in dispute.  *See* Pl. Resp. to Def. Statement of Material Facts at ¶¶ 30-62.  These facts satisfy the statutory requirement and transaction value must be applied.

The fact that Midwest's sales force is located in the United States, and that the customers are unaware of the importation of the merchandise is not relevant to the analysis.[1]

**b.  Plaintiff's Analysis Of The Statute Is Inconsistent With The Law**

Plaintiff argues that there was no sale for exportation to the United States.  However, plaintiff misapplies the legal standard for this element of the statute.

---

[1] We agree that the issue of "consignment" is not relevant to the facts of this case.  *See* Pl. Opp. Br. at 13, n. 5.

### i.   International Sale Is Not Required By Statute Or Judicial Authority

Plaintiff mischaracterizes the question before the Court as whether a "purely domestic sale can be characterized as sales 'for exportation to the United States.'"  Pl. Br. at 1-2.  However, "domestic sale" is not a statutory term, and the Court need not consider whether a domestic sale exists here.  The only relevant consideration is whether the statutory requirements for transaction value can be met – *i.e.*, whether the *bona fide* sale from Midwest to its U.S. customer is one "for exportation to the United States."  19 U.S.C. § 1401a(b)(1).  Plaintiff then maintains that there must be an "international sale" in order to satisfy the statutory requirements of section 1401a(b)(1).  *See e.g.*, Pl. Opp. Br. at 4.  However, plaintiff fails to explain the basis for this purported requirement. The term is not included in the statute, and plaintiff does not define which sales would satisfy the term.  Instead, plaintiff makes the conclusory statement that "the sales at issue in this case are not sales 'for exportation to the United States' because *inter alia*, there is no 'sale abroad.'"  Pl. Br. at 5. Plaintiff extracts the phrase "sale abroad" from *Orbisphere Corp. v. United States,* 726 F. Supp 1344, 1351 (Ct. Int'l Trade 1989)).  As we explained previously, the analysis from *Orbisphere* and the requirement that there be a "sale abroad" has no support in the current statute and does not apply here.  Gov't MSJ at 33-36.

We do not, as plaintiff asserts, contend that the Court decided *Orbisphere* "under the prior version of the Customs statute."  Pl. Opp. Br. at 17.  Rather, as we explained in our opening submission, Gov't MSJ at 33-36, the Court in *Orbisphere* erred in adopting the analysis reflected in *United States v. Massce & Co.*, 21 C.C.P.A. 54 (1933), which interpreted a prior version of Section 402 of the Tariff Act of 1930.  The Trade Agreements Act of 1979, Pub. L. 19-36, 93 Stat. 194 amended the statute subsequent to *Massce* and implemented the Agreement on Implementation of Article VII of the General Agreement on Tariffs and Trade (GATT), known as the "Customs

Valuation Agreement."

Indeed, as we explained, the prior value statute employed the terms "export value" and "United States value" (not "transaction value" and "deductive value").  Gov't MSJ at 33-36.  Export value is the "price, at the time of exportation . . . to the United States" at which merchandise "is freely offered for sale to all purchasers *in the principal markets of the country from which exported.*"  *Orbisphere*, 726 F. Supp. at 1349 (quoting Section 402(d), Tariff Act of 1930 (as previously enacted) (emphasis added)).  United States value is "the price at which such or similar imported merchandise *is freely offered for sale*, packed ready for delivery *in the principal market of the United States*."  *Id.* at 1350 (quoting Section 402(a)(3), Tariff Act of 1930 (as previously enacted) (emphasis added)).

These definitions explain the statement in *Massce* (and quoted in *Orbisphere*) that "where offers of sale, agreements to sell, and sales are all made in the United States, and none in a foreign country, there can not be an *export value* of the exported merchandise."  *Massce*, 21 CCPA at 60; *Orbisphere*, 726 F. Supp. at 1350.  That is, a "sale abroad," is necessary to determine export value because of the statutory requirement that goods be "offered for sale" in the country of exportation.

The current language of Section 402 of the Tariff Act of 1930 (19 U.S.C. § 1401a) differs significantly from the predecessor statute.  Indeed, the terms "international sale" or a "sale abroad" are not standards reflected in the current valuation statute.  Rather, the statute adopts the standard of transaction value, among others.  Because Congress implemented a new valuation system, and repealed the prior law reflected by these terms, the holding from *Massce*, and by extension *Orbisphere*, should not be applied to the facts of this case.  *See also* Gov't MSJ at 33-36.[2]

---

[2] As we noted in our opening submission, even if the analysis in *Orbisphere* applied, the facts here are distinguishable.  Gov't MSJ at 37-38.

The current version of the statute adopts the standard of transaction value, among others. Transaction value is applied when there is a *bona fide* sale and the merchandise that is the subject of that *bona fide* sale is "clearly destined for export to the United States" at the time of the transaction in question. *Nissho Iwai*, 982 F.2d at 509; *E.C. McAfee*, 842 F.2d at 319. The legislative history to the statutory amendment is instructive, identifying a more straightforward approach to the assessment of dutiable value for entered merchandise. It provides that:

> The use of transaction value as the primary basis for customs valuation will allow the use of *the price which the buyer and seller agreed to* in their transaction as the basis for valuation, rather than having to resort to more difficult concepts of 'freely offered,' 'ordinary course of trade,' 'principal markets of the country of exportation" and 'usual wholesale quantities' contained in existing U.S. law.

S. Rep. No. 96-249, 96th Cong. 1st Sess. at 119 (1979); *see also* Preamble, Agreement On Implementation of Article VII of the GATT (1979) (recognizing that "customs value should be based on simple and equitable criteria consistent with commercial practices"). The applicable requirements are different from those set forth in the previous statute, and they have been met here.

Moreover, case law confirms that neither an "international sale" or a "sale abroad" is required. As noted in our opening brief, the Federal Circuit in *VWP,* 175 F.3d 1327, and this Court in *La Perla Fashions, Inc. v. United States*, 9 F. Supp. 2d 698 (Ct. Int'l Trade 1998), *aff'd without opinion*, 185 F.3d 885 (Fed. Cir. 1999), held that certain sales from a U.S. company to a U.S. customer met the statutory requirements for sales "for exportation to the United States."

In *VWP,* VWPC (A Canadian company) sold fabrics to VWPA (a U.S. distributor), who sold the fabrics to U.S. customers. 175 F.3d at 1330-31. The question before the Court was whether the transaction between VWPC and VWPA could serve as the basis for transaction value, *id.* at 1338-39, because, as required by law, if there are two sales "for exportation to the United States" the sale

8

between the manufacturer and the middleman is the proper sale for consideration.  *See Nissho Iwai*,

982 F.2d at 509.  The Federal Circuit held that if it could not, "the transaction value *must be* based

upon sales by VWPA [a U.S. company] to its U.S. customers," which took place in the United

States.  *VWP*, 175 F.3d at 1334 (emphasis added).  Notably, the terms of delivery between VWPA

and its U.S. customers were the same as here, FOB to a location in the United States.  *Id.* at 1331.

Plaintiff disregards this case in its reply brief.

Plaintiff attempts to distinguish this Court's decision in *La Perla*, but to no avail.  In *La

Perla*, the parties to the three-tiered transaction were an Italian manufacturer, a New York

distributor and a U.S. customer.  *La Perla*, 9 F. Supp. 2d at 699-700.  The Court found that the price

from the Italian manufacturer to the New York distributor could not form the basis for transaction

value because they were related parties and the sale price between them was affected by that

relationship.  *Id.* at 703.  Therefore, the Court held that the transaction value "*can only be* based on"

the price of the transaction from the New York distributor to its U.S. customer.  *Id.* at 704 (emphasis

added).  Indeed, if there is only one *bona fide* sale, it must be the transaction considered for

purposes of assessing transaction value.  *Id.*  The same holds true here.  There is only one sale that is

the focus of the analysis – the sale to Midwest's U.S. customers.  When customers placed the order,

Midwest exported its merchandise out of Canada, in fulfillment of those orders.  As in *La Perla*, the

transaction value "can only be based on" that sale.  *Id.*

Plaintiff attempts to distinguish the decision in *La Perla* because "the terms of sale between

La Perla and its U.S. customers were delivered at [the] customer's premises, duty-paid."  Pl. Opp.

Br. at 3 (quoting HQ H309839 (September 9, 2020)); *see La Perla*, 9 F. Supp. 2d at 699-700.

Plaintiff alleges that the terms of delivery and duty-paid status are in reference to the incoterm

"DDP" or "Delivery Duty Paid."  Pl. Opp. Br. at 3, 15-16.  In plaintiff's view, these terms reflect an

"international" sale. *Id.* Plaintiff's distinction, however, is irrelevant. As a threshold matter, neither the statute, nor the Court in *La Perla* required an "international" sale for the application of transaction value. Also, in considering whether the sale from the U.S. entity to the U.S. customer could form the basis of transaction value, the Court did not cite the payment of duties by La Perla as being pertinent to its analysis. In that case, as here, there is only one *bona fide* sale that is "for exportation to the United States," and the transaction value should be based on that sale. *Id.* at 704.[3] As previously noted, the location and nationality of the parties is not relevant to the analysis. *See Synergy,* 17 CIT at 21 n.4.

Even if the Court were to consider the terms of duty payment, the holding in *La Perla* is still applicable to the facts of this case. Plaintiff contends that the term DDP "allocates responsibility for payment of customs duties assessed upon importation of goods" and therefore, its use indicates there was an "international sale" for exportation to the United States. Pl. Opp. Br. at 16. Plaintiff further notes that the use of DDP means that "the seller bears all the costs and risks involved in bringing the goods to the place of destination and has an obligation to clear the goods not only for export but also for import, to pay any duty for both export and import and carry out all customs formalities." *Id.* at 17 n. 8 (quoting Int'l Chamber of Commerce, Incoterms 2010 at 69 (2010)). The same circumstance appear to exist here. Midwest was responsible for the risk of loss, payment of duties and delivery to a precise location in the United Sates. Pl. Opp. Br. at 9-10. Indeed, as Midwest states, it "clear[s] goods through CBP, pa[ys] all duties, taxes and fees, together with

---

[3] Contrary to plaintiff contention, Pl. Opp. Br. at 12, *Nissho Iwai* also involved a contract between a U.S. entity and a U.S. customer. One sale was between a Japanese supplier to a Japanese middleman, NIC, and the other sale was between NIC's U.S. subsidiary, NIAC, to the U.S. customer. The Court observed that the sales from *both* segments of the three-tiered transaction satisfied the statutory requirement for transaction value. *See Nissho Iwai*, 982 F.2d at 506, 510.

international transportation and post-import transportation charges, [and] it delivers the goods to U.S. customers." *Id.*

As noted in *E.C. McAfee*, the Court did not limit its analysis to solely the sales terms. Rather, it considered the "reality of" the transactions to determine whether a sale "for exportation to the United States occurred." *E.C. McAfee*, 842 F.2d at 319 ("*the reality of the transaction* between the distributors and the tailors is that the goods, *at the time of the transaction* . . . are 'for exportation to the United States.'" (emphasis added)); *see also La Perla*, 9 F. Supp. 2d at 703. That "there is no reference to payment of duties or allocation of responsibility for same" with respect to the transaction at issue here does not alter the "reality of" what occurred. Pl. Opp. Br. at 16. Again, Midwest cannot evade the statutory preference for transaction value by setting certain delivery terms or not informing its customers of the exportation from Canada. *Id.* at 10, 16.

Therefore, the only relevant analysis is whether there exists a *bona fide* sale and whether the merchandise that is the subject of that *bona fide* sale is "clearly destined for export to the United States."[4] *See supra* at 4. Here, the "reality of" the transaction between Midwest and its U.S. customers is that there is a sale "for exportation to the United States."

The Government does not, as plaintiff suggests, argue that the Court should look to the transaction that "most directly caused" the transaction at issue. Pl. Opp. Br. at 13-14. That analysis,

---

[4] The Federal Circuit's analysis is consistent with the interpretation of the Technical Committee on Customs Valuation of the World Customs Organization (WCO). In its Advisory Opinion 14.1, the WCO explained that, if an importation of merchandise is established, the "only remaining requirement then, is to identify the transaction relating thereto. In this respect, there is no need that the sale take place in a specific country of exportation. If the importer can demonstrate that the immediate sale under consideration took place with the view to export the goods to the country of importation, then [Transaction Value] can apply." WCO, Advisory Opinion 14.1 Meaning of the Expression "Sold for Export to the Country of Importation" (Adopted 9th Session, 8 March 1985, 32.350), available at http://www.wcoomd.org/en/topics/valuation/instruments-and-tools/advisory-opinions.aspx.

11

as plaintiff notes, was overruled by the Federal Circuit's decision in *Nissho Iwai*, 982 F.2d at 511.

Rather, the Government advocates for the standard articled by the Federal Circuit case law.

> ii.    **Plaintiff's Reliance On Rulings Is Misplaced**

Plaintiff discusses certain administrative rulings, purportedly in support of its contention that

an "international sale" is required for a sale to be "for exportation to the United States."  Plaintiff's

reliance on those rulings is misplaced.

As a threshold matter, an administrative "ruling" by CBP is "a written statement issued by

the Headquarters Office or the appropriate office of Customs as provided in this part that interprets

and applies the provisions of the Customs and related laws *to a specific set of facts*."  19 C.F.R. §

177.1(d)(1) (emphasis added); *see also* 19 C.F.R. § 177.9 (the ruling letter "represents the official

position of the Customs Service *with respect to the particular transaction or issue* described therein

and is binding on all Customs Service personnel in accordance with the provisions of this section

until modified or revoked."  (emphasis added)).  Therefore, a ruling is personal to the importer and

is limited to the specific facts of that transaction.  The only ruling issued with respect to the facts of

this case is HQ H275056 (July 1, 2016).  *See* Pl. Ex. T.

Moreover, administrative rulings are not binding on the Court.  *S.C. Johnson & Son, Inc. v*

*United States*, 415 F. Supp. 3d 1373, 1385 (Ct. Int'l Trade 2019) *aff'd* 999 F.3d 1382 (Fed. Cir.

2021).  This is particularly so with respect to an issue of statutory interpretation.  As held by the

Federal Circuit, "pure questions of law, such as the proper interpretation of a particular tariff

provision or term . . . lie within the domain of the courts."  *Univ. Elec. Inc. v. United States*, 112 F.

3d 488, 492 (Fed. Cir. 1997).  Indeed, "'[i]t is emphatically the province and duty of the judicial

department to say what the law is."  *Id.* (quoting *Marbury v. Madison*, 5 U.S. 137 (1803)).  To be

sure, "[t]he court has an independent responsibility to decide the legal issue of the proper meaning

and scope of HTSUS terms." *S.C. Johnson*, 415 F. Supp. 3d at 1381-82; *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).  As noted by the Federal Circuit in *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984), it is the "court's duty to find the *correct* result, by whatever procedures is best suited to the case at hand."  *Id.* (emphasis in original).

Here, the Federal Circuit has articulated a standard for when a sale is "for exportation to the United States" – it is when the merchandise is "clearly destined for export to the United States" at the time of the sale in question.  *See supra* at 4.

Although administrative rulings may be relevant insofar as they have the "power to persuade," *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001); *Lerner New York, Inc. v. United States*, 908 F. Supp. 2d 1313, 1317 (Ct. Int'l Trade 2013), the rulings cited by plaintiff, two of which were issued more than 30 years ago, are distinguishable from the facts of this case and are not persuasive.  For example, plaintiff discusses HQ 543789 (February 17, 1987).  Pl. Opp. Br. at 7-11.  Contrary to plaintiff's contention, the facts of that ruling are not "virtually identical" to the facts at issue here.  *Id.* at 7.  In that ruling, the facts show that the importer transports its foreign merchandise to a warehouse in the United States, where the merchandise is prepared for delivery to U.S. customers.  *See* HQ 543789.  While held in the U.S. warehouse, the merchandise may be re-labeled and repackaged for delivery to U.S. customers.  *Id.*  There is no indication in the ruling that merchandise is being imported as a result of a sale to a particular U.S. customer; in fact, there is no indication of exactly when, or if, a sale to the U.S. customer takes place.  The ruling notes that by the time of importation, the importer will *usually* (not always) have found a U.S. customer, but that sometimes when the merchandise arrives in the United States, it just remains in inventory.  *Id.*  To satisfy the statutory requirements for transaction value, there must be a sale wherein the goods are "clearly destined for export to the United States" at the time of that sale.  *Nissho Iwai*, 982 F.2d at

13

509; *E.C. McAfee,* 842 F.2d at 319.  A sale that occurs after importation plainly cannot be a sale "for exportation to the United States."  *See id.*

The facts here are distinctly different.  Purchase orders for the merchandise are placed by U.S. customers, and those orders are sent to Midwest's Canadian facilities for processing and shipment.  Gov't MSJ at 6-12; Pl. Resp. to Def. Statement of Material Facts at ¶¶ 30-62.  Those specific sales are the impetus for the importation of the merchandise, which is prepared, in Canada, for delivery to a particular U.S. customer.  *Id.*  Midwest does not rent a public warehouse in the United States where its personnel manipulates, labels or packages goods.  Moreover, Midwest's merchandise is already packed and labeled for delivery to its U.S. customers at its Canadian warehouse, and, upon importation, the pre-labeled boxes are brought to a UPS facility only to be taken off pallets and shipped.  Gov't MSJ at 9-11; Pl. Resp. to Def. Statement of Material Facts at ¶¶ 44-62.  No Midwest personnel work at UPS or anywhere in Buffalo, where Midwest enters the merchandise.  Pl. Resp. to Def. Statement of Material Facts at ¶ 61.  These distinctions are significant in considering whether the sale from Midwest to U.S. customers meet the statutory requirements for a sale "for exportation to the United States."

The facts of HQ 536786 (September 15, 1986) are similarly distinct from those at issue here.  In that case, a parent company had its product assembled at the facilities of a subsidiary in Mexico using materials and components that had been consigned by the parent company to the subsidiary.  *Id.*  The assembled merchandise was then returned to the parent corporation.  *Id.*  Notably, from the facts of the ruling, it does not appear that the parent company paid the subsidiary company for the assembly of the merchandise.  *Id.*  Although there might have been a sale prompting the parent company to obtain merchandise assembled by the subsidiary, as stated in the ruling, the details of the transactions are not specified.  For example, it is unclear whether the merchandise was shipped

14

back from the factory in bulk or was labeled and ready for delivery to a U.S. customer. *Id.*

Moreover, the ruling indicates that the merchandise is interchangeable, likely with merchandise

already delivered from Mexico to a warehouse in the United States. The ruling describes

circumstances different from the facts of this case, and the analysis conducted by Customs is only

applicable to the facts of that ruling. *See* 19 C.F.R. §§ 177.1(d)(1), 177.9.

To the extent plaintiff cites this ruling for the argument that a sale between a domestic

company and a U.S. customer cannot form the basis for transaction value, that view of the law is

contradicted by the holdings of *VWP* and *La Perla*. That contention is also at odds with HQ

H309839 (cited by plaintiff), which held that "[i]t would be nonsensical to conclude that two parties

sitting within the United States could not form a contract for sale of merchandise for export to the

United States simply because the parties are sitting in the United States at the time the contract is

formed." HQ H309839.

These rulings, which are fact-specific, are neither binding on this Court, nor is their analysis

persuasive to this Court's consideration of the facts here.

\*     \*     \*

The undisputed facts show that the sales from Midwest to its U.S. customers meet the

standard for sales for exportation to the United States and that transaction value is the proper method

of appraisement for the imported merchandise.

## II.     THE ARGUMENTS RAISED BY MIDWEST INVOLVING DEDUCTIVE VALUE AND CBP'S UPLIFT CALCULATIONS ARE OUTSIDE THIS PHASE OF THE LITIGATION AND SHOULD NOT BE CONSIDERED

Midwest argues that "CBP's Liquidated Values Cannot Serve as the Basis for Transaction

Value." Pl. Opp. Br. at 18-26. Similar to arguments made in its opening submission, *see* Pl. MSJ at

32-34, these arguments are outside the scope of Phase One of this litigation and should not be

15

considered here.  As set forth above, Phase One "encompass[es] [1] whether Plaintiff['s] . .  import transactions reflect a sale for exportation to the United States and [2] whether the entries became deemed liquidated by operation of law."  May 10, 2020 Order, Docket No. 52.  Phase Two covers "all remaining issues in this action, such as the proper method of valuation of the imported merchandise or whether [CBP's] calculation of transaction value was in accordance with the law." *Id.*  Accordingly, we reserve all arguments regarding these issues, and the Court should not consider these issues at this time.

### III.   THE ENTRIES DID NOT LIQUIDATE BY OPERATION OF LAW AT THE RATE OF DUTY, VALUE, QUANTITY, AND AMOUNT OF DUTIES ASSERTED BY THE IMPORTER

Plaintiff argues that certain of its entries liquidated by operation of law under 19 U.S.C. § 1504 because, in plaintiff's view, as of May 22, 2014, CBP had the information necessary to process the entries and CBP failed to liquidate the entries in a timely fashion.  Pl. Opp. Br. at 29.  Plaintiff also contends that the Court should not apply the "abuse of discretion" standard to CBP's decision to extend the time period for liquidation.  *Id.*  Plaintiff misses the mark on both points.  As set forth in the Government's Statement of Undisputed Material Facts, Docket No. 61-1, CBP continued to gather information and conduct the necessary review of its analysis long after plaintiff ceased providing information to CBP.  Information other than that provided by the importer must be considered in assessing the reasonableness of CBP's decision to extend liquidation.  CBP acted in accordance with the law and did not abuse its discretion in extending liquidation in order to properly appraise the merchandise at issue.  *See also* Gov't MSJ at 13-19, 39-44.

Customs has one year to liquidate entries or they liquidate by operation of law.  19 U.S.C. § 1504(a).  However, Customs may extend the period in which to liquidate an entry if "the *information* needed for the proper appraisement . . . of the imported or withdrawn merchandise, . . .

or for ensuring compliance with applicable law, is not available to" Customs.  19 U.S.C. § 1504(b) (emphasis added); 19 C.F.R. § 159.12(a)(1).  Customs can extend the time period for liquidating an entry three times (for a length of one year each time). 19 C.F.R. § 159.12(a), (d), & (e).

Plaintiff argues that the Court should apply the "plain text of the statute."  Pl. Opp. Br. at 29. We agree.  However, as reflected in the statute, CBP is permitted to extend the time period for liquidation, and that decision is reviewed under the abuse of discretion standard.  Pursuant to the holding in *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763 (Fed. Cir. 1993), "Customs may, for statutory purposes . . . employ up to four years to effect liquidation so long as the extensions it grants ***are not abusive of its discretionary authority***."  *Id.* at 768 (emphasis added).  In so holding, the Federal Circuit aptly noted that, "we cannot lose sight of the proposition that the Secretary ***exercises discretion*** in determining how best to collect import duties.  *Id.* at 768 (citing 19 U.S.C. § 3 (emphasis added)).  The Federal Circuit in *St. Paul Fire & Marine* further noted that "courts should ordinarily defer to a Customs' determination that it needs additional information in order to liquidate an entry," unless "it can be shown that the importer, or some other entity, eliminated all reasonable basis for making that decision."  *Id.*; *see Ford Motor Co. v. United States*, 157 F.3d 849, 855 (Fed. Cir. 1998) (citing to *St. Paul Fire & Marine* and holding that "The Court of International Trade can only rule an extension [of liquidation] improper if Customs abused its discretion.").

The importer bears the burden of showing that Customs' decision to extend the time period for liquidation was an abuse of discretion.  *St. Paul Fire & Marine*, 6 F.3d at 768.  Midwest fails to meet that burden.

This Court has held that, "[t]he term 'information,' as it is used in the statute . . . should be construed to include *whatever is reasonably necessary for proper appraisement* or classification of

the merchandise involved." *Detroit Zoological Society v. United States*, 630 F. Supp. 1350, 1356-57 (Ct. Int'l Trade 1986) (noting that "[a]n extension of liquidation is . . . justified . . . if additional time is needed to obtain the internal advice and to consider it before making the classification decision." (emphasis added)).  "A need for internal information from other Customs personnel might also satisfy section 1504(b)(1)." *Ford*, 157 F.3d at 856.  Plainly, the relevant "information" includes much more than the information provided by plaintiff.

Contrary to plaintiff's contentions, CBP did not have "all information needed" by May 22, 2014 or June (as it had previously claimed).  Pl. Opp. Br. at 26; Pl. MSJ at 35.  As set forth more fully in our opening submission, Gov't MSJ at 41-44, CBP worked diligently in determining not only the proper method of appraisement (step 1), but also how to properly assess the transaction value of the merchandise based on the information before the agency (step 2).  Consideration of the information plaintiff submitted during the administrative proceedings was not the end of the inquiry.

The threshold determination was a difficult one.  As set forth in the Declaration of James Conrad, a determination as to the proper basis of appraisement, which was referred to the Office of Regulatory Audit, involved review of the importer's information, a site visit and subsequent analysis and review.  Gov't MSJ at 13-19; Def. Ex. 19 at ¶¶ 7-8.  In this process, detailed workpapers were prepared by CBP (describing the fieldwork conducted and findings reached).  *Id.*  As Mr. Conrad makes clear, significant work was conducted CBP, including a detailed review of Customs' conclusions (in workpapers and reports) by, among others, the Assistant Field Director, Report Referencing Review and the members of the Field Quality Assurance Program, to confirm their accuracy, completeness and compliance with Generally Accepted Government Auditing Standards. *Id.*

A draft findings sheet was issued on July 1, 2015, Pl. Ex. Q (Draft Audit Response). Although plaintiff describes the draft report as "so bereft of citations to evidence/authority, containing no specific findings, no citation to documents or individual transactions," (Pl. Opp. Br. at 27), this draft report identified and described the conclusions reached by the agency as to step 1. The draft report did not detail the entirety of the audit.

In the responses to the Government's Statements of Material Fact, plaintiff claims that workpapers "were never produced."  Pl. Resp. to Def. Statement of Material Facts at ¶ 90.  The record shows otherwise.  The Government produced workpapers in response to requests for the production of documents served by plaintiff.  *See e.g.*, Def. Exs. 24, 25.  The workpapers addressed the following, among other topics: "Midwest CBK, LLC Correspondence," "JRT Walk through Review On-site," "Supporting Documents", and "Basis of Appraisement."  *Id.*  These documents contain the "evidence" and "authority" that plaintiff claims are lacking from the audit report.  The workpapers were circulated within CBP by July of 2015, shortly after the draft audit report was issued.  *Id.*  In one email, the drafter noted that the workpapers from Regulatory Audit (in charge of Step 1) "will help in liquidation of Midwest entries" (step 2), acknowledging CBP's ongoing process.  Def. Ex. 25.

The agency did not end its administrative inquiry with a determination that transaction value was the proper basis of appraisement for the merchandise.  Next, the Import Specialists at the Port of Buffalo had to assess the transaction value for 562 entries based on the information before the agency (which did not include invoices identifying the price paid by the U.S. customers).  Def. Ex. 19 (Conrad Decl.) at ¶¶ 10-13.  CBP ultimately used Midwest's 2013 financials to arrive at a percentage uplift to apply to each entry.  *Id.*  This decision was determined by the Import Specialists, in conjunction with Regulatory Audit.  A final report was issued in February of 2016.

19

*Id.* Notices of Action were issued shortly thereafter, followed by liquidation of the 562 entries. *Id.* Contrary to plaintiff's assertion, the Audit Report and the liquidations were not "ships passing in the night," Pl. Opp. Br. at 32; instead the Audit Report provided the threshold determination as to the proper basis of appraisement and then Regulatory Audit worked with Import Specialists to arrive at a liquidation assessment based thereon.  Def. Ex. 19 (Conrad Decl.) at ¶¶ 10-13.

As reflected by this process, Midwest cannot establish that extending liquidation was an abuse of discretion.

**IV.  SEVERAL OF MIDWEST'S RESPONSES TO THE GOVERNMENT'S STATEMENT OF FACTS FAIL TO CONFORM TO THE RULES OF THE COURT**

For many of the statements of undisputed material facts supported by Mr. Conrad's declaration, plaintiff admitted that the declaration includes those facts, but averred that they are not material and/or denied the facts for lack of knowledge.  *See e.g.,* Pl. Resp. to the Def. Statement of Material Facts at ¶¶ 92-98, 113.  These responses do not adequately address the statements made therein, which are supported by admissible evidence.  *See* USCIT R. 56(c), (e).  Consequently, the Court may "consider the fact undisputed for purposes of the motion."  USCIT R. 56(e).  Moreover, the Government identified Mr. Conrad in its Initial Disclosures, *see* Def. Ex. 26, and in Defendant's Responses to Plaintiff's Interrogatories.  Def. Ex. 27.  Plaintiff chose not to depose this individual. Therefore, plaintiff should be foreclosed from responding to the testimony of Mr. Conrad with a denial for lack of knowledge.

## <u>CONCLUSION</u>

We respectfully request that the Court deny Midwest's motion for partial summary

judgment, and grant the Government's motion for partial summary judgment as to Phase One of this

action.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Justin R. Miller
By:   JUSTIN R. MILLER
Attorney in Charge
International Trade Field Office

/s/ Monica P. Triana
MONICA P. TRIANA
Trial Attorney
Civil Division, Dept. of Justice
Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
Of counsel:                                    New York, New York 10278
Mathias Rabinovitch, Esq.                      *Attorneys for Defendant*
Office of Assistant Chief Counsel              Tel. No. 212-264-9240 or 9230
International Trade Litigation
U.S. Customs and Border Protection

21

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____
                                                  :
MIDWEST-CBK, LLC.,                                :
                                                  :
            Plaintiff,                            :
                                                  :   Consol. Court No. 17-00154
            v.                                    :
                                                  :
UNITED STATES,                                    :
                                                  :
_____ Defendant. _____        :

CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT
STANDARD CHAMBER PROCEDURE 2(B)

I, Monica P. Triana, trial counsel in the Office of the Assistant Attorney General, Civil

Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for

the foregoing brief, relying upon the Microsoft Word word count feature of the word processing

program used to prepare the brief, certify that this brief complies with the type-volume limitation

under USCIT Standard Chamber Procedure 2(B) and contains 6,734 words.


/s/ Monica P. Triana