Slip Op. 22-51

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **MIDWEST-CBK, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Before: Jennifer Choe-Groves, Judge** |
| **UNITED STATES,** | **Consol. Court No. 17-00154** |
| **Defendant.** | |

### OPINION AND ORDER

[Denying Plaintiff's motion for partial summary judgment and granting Defendant's cross-motion for partial summary judgment regarding whether sales of giftware, houseware, and decorative items imported by Plaintiff were "for exportation to the United States" and whether certain subject entries should have been deemed liquidated by operation of law.]

Dated: May 20, 2022

John M. Peterson and Patrick B. Klein, Neville Peterson, LLP, of New York, N.Y., argued for Plaintiff Midwest-CBK, LLC. With them on the reply brief was Richard F. O'Neill.

Monica P. Triana and Brandon A. Kennedy, Trial Attorneys, International Trade Field Office, U.S. Department of Justice, of New York, N.Y., argued for Defendant. With them on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Justin R. Miller, Attorney-in-Charge, International Trade Field Office. Of counsel on the brief was Mathias Rabinovitch, Office of Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection. With them on the reply brief was Patricia M. McCarthy, Director.

Choe-Groves, Judge: Plaintiff Midwest-CBK, LLC ("Plaintiff") is a

Minnesota-based retailer and wholesaler of Christmas ornaments, nutcrackers,

wood carvings, and similar decorative articles that are manufactured in China.

Plaintiff commenced this action to contest the denial by U.S. Customs and Border

Protection ("Customs") of Plaintiff's protest against liquidation and reliquidation

of subject merchandise imported into the United States.  Compl. at 1, ECF No. 8.

Plaintiff contends that Customs appraised its merchandise improperly on the basis

of transaction value because Plaintiff's sales to customers were not "for

exportation to the United States" under 19 U.S.C. § 1401a(b)(1), erred in its

calculation during liquidation, and failed to liquidate certain entries that should

have been deemed liquidated by operation of law.  Id. at 7–12.

At the request of the Parties, this case was bifurcated into two phases.  Order

(May 10, 2021) ("Bifurcation Order"), ECF No. 52.  Phase One is limited to the

questions: (1) whether Plaintiff's import transactions reflect a sale "for exportation

to the United States" and (2) whether the subject entries became deemed liquidated

by operation of law.  Id. at 1.  Whether a sale is "for exportation to the United

States" is a threshold question for determining the appropriate method of valuation.

See 19 U.S.C. § 1401a.  Phase Two will encompass all remaining issues, including

the determination of the proper method of valuing the subject merchandise and

whether Customs' calculation of the transaction value during liquidation was

correct.  Bifurcation Order at 1.

Plaintiff filed a Motion for Partial Summary Judgment arguing that its

subject merchandise cannot be appraised on the basis of transaction value because

Plaintiff's sales to customers within the United States were not "sales for

exportation to the United States."  See Pl.'s Mot. Partial Summ. J. ("Plaintiff's

Motion" or "Pl.'s Mot."), ECF No. 56; Pl.'s Mem. P. & A. Supp. Mot. Partial

Summ. J. ("Plaintiff's Brief" or "Pl.'s Br."), ECF No. 56-1.  Defendant United

States ("Defendant") filed a Cross-Motion for Partial Summary Judgment arguing

that Plaintiff's sales were "for exportation to the United States" under 19 U.S.C.

§ 1401a(b)(1), that transaction value is the proper basis of appraisal for the subject

merchandise, and that the subject entries should not have been deemed liquidated

by operation of law.  See Def.'s Cross-Mot. Partial Summ. J. ("Defendant's Cross-

Motion" or "Def.'s Cross-Mot."), ECF No. 61; Def.'s Mem. Opp'n Pl.'s Mot.

Partial Summ. J. and Supp. Def.'s Cross-Mot. Partial Summ. J. ("Defendant's

Brief" or "Def.'s Br."), ECF No. 61.

The Court concludes that under Phase One of the bifurcated action,

Plaintiff's sales of the subject merchandise were sales "for exportation to the

United States" and the subject entries should not have been deemed liquidated by

operation of law.  The proper method of valuing the subject merchandise is not a

question within the scope of Phase One of this action.  Accordingly, the Court

denies Plaintiff's Motion for Partial Summary Judgment and grants Defendant's

Cross-Motion for Partial Summary Judgment.

## BACKGROUND

The Parties have submitted separate statements of undisputed material facts.

See Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s SMF"), ECF No. 56-2;

Def.'s Statement of Undisputed Material Facts ("Def.'s SMF"), ECF No. 61-1;

Def.'s Resp. Pl.'s Statement of Material Facts ("Def.'s Resp."), ECF No. 61-2;

Pl.'s Resp. Def.'s Statement of Material Facts ("Pl.'s Resp."), ECF No. 64-1.

The following facts are not in dispute:

Plaintiff is a Delaware limited liability company.  Pl.'s SMF ¶ 1 at 1; Def.'s

Resp. at 1.  Plaintiff was founded as Midwest of Cannon Falls, Inc. in 1953 as a

wholesaler of seasonal items.  Pl.'s SMF ¶ 2 at 1; Def.'s SMF ¶ 1 at 1; Def.'s Resp.

at 1–2; Pl.'s Resp. at 1.  Midwest of Cannon Falls, Inc. maintained its headquarters

and warehouse facility in Cannon Falls, Minnesota.  Def.'s SMF ¶ 2 at 1; Pl.'s

Resp. at 1.  Merchandise was imported from foreign suppliers and sold to

customers in the United States through a catalogue and staff of sales

representatives.  Pl.'s SMF ¶ 3 at 1–2; Def.'s SMF ¶¶ 3–4 at 1–2; Def.'s Resp. at 2;

Pl.'s Resp. at 1.

In 2009, Midwest of Cannon Falls, Inc. was acquired by Blyth, Inc. and merged with CBK Holdings Group, forming Midwest-CBK, Inc.  Pl.'s SMF ¶ 4 at 2; Def.'s Resp. at 2.  Midwest-CBK, Inc. maintained its headquarters, operations, and sales offices in Cannon Falls, Minnesota and relocated its warehouse and inventory to Union City, Tennessee.  Pl.'s SMF ¶ 4 at 2; Def.'s Resp. at 2.  In December 2012, the assets of Midwest-CBK, Inc. were acquired by the Ganz family, a group of Canadian investors.  Pl.'s SMF ¶ 6 at 2; Def.'s SMF ¶ 7 at 2; Def.'s Resp. at 2–3; Pl.'s Resp. at 2.  The assets of Midwest-CBK, Inc. were transferred to Plaintiff Midwest-CBK, LLC.  Pl.'s SMF ¶ 6 at 2; Def.'s SMF ¶ 8 at 2; Def.'s Resp. at 2–3; Pl.'s Resp. at 2.

Following its acquisition by the Ganz family, Plaintiff maintained its corporate office in Cannon Falls, Minnesota, which housed the product development, supply chain, procurement, purchasing, compliance, financial analysis, planning, accounting, and sales management departments.  Def.'s SMF ¶ 13 at 3; Pl.'s Resp. at 3.  Plaintiff relocated its inventory, distribution, warehousing, invoicing, and order control departments to Ontario, Canada, where it leased a warehouse, storage space, and a two-story office building from other entities controlled by the Ganz family.  Def.'s SMF ¶¶ 14–18 at 3–4; Pl.'s Resp. at 3–4.  Plaintiff also operated a data center and showroom in Ganz-owned properties in Ontario, Canada.  Def.'s SMF ¶¶ 23–25 at 5; Pl.'s Resp. at 5.  Approximately

twenty-two employees worked in the Ontario, Canada facility in the order processing, inventory control, customer service, key accounts, information technology, and customer accounts departments. Def.'s SMF ¶ 19 at 4; Pl.'s Resp. at 4. Plaintiff opened Canadian bank accounts for payroll, rent, and other expenses associated with its Canadian operations. Pl.'s SMF ¶ 8 at 3; Def.'s Resp. at 3.

Plaintiff's business model involved purchasing merchandise from foreign suppliers for exportation to Canada. Pl.'s SMF ¶ 11 at 3; Def.'s SMF ¶ 27 at 5; Def.'s Resp. at 4; Pl.'s Resp. at 6. Merchandise was imported into Canada at the Port of Vancouver, British Columbia and transported to Plaintiff's Ontario, Canada warehouse. Pl.'s SMF ¶ 11 at 3; Def.'s SMF ¶ 27 at 5; Def.'s Resp. at 4; Pl.'s Resp. at 6. Plaintiff employed a United States sales staff to solicit orders from customers within assigned geographic territories. Pl.'s SMF ¶ 14 at 4; Def.'s SMF ¶ 30 at 6; Def.'s Resp. at 5; Pl.'s Resp. at 6. Sales representatives accepted orders using electronic devices loaded with two point-of-sale software systems, Enum and WhereOWare. Def.'s SMF ¶¶ 31–32 at 6; Pl.'s Resp. at 7. When a completed order was accepted into either system, it was made available to Plaintiff's personnel in Cannon Falls, Minnesota and Ontario, Canada. Def.'s SMF ¶ 33 at 6; Pl.'s Resp. at 7. Purchase orders provided to customers included the language: "All prices [Free on Board ("FOB")] Buffalo, New York as defined by the New

York State Uniform Commercial Code."  Def.'s SMF ¶¶ 36–38 at 7; Def.'s Resp.
at 7–8.

Purchase orders were usually first accessed and reviewed by Plaintiff's
Order Processing Department in Canada.  Def.'s SMF ¶ 35 at 7; Pl.'s Resp. at 7;
see also Pl.'s Mot. Partial Summ. J., Ex. B ("Pl.'s Basis of Appraisement Letter")
at 4, ECF No. 56-3.  Employees at the Canadian facility confirmed the availability
of merchandise located in Canada in an inventory control system, collected
merchandise from the Canadian warehouse, packaged merchandise for shipment,
attached waybills for customers' designated domestic carriers, and loaded
shipments onto trucks for transport to the United States.  Pl.'s SMF ¶¶ 18, 20–22,
24 at 5, 6; Def.'s SMF ¶¶ 41, 43–51 at 7–8; Def.'s Resp. at 6–7; Pl.'s Resp. at 8–
10.

Plaintiff engaged a third-party overland truck carrier to transport
merchandise from its facility in Ontario, Canada to Buffalo, New York.  Pl.'s SMF
¶¶ 23, 25 at 5, 6; Def.'s Resp. at 7.  Plaintiff acted as the importer of record for the
merchandise and was responsible for all duties.  Pl.'s SMF ¶ 26 at 6; Def.'s SMF
¶ 59 at 10; Def.'s Resp. at 7; Pl.'s Resp. at 11.  Upon arrival in Buffalo, New York,
merchandise was delivered to domestic carriers designated by Plaintiff's customers
or to a facility rented by Plaintiff from United Parcels Service ("UPS").  Pl.'s SMF
¶ 27 at 6; Def.'s Resp. at 7–8.  UPS employees deconsolidated shipping boxes,

scanned shipping labels, and shipped merchandise to Plaintiff's United States

customers.  Def.'s SMF ¶¶ 60–61 at 10–11; Pl.'s Resp. at 12.

Invoices were prepared in Ontario, Canada and couriered to Buffalo, New

York for mailing.  Def.'s SMF ¶¶ 63–65, 67 at 11; Pl.'s Resp. at 12, 13.

Customers were directed to remit physical payments to a post office box in

Buffalo, New York.  Def.'s SMF ¶ 68 at 11; Pl.'s Resp. at 13.  Plaintiff engaged a

bank's lockbox service to collect and deposit the payments.  Def.'s SMF ¶ 69 at

12; Pl.'s Resp. at 13.

The Parties do not dispute whether Plaintiff imported the subject

merchandise into the United States.  Plaintiff advised Customs in 2013 that

Plaintiff imported merchandise from foreign manufacturers into Canada, where

merchandise was stored until sold.  Pl.'s Basis of Appraisement Letter at 2–4; Pl.'s

SMF ¶ 34 at 7; Def.'s SMF ¶ 73 at 12; Def.'s Resp. at 9; Pl.'s Resp. at 14.  After

receiving a sales order, merchandise was transported from Plaintiff's Canadian

warehouse to the United States for delivery to customers with shipments

designated as FOB Buffalo, New York.  Pl.'s Basis of Appraisement Letter at 2–4;

Pl.'s SMF ¶ 34 at 7; Def.'s SMF ¶ 73 at 12; Def.'s Resp. at 9; Pl.'s Resp. at 14.

Plaintiff described the same process in 2015 when it requested that Customs seek

internal advice on the proper method of valuation.  Def.'s Cross-Mot. Partial

Summ. J., Ex. 20 ("Def.'s Request for Internal Advice").  At oral argument,

Defendant offered a similar description of Plaintiff's importation process of subject merchandise:

> [Plaintiff] purchased [the] merchandise at issue from a manufacturer in China and it was imported directly from China to [Plaintiff's] facilities in Canada.  The merchandise remained at [Plaintiff's] Canadian facilities until a sale was made.  And when a sale was made to a specific U.S. customer, [Plaintiff] caused the goods to be picked, packed, and labeled for that specific U.S. customer in Canada and [Plaintiff] would export the merchandise out of Canada and into the United States for the first time based on that specific sale.  [Plaintiff] arranged for this exact process to apply to each of the sales that are at issue here.

Oral Arg. at 28:22–29:00, Mar. 22, 2022, ECF No. 70.  This description of Plaintiff's importation process is also consistent with the Parties' written submissions to the Court.  Compl. at 2–5; Pl.'s Br. at 8–12; Def.'s Br. at 6–13. Neither Party has disputed Plaintiff's sale and importation of the subject merchandise at issue in this case.  It is also undisputed that the sales transactions for the relevant entries involved FOB Buffalo, New York shipping terms.  Pl.'s SMF ¶ 33 at 7; Def.'s Resp. at 9.  The Court finds that the following facts are undisputed: (1) the subject merchandise was imported from foreign countries to Canada; (2) the subject merchandise was based in Canada at the time of sale; (3) the subject merchandise was packaged and sent from Canada to the United States after sales orders were received; (4) the subject merchandise was clearly destined for the United States at the time of sale; and (5) the subject merchandise was sold and exported from Canada to customers based in the United States.

In 2013, Plaintiff advised Customs that Plaintiff had changed its operations model and would enter merchandise on the basis of its deductive value, in accordance with 19 U.S.C. § 1401a(d).[1]  Pl.'s Basis of Appraisement Letter; Pl.'s SMF ¶ 34 at 7; Def.'s SMF ¶ 73 at 12; Def.'s Resp. at 9; Pl.'s Resp. at 14. Customs subsequently extended the deadline for liquidation of Plaintiff's entries and initiated a Regulatory Audit to determine the proper basis of valuation.  Pl.'s SMF ¶¶ 35–36 at 7–8; Def.'s SMF ¶¶ 75–77 at 12–13; Def.'s Resp. at 9–10; Pl.'s Resp. at 14.  The audit involved multiple steps, including a risk assessment of the relevant issues, the issuance of a questionnaire, a walkthrough of import practices or entries, interviews with Plaintiff's personnel, and the issuance of a final report. Def.'s SMF ¶ 80 at 13; Pl.'s Resp. at 15; <u>see also</u> Def.'s Cross-Mot. Partial Summ. J., Ex. 19 ("Conrad Decl."), ECF No. 61-4 (describing audit process).  Customs requested information from Plaintiff and conducted an on-site visit at the Ontario, Canada facility.  Def.'s SMF ¶¶ 81–82 at 13; Pl.'s Resp. at 15.  The auditor's fieldwork also involved matching customer invoices with specific line items on Plaintiff's entry paperwork.  Def.'s SMF ¶ 85 at 14; Pl.'s Resp. at 16.  More than 560 entries were subject to the audit.  Def.'s SMF ¶ 86 at 14; Pl.'s Resp. at 16.

---

[1] The deductive value method bases valuation on the price of sale adjusted for certain considerations, including transportation and insurance costs, duties and taxes, and other general expenses.  19 U.S.C. § 1401a(d); 19 C.F.R. § 152.105.

Customs completed its fieldwork on October 14, 2014.  Def.'s SMF ¶ 89 at 14;

Pl.'s Resp. at 16–17.

Customs' auditors issued a Draft Audit Report on July 1, 2015, concluding

that transaction value was the proper basis of appraisal for the subject merchandise.

Pl.'s Mot. Partial Summ. J., Ex. Q ("Draft Audit Report"), ECF No. 56-3; Pl.'s

SMF ¶ 36 at 8; Def.'s SMF ¶ 99 at 16; Def.'s Resp. at 10; Pl.'s Resp. at 18.

Plaintiff submitted responsive comments on July 8, 2015.  Pl.'s Mot. Partial

Summ. J., Ex. R ("Pl.'s Resp. Draft Audit Report"), ECF No. 56-3; Pl.'s SMF ¶ 37

at 8; Def.'s SMF ¶ 100 at 15; Def.'s Resp. at 10; Pl.'s Resp. at 18.  No additional

information was requested from Plaintiff.  Pl.'s SMF ¶ 38 at 8; Def.'s Resp. at 10.

On August 20, 2015, Plaintiff requested advice from Customs' Office of

Regulations and Rulings pursuant to 19 C.F.R. § 177.11 regarding the proper basis

for valuation of the subject merchandise.  Def.'s SMF ¶¶ 103–04 at 16; Pl.'s Resp.

at 19.  Customs issued a Final Audit Report to Plaintiff on February 24, 2016,

stating that the subject merchandise should be valued on the basis of transaction

value.  Pl.'s Mot. Partial Summ. J., Ex. S ("Final Audit Report"), ECF No. 56-4;

Pl.'s SMF ¶ 39 at 8; Def.'s SMF ¶ 101 at 16; Def.'s Resp. at 10–11; Pl.'s Resp. at

19.  On July 1, 2016, Customs issued Headquarters Ruling H275056, which also

determined that valuation on the basis of transaction value was proper.  HQ

H275056 (July 1, 2016); Pl.'s SMF ¶ 40 at 9; Def.'s SMF ¶ 114 at 18; Def.'s Resp.

at 11; Pl.'s Resp. at 21.

On March 28, 2016, Customs officials at the Port of Buffalo, New York

issued a Form 29 Notice of Action indicating that Customs would liquidate certain

entries and that transaction value would be calculated using the original entered

values plus a 123.18% adjustment.  Pl.'s Mot. Partial Summ. J., Ex. U, ECF No.

56-4; Pl.'s SMF ¶ 42 at 9; Def.'s SMF ¶ 110 at 17; Def.'s Resp. at 11; Pl.'s Resp.

at 20.  Plaintiff requested information from Customs about the basis of the

appraisal and requested an extension of the liquidation deadline.  Pl.'s Mot. Partial

Summ. J., Ex. V, ECF No. 56-4; Pl.'s SMF ¶ 43 at 10; Def.'s SMF ¶ 111 at 17;

Def.'s Resp. at 11–12; Pl.'s Resp. at 21.  Customs responded that the calculation

was based on financial information provided by Plaintiff for the year 2013.  Pl.'s

Mot. Partial Summ. J., Ex. W, ECF No. 56-4; Pl.'s SMF ¶ 44 at 10; Def.'s Resp. at

12.  Plaintiff submitted a response and argued that the proposed method of

calculation was based on multiple errors.  Pl.'s Mot. Partial Summ. J., Ex. X, ECF

No. 56-4; Pl.'s SMF ¶ 45 at 10–11; Def.'s SMF ¶¶ 112–13 at 17; Def.'s Resp. at

12; Pl.'s Resp. at 21.  Three hundred thirty-six entries were liquidated using the

method described in Customs' March 28, 2016 notice, including the application of

a 123.18% upward adjustment.  Def.'s SMF ¶ 117 at 18; Pl.'s Resp. at 22.  Plaintiff

protested the liquidation of these entries.  Pl.'s Mot. Partial Summ. J., Ex. Y, ECF

No. 56-4; Pl.'s SMF ¶ 46 at 11; Def.'s SMF ¶ 120 at 18–19; Def.'s Resp. at 12;

Pl.'s Resp. at 22.  Customs approved the protests in part and reduced the

adjustment to 75.75%.  Pl.'s Mot. Partial Summ. J., Ex. Z, ECF No. 56-4; Pl.'s

SMF ¶¶ 47–48 at 11; Def.'s SMF ¶ 118 at 18; Def.'s Resp. at 12–13; Pl.'s Resp. at

22.  Plaintiff protested the reliquidation.  Pl.'s Mot. Partial Summ. J., Ex. AA, ECF

No. 56-4; Pl.'s SMF ¶ 49 at 11; Def.'s SMF ¶ 122 at 19; Def.'s Resp. at 13; Pl.'s

Resp. at 23.  Customs denied Plaintiff's protest.  Pl.'s SMF ¶ 50 at 11; Def.'s SMF

¶¶ 122–23 at 19; Def.'s Resp. at 13; Pl.'s Resp. at 23.

　　　　Plaintiff filed three cases in June and November 2017 contesting Customs'

denial of Plaintiff's protests.  Summons, ECF No. 1; Summons, <u>Midwest-CBK,</u>

<u>LLC v. United States,</u> Court No. 17-00155, ECF No. 1; Summons, <u>Midwest-CBK,</u>

<u>LLC v. United States,</u> Court No. 17-00272, ECF No. 1.  Plaintiff filed Complaints

in March 2019 in two of the cases.  Compl.; Compl., Court No. 17-00155, ECF

No. 9.  The third case remained on the Court's Customs Case Management

Calendar.  Order (Oct. 16, 2019), Court No. 17-00272, ECF No. 9.  The Court

consolidated the three cases in May 2020 at the request of the Parties.  Pl.'s Mot.

Consol., ECF No. 25; Pl.'s Consol. Compl., ECF No. 26; Order (May 21, 2020),

ECF No. 27.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a).  The Court will

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law.  USCIT

R. 56(a).  To raise a genuine issue of material fact, a party cannot rest upon mere

allegations or denials and must point to sufficient supporting evidence for the

claimed factual dispute to require resolution of the differing versions of the truth at

trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986); Barmag

Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 835–36 (Fed.

Cir. 1984).

## DISCUSSION

Plaintiff argues that Customs appraised the subject merchandise improperly

based on transaction value because the sales were domestic and not for exportation

to the United States.  Pl.'s Br. at 14–32.  Plaintiff also contends that certain subject

entries should have been deemed liquidated by operation of law because Customs

had no authority to extend the deadline for liquidation after June 14, 2015.  Id. at

34–38.  Defendant counters that the subject merchandise was destined for export to

the United States at the time of sale, there is no requirement for an international

sale, and transaction value is the appropriate method of appraising the subject

merchandise.  Def.'s Br. at 21–38.  Defendant also argues that Customs'

extensions of the liquidation deadline were proper.  Id. at 39–44.

## I.       "For Exportation to the United States"

In order to determine appropriate duties, Customs appraises merchandise at

the time of entry to ascertain its value.  19 U.S.C. § 1500.  Transaction value is the

default method of appraising the value of imported merchandise.  Id.

§ 1401a(a)(1); see also Trimil S.A. v. United States, 43 CIT __, __, 419 F. Supp.

3d 1307, 1311 (2019) ("Whenever possible, Customs appraises imported

merchandise on the basis of its 'transaction value.'").  Transaction value is defined

by statute as the "price actually paid or payable for the merchandise when sold for

exportation to the United States," plus other considerations enumerated by statute.

19 U.S.C. § 1401a(b).

Appraisal on the basis of transaction value has two requirements: (1) that the

merchandise is sold and (2) that the sale is for exportation to the United States.  Id.;

VWP of Am., Inc. v. United States, 175 F.3d 1327, 1338–39 (Fed. Cir. 1999).

Only if transaction value cannot be determined or used should merchandise be

appraised by "looking to the secondary valuation methods in the order listed in

[section] 1401a(a)(1) until an appraisal is obtained."  VWP of Am., Inc., 175 F.3d

at 1330 (citing 19 U.S.C. § 1401a(a)(1)).  Neither party contests that a bona fide

sale of merchandise occurred in this case.  See Pl.'s Br. at 15; Def.'s Br. at 22.

The Court determines whether merchandise is sold "for exportation to the

United States" based on a fact-specific inquiry that requires case-by-case analysis.

E.C. McAfee Co. v. United States, 842 F.2d 314, 319 (Fed. Cir. 1988).  The

relevant factual inquiry for the Court is to examine "the reality of the transaction"

between the parties to the sale.  Id.  When goods are clearly destined for the United

States at the time of sale, the sale is for exportation to the United States.  Id.

After conducting a fact-specific inquiry of whether the sales were for

exportation to the United States under 19 U.S.C. § 1401a(b)(1), the Court

concludes that the undisputed evidence demonstrates that Plaintiff's sales were for

exportation to the United States at the time of sale.  It is undisputed that when

Plaintiff's sales representatives accepted sales orders from customers within the

United States, the subject merchandise was stored in a warehouse facility in

Ontario, Canada at the time of sale.  Pl.'s SMF ¶¶ 7, 14, 17 at 3, 4, 5; Def.'s SMF

¶¶ 14–16, 30 at 3–4, 6; Def.'s Resp. at 3, 5–6; Pl.'s Resp. at 3–4, 6.  The sales

orders were transmitted electronically and were usually first accessed and reviewed

by Plaintiff's Order Processing Department in Canada.  Def.'s SMF ¶¶ 31–35 at 6–

7; Pl.'s Resp. at 7.  Plaintiff's employees in Canada confirmed the availability of

the subject merchandise located in the Canadian warehouse, then collected,

packaged, and prepared the goods for shipment from the Canadian warehouse to

United States customers.  Pl.'s SMF ¶¶ 18–22 at 5; Def.'s SMF ¶¶ 43–49 at 8–9;

Def.'s Resp. at 6–7; Pl.'s Resp. at 9–10.  It is undisputed that upon receiving orders

from customers based in the United States, the subject merchandise was

transported from Plaintiff's Ontario, Canada warehouse to Buffalo, New York,

where the merchandise was delivered to domestic carriers for distribution to United

States customers.  Pl.'s SMF ¶¶ 23–25, 27 at 5–6; Def.'s Resp. at 7–8.  Based on

the undisputed evidence and a fact-specific analysis of the record, the Court

concludes that the reality of the transaction establishes that the subject merchandise

was based in Canada at the time of sale, was clearly destined for the United States

at the time of sale, and Plaintiff's sales of the subject merchandise were for

exportation to the United States under 19 U.S.C. § 1401a(b)(1).

Plaintiff argues that a sale "for exportation to the United States" imposes an

additional requirement that the sale must have occurred abroad or have an

international character.[2]  Pl.'s Br. at 16–18.  Plaintiff contends that the individual

sales were negotiated and agreed to within the United States, that Plaintiff retained

title to the subject merchandise when the goods were shipped from Canada and

imported into the United States, and under the FOB shipping terms included by

Plaintiff on the purchase orders, that title transferred to the United States customers

only after the goods were imported into the United States and delivered to

---

[2] Plaintiff uses the terms "international" and "abroad" interchangeably to describe
a sale that occurred outside of the United States.

domestic carriers in Buffalo, New York for delivery, thus reflecting domestic sales within the United States.  Id. at 16–23.

In support of its argument that there was no transfer of property until after importation and thus no possible export or international sale to the United States from which to calculate transaction value, Plaintiff relies mainly on Orbisphere Corp. v. United States ("Orbisphere"), 13 CIT 866, 726 F. Supp. 1344 (1989).  The Court notes at the outset that Orbisphere is a thirty-three-year-old case from the U.S. Court of International Trade that applies an outdated statute that was amended in 1979.  In Orbisphere, the court considered the method of valuation for oxygen analyzing devices manufactured in Geneva, Switzerland by Orbisphere Laboratories, a subsidiary of Orbisphere Corporation.  Orbisphere, 13 CIT at 867, 726 F. Supp. at 1344.  Orders accepted from customers in the United States were forwarded to Orbisphere Laboratories in Geneva for manufacture.  Id., 726 F. Supp. at 1344–45.  Completed orders were shipped to New Jersey, where they were unpacked, inspected, repackaged, and shipped to customers.  Id., 726 F. Supp. at 1345.

The court in Orbisphere reasoned that a determination of whether transaction value may be used "depends substantially upon where the sales of the merchandise are deemed to have occurred."  Id. at 872, 726 F. Supp. at 1348.  The Orbisphere court relied on the Court of Customs and Patent Appeals' analysis in United States

v. Massce & Company ("Massce"), 21 CCPA 54 (1933), a case decided under a

predecessor to the current valuation statute. Orbisphere, 13 CIT at 875, 726 F.

Supp. at 1350. Relying on the 1933 Massce case, the Orbisphere court analogized

"transaction value" and "deductive value" under 19 U.S.C. § 1401a to "export

value" and "United States value" as they were used under the predecessor statute.

Id. at 875–76, 726 F. Supp. at 1350–51.[3] The Massce court concluded that "where

offers of sale, agreements to sell, and sales are all made in the United States, and

none in a foreign country, there can not [sic] be an export value of the exported

---

[3]      "Export value" under the predecessor statute was defined as:

the market value or the price, at the time of exportation of such
merchandise to the United States, at which such or similar merchandise
is freely offered for sale to all purchasers in the principal markets of the
country from which exported, in the usual wholesale quantities and in
the ordinary course of trade, for exportation to the United States . . . .

Id. at 873–74, 726 F. Supp. at 1349 (quoting 19 U.S.C. § 1401a(b) (1964)).

"United States value" was defined as:

the price at which such or similar imported merchandise is freely
offered for sale, packed ready for delivery in the principal market of the
United States to all purchasers, at the time of exportation of the
imported merchandise, in the usual wholesale quantities and in the
ordinary course of trade, with allowance made for duty, cost of
transportation and insurance, and other necessary expenses from the
place of shipment to the place of delivery . . . .

Id. at 874, 726 F. Supp. at 1349–50 (quoting 19 U.S.C. § 1401a(b) (1964)).

merchandise involved in such transactions." Massce, 21 CCPA at 60.  The court in

Orbisphere reasoned that the determinative factor between the use of "export

value" and "United States value" was whether the sale occurred within or outside

of the United States.  Orbisphere, 13 CIT at 876, 726 F. Supp. at 1351.  Though

acknowledging that the definitions of "export value" and "transaction value" are

not identical, the court concluded that they were sufficiently similar to both require

a "sale abroad for export to the United States."  Id. at 875, 726 F. Supp. at 1350–

51.

　　　This Court does not find Orbisphere persuasive due to its reliance on the

1933 Massce case pre-dating the relevant statutory amendments in the Trade

Agreements Act of 1979 that abandoned export value in favor of transaction value.

See Trade Agreements Act of 1979, Pub. L. No. 96-39, § 201(a), 93 Stat. 144,

194–201 (1979).  Significantly, this Court notes that the language of the current

statute does not expressly require that a sale be international or occur abroad.  The

1979 revision removed all references to foreign markets in which merchandise

might be traded.  As the Senate Committee on Finance noted in its report on the

Trade Agreements Act of 1979:

> The use of transaction value as the primary basis for customs valuation
> will allow use of the price which the buyer and seller agreed to in their
> transaction as the basis for valuation, rather than having to resort to the
> more difficult concepts of "freely offered," "ordinary course of trade,"

>"principal markets of the country of exportation," and "usual wholesale
>quantities" contained in existing U.S. law.

S. Rep. No. 96-249, at 119 (1979).  The U.S. Court of Appeals for the Federal

Circuit has also recognized that transaction value is a departure from the

complexities of export value.  See Generra Sportswear Co. v. United States, 905

F.2d 377, 381 (Fed. Cir. 1990); see also VWP of Am., Inc., 175 F.3d at 1334–35

(recognizing the difference between "export value" and "transaction value" and

that the Trade Agreement Act of 1979 effectively repealed the prior valuation

statute).

Moreover, Plaintiff's contention that a sale "for exportation to the United

States" requires an international sale or a sale abroad is contrary to existing case

law.  In VWP of America, Inc. v. United States, 175 F.3d 1327, 1338–39 (Fed. Cir.

1999), the U.S. Court of Appeals for the Federal Circuit considered a three-tier

system involving a Canadian manufacturer that sold fabric to its wholly-owned

United States subsidiary for resale to buyers within the United States.  VWP of

Am., Inc., 175 F.3d at 1331.  The VWP court held that the sales between the

Canadian manufacturer and United States distributor were sales for exportation to

the United States that served as the basis for transaction value, but noted that the

sales between the United States distributor and its domestic buyers could provide

an alternative basis for transaction value.  Id. at 1334.

Consol. Court No. 17-00154                                          Page 22

The Court concludes that 19 U.S.C. § 1401a(b)(1) does not require an international sale or sale abroad, but rather requires a sale for exportation to the United States based on a fact-specific analysis of the reality of the transaction.  As noted previously, the undisputed evidence establishes that at the time of sale when customers in the United States placed orders electronically with Plaintiff's sales representatives, the subject merchandise was located in Canada and was shipped from the Canadian warehouse to customers in the United States.  Thus, a sale for exportation to the United States occurred based on the undisputed facts.

Plaintiff argues that the Court should consider the intentions of Plaintiff and its customers in determining whether the sales were "for exportation to the United States."  See Pl.'s Br. at 23–24; Oral Arg. at 7:39–8:57, 1:01:10–1:01:30, Mar. 22, 2022, ECF No. 70.  Plaintiff cites the existence of the shipping term "FOB Buffalo, New York" printed on purchase orders as evidence of the intention of Plaintiff and its customers to engage in domestic sales.  See Pl.'s Br. at 23–24.

The term "FOB" means "free on board" and denotes a "method of shipment whereby goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of loss passes from seller to buyer." Litecubes, LLC v. N. Lights Prods., Inc., 523 F.3d 1353, 1358 n.1 (Fed. Cir. 2008). The U.S. Court of Appeals for the Federal Circuit has held that a sale does not necessarily occur at the location where the title to the goods passes under FOB

shipping terms, and that the location of a sale can be established by record
evidence notwithstanding an FOB shipping term.  See, e.g., SEB S.A. v.
Montgomery Ward & Co., Inc., 594 F.3d 1360, 1375 (Fed. Cir. 2010) (recognizing
in a patent infringement case that an FOB shipping term is not dispositive when
considering whether a sale took place inside or outside the United States, while
noting that examination of the record evidence is critical to determining where the
sale took place); MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon
Corp., 420 F.3d 1369, 1377 (Fed. Cir. 2005) (in a patent infringement case, finding
that a sale occurred in Japan when all the essential activities of a sale occurred
outside the United States and noting that despite an FOB delivery term, "the
criterion for determining the location of a 'sale' . . . is not necessarily where legal
title passes"); N. Am. Philips Corp. v. Am. Vending Sales, Inc., 35 F.3d 1576,
1579 (Fed. Cir. 1994) (noting that appellee failed to explain why the criterion for
where a sale occurred should be the place where legal title passes rather than the
"more familiar places of contracting and performance"); see also E.C. McAfee Co.,
842 F.2d at 319 (concluding that a lack of knowledge that goods were destined for
the United States by one party to a transaction was irrelevant when determining
whether transaction value was appropriate).  Accordingly, this Court does not
consider the existence of the delivery term "FOB Buffalo, New York" to be

dispositive evidence that sales of the subject merchandise were domestic and not for export to the United States.

The Court concludes that Plaintiff's emphasis on the term "FOB Buffalo, New York" is misplaced.  The record does *not* establish that Plaintiff's customers in the United States intended to make a domestic purchase because there is no evidence on the record that Plaintiff's customers were aware of the location of the products when placing their orders.  Similarly, Plaintiff contends that the shipping terms were "explicitly selected" but the record is silent on whether Plaintiff's customers negotiated the FOB Buffalo, New York terms of delivery.  Pl.'s Br. at 23.

The Court rejects Plaintiff's argument that inclusion of the term "FOB Buffalo, New York" is dispositive evidence that Plaintiff and its customers intended the sales to be domestic and not for export to the United States.  Because the undisputed facts establish that the subject merchandise was destined for the United States at the time of sale when the customers based in the United States first submitted their sales orders electronically to Plaintiff's Order Processing Department in Canada, the Court holds that the sales of the subject merchandise are "for exportation to the United States" pursuant to 19 U.S.C. § 1401a(b).

## II.      Deemed Liquidated By Operation of Law

Plaintiff contends that Customs' extensions of the liquidation deadline after

June 14, 2015 were unlawful and that entries subject to those extensions should be

deemed liquidated by operation of law pursuant to 19 U.S.C. § 1504.  Pl.'s Br. at

34–38.  Defendant opposes Plaintiff's liquidation contentions.  Def.'s Cross-Mot.

at 3; Def.'s Br. at 39–44.  The Court concludes that Customs' extensions of the

relevant deadlines were in accordance with the law and that the subject entries

should not be deemed liquidated by operation of law.

Merchandise entered for consumption not liquidated within one year of entry

are "deemed liquidated" by operation of law at the duty rate asserted by the

importer at the time of entry.  19 U.S.C. § 1504(a)(1).  Customs may extend the

deadline for liquidation for one year at the request of the importer of record or if

additional information is needed for a proper assessment or classification of the

merchandise.  Id. § 1504(b); 19 C.F.R. § 159.12(a)(1).

The Parties disagree as to what standard the Court should apply in reviewing

Customs' extensions of liquidation.  Defendant posits that the Court should apply

an abuse of discretion standard.  Def.'s Br. at 40.  Plaintiff contends that a plain

reading of 19 U.S.C. § 1504(b) does not confer discretion to Customs but

establishes an objective rule.  Pl.'s Reply Br. at 29.  Under Plaintiff's interpretation

of the statute, Customs has no discretion to extend the deadline for liquidation in

order to obtain additional information necessary for its appraisement.  Id. at 29–30.

　　　　Plaintiff's argument runs contrary to the precedent of this Court holding that

Customs' decisions regarding liquidation extensions are reviewed for arbitrariness

and abuse of discretion, and whether Customs acted in accordance with the law.

See Int'l Fid. Ins. Co. v. United States, 41 CIT __, __, 227 F. Supp. 3d 1353, 1362

(2017) ("This Court reviews the validity of Customs' liquidation extensions to

determine whether they are proper under the statute, and are not arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."

(internal quotation omitted)); Int'l Cargo & Sur. Ins. Co. v. United States, 15 CIT

541, 542, 779 F. Supp. 174, 176 (1991); Detroit Zoological Soc. v. United States,

10 CIT 133, 137–38, 630 F. Supp. 1350, 1356 (1986).  The only authority offered

by Plaintiff in support of its position is North Dakota v. United States, 480 F. Supp.

3d 917 (D.N.D. 2020), in which the U.S. District Court for the District of North

Dakota considered whether the Army Corps of Engineers was able to assert the

discretionary function exception as a defense to claims brought under the Federal

Tort Claims Act ("FTCA").  The FTCA provides a limited waiver of the

Government's sovereign immunity for claims seeking monetary damages for

injuries resulting from a negligent or wrongful act or omission by a Government

employee.  28 U.S.C. § 1346(b).  A statutory exception to this waiver is recognized

for claims based on a Government employee's exercise of or failure to exercise a discretionary function or duty.  Id. § 2680(a).  In determining whether the discretionary function exception was applicable, the district court noted that "if the statutes and regulations impose a mandatory obligation upon the government[,] there is no discretion to act contrary to or ignore such an obligation."  North Dakota, 480 F. Supp. 3d at 923.

The only relevant commonality between the FTCA claims considered by the U.S. District Court for the District of North Dakota and the issues currently before this Court is the presence of a Government action.  The Court is not persuaded that this minor similarity warrants deviating from well-established precedent.  There is no statutory ambiguity in Customs' discretion to determine how to best collect import duties or extend liquidation deadlines.  See St. Paul Fire & Marine Ins. Co. v. United States, 6 F.3d 763, 768 (Fed. Cir. 1993).  Accordingly, the Court reviews Customs' extensions of liquidation deadlines under the standard of whether Customs abused its discretion and acted in accordance with the law.  Int'l Fid. Ins. Co., 41 CIT at __, 227 F. Supp. 3d at 1362–63; Ford Motor Co. v. United States, 157 F.3d 849, 855 (Fed. Cir. 1998).  Plaintiff carries the burden of proving by a preponderance of the evidence that Customs abused its discretion in granting the extensions.  28 U.S.C. § 2639(a)(1); St. Paul Fire & Marine Ins. Co., 6 F.3d at 768–69.

Plaintiff contends that Customs had no reasonable basis for extending liquidation after June 14, 2015 because Plaintiff provided all requested information on or before June 14, 2014, and Customs' final appraisement calculation was based on Plaintiff's submissions from before June 14, 2014.  Pl.'s Br. at 34–36. Defendant argues that the extensions were justified because Customs required additional internal information in order to determine the appropriate method of appraisement and to liquidate the subject entries.  Def.'s Br. at 41–44.

"Information" under section 1504(b) includes "whatever is reasonably necessary for proper appraisement or classification of the merchandise involved." Detroit Zoological Soc., 10 CIT at 138, 630 F. Supp. at 1356.  In acquiring necessary information, Customs is not limited to information provided by the importer and may seek additional information internally.  Ford Motor Co., 157 F.3d at 856.  As this Court has previously noted, "[section] 1504(b)(1) should be construed sufficiently broadly for Customs to perform its obligations in a competent manner."  Int'l Cargo & Sur. Ins. Co., 15 CIT at 546, 779 F. Supp. at 179.

The Court observes that James Conrad, an auditor at the Port of Buffalo, New York, described Customs' audit process in his declaration.  Conrad Decl.  The auditor's fieldwork began on February 24, 2014 and continued to October 14, 2014.  Id. ¶¶ 8a, b, & f at 2–3; Def.'s SMF ¶ 89 at 14; Pl.'s Resp. at 16–17.

Documents were prepared by auditors based on fieldwork and reviewed by

Customs personnel.  Conrad Decl. ¶ 8f at 3.  Following review of the documents, a

senior auditor prepared an Audit Document Review Sheet on December 1, 2014.

Id. ¶¶ 8f–g at 3.  On March 10, 2015, an Audit Report Review Sheet was

completed to ensure that the report satisfied Customs' internal standards and

Generally Accepted Government Auditing Standards ("GAGAS").  Id. ¶ 8i at 3.

The report was then submitted to a Report Referencing Review to confirm its

accuracy, which was completed on April 1, 2015.  Id. ¶ 8j at 3–4.  A Field Quality

Assurance Program review was completed on April 8, 2015 to ensure compliance

with GAGAS.  Id. ¶ 8k at 4.  The Draft Audit Report was issued on July 1, 2015.

Draft Audit Report; Pl.'s SMF ¶ 36 at 8; Def.'s SMF ¶ 99 at 16; Def.'s Resp. at 10;

Pl.'s Resp. at 18.  Plaintiff provided its reply to the Draft Audit Report on July 8,

2015.  Pl.'s Resp. Draft Audit Report; Pl.'s SMF ¶ 37 at 8; Def.'s SMF ¶ 100 at 16;

Def.'s Resp. at 10; Pl.'s Resp. at 18.  On August 20, 2015, Plaintiff requested

internal advice from Customs' Office of Regulations and Rulings pursuant to 19

C.F.R. § 177.11 with respect to the proper basis of appraisement for the subject

merchandise.  Def.'s Request for Internal Advice; Def.'s SMF ¶¶ 103–04 at 16;

Pl.'s Resp. at 19.  The Final Audit Report was issued on February 24, 2016.  Final

Audit Report; Pl.'s SMF ¶ 39 at 8; Def.'s SMF ¶ 101 at 16; Def.'s Resp. at 10–11;

Pl.'s Resp. at 19.  Customs Headquarters Ruling H275056 was issued on July 1,

2016.  HQ H275056; Pl.'s SMF ¶ 40 at 9; Def.'s Resp. at 11.  The subject entries

were liquidated between April and October 2016.  Def.'s SMF ¶ 116 at 18; Pl.'s

Resp. at 22.

     Plaintiff characterizes Customs' review as a "lassitude" or "prolonged

internal deliberation."  Pl.'s Br. at 38.  While extensions solely for the purpose of

excusing or facilitating prolonged periods of inaction or actions unrelated to

appraisement might be an abuse of discretion, see Ford Motor Co., 157 F.3d at

855–57, the record reflects that Customs was actively engaged throughout the audit

process in collecting and reviewing the information needed to determine the proper

method of appraisement.  The fact that Customs' final determination and

calculations appear to be based mainly on information obtained early in the audit

process does not support a conclusion that Customs abused its discretion or acted

contrary to law by granting extensions to collect information, to confirm the

accuracy of that information, or to verify the appropriateness of the application.

Because Customs had a reasonable basis for extending liquidation in order to

complete the audit process, ensure its accuracy, and comply with established

standards, the Court concludes that Customs acted in accordance with the law and

did not abuse its discretion.  The Court holds that the subject entries should not

have been deemed liquidated by operation of law pursuant to 19 U.S.C.

§ 1504(a)(1).

# CONCLUSION

The Court holds that there are no genuine issues of material fact in dispute regarding whether Plaintiff's import transactions were sales for exportation to the United States and whether certain entries became deemed liquidated by operation of law. Partial summary judgment is therefore appropriate as a matter of law. Upon consideration of Plaintiff's Motion for Partial Summary Judgment, Defendant's Cross-Motion for Partial Summary Judgment, and all other papers and proceedings in this action, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment, ECF No. 56, is denied; and it is further

**ORDERED** that Defendant's Cross-Motion for Partial Summary Judgment, ECF No. 61, is granted as it pertains to Plaintiff's transactions qualifying as sales "for exportation to the United States" under 19 U.S.C. § 1401a(b) and to the subject entries not having been deemed liquidated by operation of law; and it is further

**ORDERED** that the remaining issues relating to the proper methods of valuation are reserved for Phase Two and that the Parties shall submit a joint status report and scheduling order by June 21, 2022 regarding Phase Two of this action.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:   May 20, 2022
         New York, New York